UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

* * * * * * * * * * * * * * * * * * * * * * * * * * *

VIRGINIA PRUST, individually and
as Special Administrator on behalf
of the Estate of Valmore Prust,

     Plaintiff,

-vs-                       Case No. 14-CV-143-WMC

WEYERHAEUSER COMPANY         Madison, Wisconsin
and METROPOLITAN LIFE        **December 3, 2015**
INSURANCE COMPANY,           **9:10 a.m.**

     Defendants.

* * * * * * * * * * * * * * * * * * * * * * * * * * *

JANET PECHER, individually and
as Special Administrator on behalf
of the Estate of Urban Pecher,

     Plaintiff,

 -vs-                      Case No. 14-CV-147-WMC

WEYERHAEUSER COMPANY,
3M COMPANY, and METROPOLITAN
LIFE INSURANCE COMPANY,

     Defendants.

* * * * * * * * * * * * * * * * * * * * * * * * * * *

STENOGRAPHIC TRANSCRIPT OF DAUBERT MOTION HEARING
    HELD BEFORE CHIEF JUDGE WILLIAM M. CONLEY

Lynette Swenson  RMR, CRR, CBC
U.S. District Court Federal Reporter
United States District Court
120 North Henry Street, Rm. 520
Madison, Wisconsin  53703
608-255-3821

```
 1   * * * * * * * * * * * * * * * * * * * * * * * * * *

 2   JANICE SEEHAFER, individually and
     as Special Administrator on behalf
 3   of the Estate of Roger Seehafer,

 4          Plaintiff,

 5    -vs-                          Case No. 14-CV-161-WMC

 6   WEYERHAEUSER COMPANY,

 7          Defendant.

 8   * * * * * * * * * * * * * * * * * * * * * * * * * *

 9   KATRINA MASEPHOL, Individually
     and as Special Administrator on
10   behalf of Richard Masephol,

11          Plaintiff,

12    -vs-                          Case No. 14-CV-186-WMC

13   WEYERHAEUSER COMPANY,
     3M COMPANY, and METROPOLITAN
14   LIFE INSURANCE COMPANY,

15          Defendants.

16   * * * * * * * * * * * * * * * * * * * * * * * * * *

17   WESLEY and THERESA SYDOW,

18          Plaintiffs,

19    -vs-                          Case No. 14-CV-219-WMC

20   WEYERHAEUSER COMPANY,
     3M COMPANY, and METROPOLITAN
21   LIFE INSURANCE COMPANY,

22          Defendants.

23   * * * * * * * * * * * * * * * * * * * * * * * * * *

24

25
```

```
1   * * * * * * * * * * * * * * * * * * * * * * * * * *

2   MILTON and KATHY BOYER,

3          Plaintiffs,

4    -vs-                           Case No. 14-CV-286-WMC

5   WEYERHAEUSER COMPANY,
    3M COMPANY, and METROPOLITAN
6   LIFE INSURANCE COMPANY,

7          Defendants.

8   * * * * * * * * * * * * * * * * * * * * * * * * * *

9   DIANNE JACOBS, individually and
    as Special Administrator on behalf
10  of Rita Treutel,

11         Plaintiff,

12   -vs-                           Case No 12-CV-899-WMC

13  RAPID AMERICAN CORPORATION
    and WEYERHAEUSER COMPANY,
14
           Defendants.
15
16  * * * * * * * * * * * * * * * * * * * * * * * * * *

    BRIAN HECKEL, Individually and
17  as Special Administrator on behalf
    of Sharon Heckel,
18
           Plaintiff,
19
     -v-                            Case No. 13-CV-459-WMC
20
    CBS CORPORATION, GENERAL
21  ELECTRIC COMPANY, METROPOLITAN
    LIFE INSURANCE COMPANY,
22  and WEYERHAEUSER COMPANY,

23         Defendants.

24  * * * * * * * * * * * * * * * * * * * * * * * * * *

25
```

```
1   APPEARANCES:

2   For the Plaintiff:
                    Motley Rice
3                   BY:  NATHAN FINCH
                        JOHN HERRICK
4                   3333 K St. NW, Ste. 450
                    Washington, DC  20007
5
                    Cascino & Vaughn Law Offices, Ltd.
6                   BY:  ROBERT MCCOY
                    220 South Ashland Avenue
7                   Chicago, Illinois  60607

8                   Galiher DeRobertis Waxman
                    BY:  ANTHONY CARR
9                        ALYSSA SEGAWA (telephonically)
                    610 Ward Avenue
10                  Honolulu, Hawai'i  96814-3308

11  For Defendant Weyerhaeuser Company:
                    Forman Watkins Krutz & Tardy, LLP
12                  BY:  JOSHUA METCALF
                        TANYA ELLIS
13                      C. MITCH MCGUFFEY
                        T. BENTON YORK
14                  200 South Lamar Street, Ste. 100
                    Jackson, Mississippi 39201
15
    For Defendant 3M Corporation Company:
16                  Segal McCambridge Singer Mahoney, Ltd.
                    BY:  JASON ECKERLY
17                  233 South Wacker Drive, Ste. 5500
                    Chicago, Illinois  60606
18
    For Defendant Metropolitan Life:
19                  von Briesen & Roper
                    BY: SMITHA CHINTAMANENI
20                  411 East Wisconsin Avenue, Ste. 1000
                    Milwaukee, Wisconsin  53201
21                  (appearing telephonically)

22

23

24

25
```

1                          I-N-D-E-X

2    PLAINTIFFS' WITNESSES          EXAMINATION          PAGES

3    HENRY ANDERSON          Cross by Ms. Ellis          40-90
                             Redirect by Mr. Finch       91-132
4                            Recross by Ms. Ellis        133-138
     FRANK PARKER            Cross by Mr. Metcalf        140-166
5                            Redirect by Mr. Finch       169-198
                             Recross by Mr. Metcalf      199-200
6                            Further redirect Mr. Finch  201-201

7

8

9                          * * * * *

10        (Proceedings called to order.)

11             THE CLERK:  Case Number 14-CV-161, *Roger*

12   *Seehafer v. Weyerhaeuser Company and others*.  Case

13   Number 14-CV-286, *Milton Boyer and others v.*

14   *Weyerhaeuser Company and others*.  Case Number 14-CV-186,

15   *Richard Masephol v. 3M Company and others*.  Case Number

16   14-CV-143, *Virginia Prust v. Weyerhaeuser Company and*

17   *others*.  Case Number 14-CV-147, *Janet Pecher v.*

18   *Weyerhaeuser Company and others*.  Case Number 14-CV-219,

19   *Wesley Sydow v. Weyerhaeuser Company and others*.  Case

20   Number 12-CV-899, *Dianne Jacobs v. Owens-Illinois, Inc.*

21   *and others*.  Case Number 13-CV-459, *Brian Heckel v. 3M*

22   *Company and others* called for a Daubert hearing.

23        May we have the appearances, please.

24             MR. FINCH:  Good morning, Your Honor.  Counsel.

25   My name is Nate Finch.  I'm with Motley Rice.  My

1   colleagues, John Herrick and Meredith Clark, are here as

2   well.

3   　　　　MR. HERRICK:  Morning, Your Honor.

4   　　　　MR. FINCH:  And we also have Mr. Robert McCoy

5   and Allen Vaughn from the Casino Vaughn law firm on

6   behalf of the plaintiffs.

7   　　　　MR. MCCOY:  Morning.

8   　　　　MR. CARR:  Good morning, Your Honor.  Anthony

9   Carr on behalf of plaintiffs as it relates to claims

10  against the 3M Company.

11  　　　　THE COURT:  And there wasn't enough seats for

12  you up here?  Was that the problem?

13  　　　　MR. CARR:  I would be more than glad to join

14  the bar.

15  　　　　THE COURT:  I think you should if you intend to

16  actually speak at this hearing.

17  　　　　MR. CARR:  I will not be speaking.

18  　　　　THE COURT:  So your appearance is simply for

19  that purpose.

20  　　　　MR. CARR:  Yes.

21  　　　　THE COURT:  All right.

22  　　　　MR. METCALF:  Your Honor, Joshua Metcalf for

23  Weyerhaeuser.  Also have Tanya Ellis --

24  　　　　MS. ELLIS:  Morning, Your Honor.

25  　　　　MR. METCALF:  -- Mitch McGuffey and Benton

1  York.

2          THE COURT:  All right.  I'm sorry, were there

3  other appearances?

4          MR. ECKERLY:  One more appearance.  Jason

5  Eckerly for 3M Company.

6          THE COURT:  All right.  I welcome you all.  I

7  believe we may have someone on the -- on my bench phone,

8  which may have been overkill because I don't know that

9  we're going to have video conferencing this morning.

10 Perhaps we are.  But just so there's an indication,

11 perhaps you could unmute anyone on the phone and

12 indicate for my benefit, if not for the court reporter,

13 who you are.

14         MS. CHINTAMANENI:  Good morning, Your Honor.

15 Smitha Chintamaneni on behalf of Metropolitan Life

16 Insurance Company.

17         THE COURT:  All right.  Very good.

18         MS. SEGAWA:  Morning, Your Honor.  This is

19 Alyssa Segawa (unintelligible).

20         THE COURT:  All right.  It's -- you're not

21 appearing for the record but I appreciate your

22 identifying yourself for the benefit of the Court.  As I

23 say, because there was a plan, whether we need it or not

24 for video testimony, you're on the bench phone, but

25 you're welcome to listen in as long as you keep your

8

1   mute button on.

2        With that said, welcome all those who are here in

3   court today and want to make clear what it is you're

4   attempting to accomplish.  You don't have to poise to

5   stand yet, but I'll give you an opportunity to speak

6   briefly.  I'm not sure, since it's not your motion, that

7   you'll be the first to speak, which is why I

8   particularly want to indicate, Mr. Finch, that there's

9   no need to be poised.

10       With that said, we are here on a motion by

11  Defendant Weyerhaeuser under Rule 7 –– Rule of Evidence

12  702 and Daubert to exclude certain plaintiffs' expert

13  witnesses:  Frank Parker, Henry Anderson, and Jerrold

14  Abraham, the latter two being I guess at least Ph.D.s,

15  actually maybe both are medical doctors, and I wanted to

16  try to focus the discussion, and I am going to allow

17  some brief discussion to begin with before we hear any

18  testimony, and also to suggest that if there's going to

19  be any value to this hearing, and I'm not sure there

20  will be, but if there's any value to this hearing, it's

21  because the parties will actually join in issue over

22  what it is is being complained about with respect to

23  plaintiffs' experts.  There's an element of –– I don't

24  mean this as pejoratively as it may sound –– but cookie

25  cutter nature to the briefing.  It doesn't very well

1  focus on the specifics of the testimony that you're

2  hoping to exclude.  I am unsympathetic, although I'll

3  certainly hear argument to a position by Weyerhaeuser,

4  that the plaintiffs' experts are not qualified experts.

5  I think their qualifications speak for themselves and

6  they are expert in their respective fields and so they

7  qualify in that sense under Daubert.

8       I also think that there are any number of opinions

9  that they express that would be very hard to challenge

10 under Daubert because they are straightforward

11 propositions.  So the real question -- it seems to me

12 the only material issue that Weyerhaeuser can be

13 pointing to, although their briefs are broader, is

14 whether or not these experts can speak to liability for

15 the marginal impact.  And again, I don't suggest that it

16 may not have been a real impact or a meaningful impact,

17 particularly for those who are here on behalf of the

18 deceaseds who suffered a serious injury and suffered it

19 for many years.  But the only real question is is it --

20 is the testimony probative of causation and of

21 liability.  It seems to me that there's two ways in

22 which that's true, either because the opinion goes to

23 proof of substantial exposure from the asbestos or

24 related material or proof of substantial impact.  And

25 I'm not sure there's any testimony -- and this maybe is

1   for the plaintiff, the plaintiffs' benefit -- I'm not

2   sure there's any testimony here, expert testimony, and

3   that's all we're dealing with at this stage, of

4   substantial impact.  There is testimony of exposure.

5   I'm not even sure there is testimony of substantial

6   exposure.  It depends on how the Court ultimately cuts

7   sort of unsettled case law and I would prefer today to

8   not get bogged down in the case law but rather just to

9   focus on what exactly it is Weyerhaeuser wants to strike

10  from each of the witnesses' reports.

11       And by way of preliminary discussion then, I'll

12  turn to Weyerhaeuser whose motion it is to -- you can

13  have 10 to 15 minutes to try to inform the Court as to

14  exactly what it is that you think needs to be excluded,

15  understanding that I am strongly disinclined to

16  wholesale exclude testimony by these experts.  I don't

17  know who's going to speak on behalf of Weyerhaeuser.

18            MR. METCALF:  Your Honor, one second.  Joshua

19  Metcalf for Weyerhaeuser and I'll address the Court's

20  overarching points and then speak specifically to

21  Mr. Parker.

22       As Your Honor noted, this case has been narrowed to

23  a nuisance case and that's really all that's left with

24  respect to Weyerhaeuser is this nuisance.

25            THE COURT:  I am aware of that.  And again,

1  we're not going to have a summary judgment argument.

2          MR. METCALF:  Yes, Your Honor.

3          THE COURT:  I want to know what is it

4  specifically that you believe should be struck from each

5  of the expert reports.

6          MR. METCALF:  Okay.  Our real problem with

7  Mr. Parker's expert reports is that he gives opinions

8  that are too far disconnected from the facts at issue.

9  I'm not going to argue the case law, but just pointing

10  the court to *Textron*, which I think is the most recent

11  pronouncement of the Seventh Circuit on Daubert.

12          THE COURT:  You know, we're not going to take

13  all day.

14          MR. METCALF:  Yes, Your Honor.

15          THE COURT:  And you can assume that I

16  understand the Daubert standards and you can assume that

17  I understand the current unsettled nature of the case

18  law with respect to nuisance claims.  I will tell you I

19  remain skeptical as to a private nuisance claim, but it

20  seems like a public nuisance claim may be available

21  under the case law.

22      If what you're telling me is you just think this is

23  not relevant because it's too far afield, as you say,

24  that's not really helpful to me because there's some

25  parts of this surely that you agree is relevant.  What

1  would be helpful to me, and I'll say it one last time,

2  is what specific opinions you're looking to strike.

3       MR. METCALF:  Your Honor, we're -- I'm trying

4  to find the right way to say this.  His -- Mr. Parker's

5  conclusions that every plaintiff was exposed to asbestos

6  in the community air and that exposure was significant,

7  those are too far removed from the studies that are out

8  there, from the testing that was there --

9       THE COURT:  Okay.  I'm trying to find where is

10  he testifying that -- where in his opinions does he say

11  that every exposure was significant?

12       MR. METCALF:  And Your Honor, I'm not -- I'm

13  not talking about every exposure.

14       THE COURT:  But that's what you just said.

15  Look it.  I'm trying to -- I'm trying to give you a

16  ruling on this motion.

17       MR. METCALF:  Right.

18       THE COURT:  I can't do it unless -- there are

19  14 opinions expressed and those are all he'll testify to

20  at trial.  He'll be limited to his report.  So are there

21  any one of those 14 that you can point to that need to

22  be excluded because they don't satisfy 702 or Daubert?

23  Again, my point is not to put you on the spot, although

24  I realize I've done that.  My point is I've got these

25  generic motions and I know where you want to get to,

1   which is ultimately at summary judgment to argue that

2   there wasn't adequate proof of liability and

3   particularly of causation and I know where that is.  But

4   that's not what you did.  You moved on Daubert saying

5   that this person can't testify at all because it doesn't

6   meet the standards of science or relevance to the case.

7   I'm looking at these opinions and they strike me as

8   yeah, they're all relevant, marginally perhaps in many

9   of the cases, but they all appear relevant.  So I can't

10  grant you anything under Daubert.

11          MR. METCALF:  Your Honor, so there are several

12  important things, like the fact that Mr. Parker had his

13  people do testing of homes in the community to search

14  for asbestos.  Those test results all came back

15  negative.  They never --

16          THE COURT:  Surely you're not going to oppose

17  to him testifying to that.

18          MR. METCALF:  No, Your Honor.  But for him to

19  then take the leap --

20          THE COURT:  What's the leap?  What do you think

21  he leapt to?  I still haven't -- you haven't pointed to

22  one of the opinions in which he leapt anywhere.

23          MR. METCALF:  And Your Honor, let me -- you

24  said you did put us on the spot and I apologize for not

25  being prepared to say 1, 2, 3, these are the exact ones

1    that you want to strike.

2            THE COURT:  And that's what I guess I'm really

3    getting at is your motion is just too general.  If you

4    had a goal here, you should have arrived with it, which

5    was something more than this person isn't expert or the

6    quality of his research wasn't sufficient generally.

7    I'm sorry, I'm just really having trouble with what the

8    *there* is.

9            MR. METCALF:  Your Honor, we believe that the

10   case law requires a connection between his opinions and

11   his research.  So when he doesn't have any testing that

12   shows the presence of asbestos in anyone's house, when

13   he doesn't have any modeling to show how asbestos would

14   have gone from this plant into the community, when --

15           THE COURT:  Well, that's not entirely true he

16   doesn't have any modeling.  But let's leave that aside

17   for the moment.  His first opinion is persons handling

18   or distributing -- disturbing, excuse me, raw asbestos

19   and the fire door cores were significantly

20   occupationally exposed to asbestos fibers.  You surely

21   can't want to oppose that opinion.

22           MR. METCALF:  We don't, Your Honor.  We don't.

23           THE COURT:  All right.  So he's going to

24   testify.  In fact, that's an opinion you propound.

25           MR. METCALF:  Right.  That's not --

1            THE COURT:  All right.  So his second opinion

2    that persons who simply trans- -- it's transited or

3    temporarily worked, I'm not even sure if that's the

4    proper word, but let's go with transited or temporarily

5    worked in the door areas of the old mill or new core

6    mill were significantly occupationally exposed.  Again,

7    no problem; right?

8            MR. METCALF:  We do not dispute that, Your

9    Honor.

10           THE COURT:  All right.  Persons who worked in

11   or transited the fire door areas of the old mill and/or

12   new core person's and clothing were significantly

13   contaminated.  Again, no problem.  You're not liable for

14   that.

15           MR. METCALF:  Right, Your Honor.

16           THE COURT:  Okay.  4.  People who were simply

17   on the plant site were most likely exposed to asbestos

18   in significant concentrations.  No problem.

19           MR. METCALF:  Correct, Your Honor.

20           THE COURT:  Contaminated workers were allowed

21   to leave the plant which spread asbestos into their

22   vehicles, homes and communities.  Certainly you can't

23   disagree with that as a proposition, a scientific

24   proposition, that this expert is qualified to opine

25   that.

1          MR. METCALF:  As a general proposition you're

2    right, Your Honor.

3          THE COURT:  6.  The community was frequently

4    and routinely contaminated with asbestos as a result of

5    plant emissions and transportations.  This contamination

6    was most likely the greatest between World War II and

7    the advent of OSHA regulations in early 1970's.  The

8    Court's view, looking at the background that he's

9    provided, is that he is qualified to express that

10   opinion.  Doesn't get to your point about the specific

11   concentrations or an individual home, but he can testify

12   to 6 as well; right?

13         MR. METCALF:  And Your Honor, our problem with

14   that is his broad brush on the frequently routinely

15   contaminated.  He is not offering anything more on that

16   point than just rehashing what plaintiffs have testified

17   to or witnesses have testified to.  There's no

18   specialized knowledge that he's offering on this.

19         THE COURT:  Well, at least now we're getting

20   down to the rough of it.  All right.  So your concern is

21   that he is not qualified, based on his background and

22   experience, as well as his knowledge of this particular

23   plant and the movement of individuals from a plant like

24   this to testify generally that a community -- the

25   community in which this plant was located, Marshfield,

1  Michigan --

2          MR. METCALF:  Wisconsin, Your Honor.  It was a

3  typo in his --

4          THE COURT:  I'm sorry, Marshfield, Wisconsin.

5  Oh, that's his typo.  That makes more sense since here

6  we are in Wisconsin.  Marshfield, Wisconsin, which

7  frequently and routinely contaminated with asbestos or

8  was contaminated with asbestos out of this plant.

9  You're saying that that's not something that he could

10  opine on.

11          MR. METCALF:  That's correct, Your Honor.

12  Because he didn't model, because he didn't test, and

13  he's admitted in his deposition that he has not come up

14  with any levels or any predictions of what those would

15  be out in the community.

16          THE COURT:  All right.  7.  Household members

17  who lived and/or visited houses where workers or others

18  contaminated were exposed to airborne asbestos

19  concentrations in excess of typical ambient

20  concentrations.  Is that -- you're objecting to that as

21  well?

22          MR. METCALF:  So we have two problems with

23  that, Your Honor, and the reasons that we don't believe

24  he should be able to testify to that is that one, he

25  doesn't know the background levels in Wisconsin.  He's

1    admitted that.

2        Number two, when you're talking in the context of

3    nonplaintiff employees, so I would call this sort of the

4    typical household claim as distinguished from the

5    employee bringing it home on their own clothes, he did

6    nothing to evaluate the amount of asbestos that that

7    family member would have been exposed to at work and

8    then brought home on their clothes.  And we think that's

9    an important thing.  He's got to quantify not just hey,

10   there was asbestos there, it had to come home on the

11   family members' clothes, but he's got to give some kind

12   of estimate, some kind of idea of the amount of asbestos

13   that would have been brought home.  And there are

14   several situations where in his deposition he admitted

15   that he didn't know what the asbestos exposure of that

16   family member would have been at work.

17            THE COURT:  Okay.  I get it.

18            MR. METCALF:  Okay.

19            THE COURT:  All right.  8.  Individuals who

20   drove or were passengers in vehicles contaminated by

21   contaminate workers and others would most likely have

22   been likely exposed to airborne asbestos concentrations

23   in excess of typical ambient concentrations.

24            MR. METCALF:  And our --

25            THE COURT:  And your main problem essentially

1 is that he doesn't tie that out to these vehicles, the

2 vehicles of the plaintiffs.

3          MR. METCALF:  Correct, Your Honor.

4          THE COURT:  I should say the deceased plaintiff

5 or the deceaseds.  Household members who handle

6 contaminated clothing were most likely and frequently

7 exposed to airborne asbestos concentrations in excess of

8 typical ambient concentrations.  Same problem.

9          MR. METCALF:  Yes, Your Honor.  And the second

10 half as well.

11          THE COURT:  Goes to washed contaminated clothes

12 were frequently exposed.

13          MR. METCALF:  Yes, Your Honor.  You've got to

14 know what the levels were on the clothing to know

15 whether the person washing it is going to be exposed or

16 to what level they would be exposed.

17          THE COURT:  All right.  Significant plant,

18 house and community asbestos contamination persisted for

19 many years after cessation.

20          MR. METCALF:  No documentation to back that up.

21 No testing.  In fact, the testing goes the opposite way.

22          THE COURT:  11.  You have the same -- what's

23 your -- the same basic objection?

24          MR. METCALF:  Yes, Your Honor.  He admitted

25 that he didn't do any kind of modeling of what came off

1  of the trucks, how much went in the truck, what kind of

2  exposure that would have been.  In previous cases, he

3  has done testing along the roads to the dumps, tested

4  the attic dust, and said oh, I found asbestos in the

5  attic dust and that let's me know that asbestos was

6  coming off these dump trucks.  There's none of that in

7  this case.

8          THE COURT:  All right.  Is warning even an

9  issue anymore?  12?

10          MR. METCALF:  No, Your Honor.  I don't believe

11  it is.

12          THE COURT:  All right.  I'll confirm that with

13  the plaintiff.  13.

14          MR. METCALF:  I don't think that's at issue

15  anymore either.

16          THE COURT:  I wouldn't think so either, but

17  we'll find out.  And I think 14 is not an issue anymore.

18          MR. METCALF:  Correct.

19          THE COURT:  All right.  Anything more you wish

20  to add just for the purpose of opening statement?

21          MR. METCALF:  No, Your Honor.

22          THE COURT:  All right.  Then --

23          MR. METCALF:  With the one caveat that's the

24  Parker piece of it and I assume you want to take the

25  Parker piece and then take the doctor piece later.

1        THE COURT:  Only because it may move this

2   matter along, I'm going to agree with you.  And I'll

3   hear from plaintiffs' counsel.

4        MR. FINCH:  Your Honor, Dr. Anderson is here

5   and is only available until lunch time, so I'd

6   respectfully request that we take him up.

7        THE COURT:  I'm not sure either one of them is

8   going to take that much time.  But with that said, let

9   me hear your --

10        MR. FINCH:  Sure.

11        THE COURT:  Well, let's do it this way then:

12   Let me hear your response, what it is you're complaining

13   about with Dr. Anderson's testimony.

14        MS. ELLIS:  Good morning, Your Honor.  Tanya

15   Ellis for Weyerhaeuser.  There's two components for

16   Dr. Anderson.  The first is, as the Court has noted,

17   because these are former employees of this plant, the

18   plaintiffs have to untangle these various exposures such

19   that a jury can parse them out and possibly attribute

20   causation and fault to the nonoccupational pieces.

21   Dr. Abraham has testified that he cannot do that.  The

22   plaintiffs were exposed to dust from their own work

23   clothes that they brought home from the plant as a

24   result of their work there.  They were exposed to that

25   dust in their car and in their home.  And in several of

22

1   these cases, Your Honor, that's the only component to

2   the household exposure involved.  In fact, in three of

3   the cases.

4        Now, there's five cases that involve exposure from

5   the employees' own work clothes as well as alleged

6   exposure from a family member's work clothes.

7   Dr. Anderson testified he cannot separate those two

8   things and that the exposure in the home occurred to

9   whatever combined asbestos was there from the employees'

10  clothes and whatever else came in.  And he said that

11  there is no scientific basis for parsing those two

12  things.  So to the point of being able to unravel

13  these exposures in any meaningful way, Dr. Anderson's

14  opinions would not be relevant to that point.

15       The second piece for Dr. Anderson is specific

16  causation.  That is the crux of his opinions in these

17  cases is to take Mr. Parker's report and testimony on

18  emissions and dust at the plant and those sorts of

19  things and tie that to the plaintiffs' nonspecific

20  causation opinions.  And he did that in each case.  And

21  in each case, Dr. Anderson opined that the cumulative

22  exposure that each of these plaintiffs had caused their

23  disease; that their cumulative exposure was comprised of

24  three components of --

25            THE COURT:  I get it.

1          MS. ELLIS:  -- occupational, household,

2     environmental.  And he cannot give a value to, he cannot

3     quantify in any way the nonoccupational pieces.

4          THE COURT:  All right.

5          MS. ELLIS:  One other point is in light of the

6     fact that he also testified that the occupational

7     exposures in each case were sufficient alone to have

8     caused these diseases.

9          THE COURT:  I get it.  Anything more?

10          MS. ELLIS:  And the last piece I will say is

11     there is a pretty significant methodology piece in the

12     reliance on epidemiological studies that Dr. Anderson is

13     relying on for the entire basis of his opinion and these

14     are studies that relate to other factories and mines in

15     other countries where individuals were identified with

16     no other known exposure other than living in an area

17     near these facilities or mines.  They specifically

18     excluded occupational folks.  And so to take --

19          THE COURT:  But isn't that -- how else would

20     you show marginal causation then if you excluded

21     everything else?

22          MS. ELLIS:  Well, these studies might be

23     relevant to a general causation point to show in certain

24     circumstances mesothelioma can develop in a community

25     setting when there are no other known exposures.

1   However, there are no studies demonstrating causation in

2   cases like we have here where the plaintiffs have

3   multiple layers of exposure.

4          THE COURT:  But that's just really making your

5   same point over again.  What I'm asking is how else

6   through studies of exposures like those claimed here,

7   which do not include these additional exposures, would

8   one prove a particular impact?

9          MS. ELLIS:  It would be through a comparison of

10  the exposures that those individuals in the studies

11  experienced to the individuals in our cases.  Compare

12  the facilities there to our facility.  And Dr. Anderson

13  expressly testified he made no such comparison.  I think

14  the quote is the differences between the facilities

15  didn't matter to me.  He simply looked at those studies

16  for incidence of disease in the community and took that

17  and put it on top of Marshfield without connecting the

18  two.

19         THE COURT:  And I take it that Mr. Parker

20  doesn't do that either.

21         MS. ELLIS:  No, Your Honor.

22         THE COURT:  All right.  Anything further?

23         MS. ELLIS:  No.  Thank you.

24         THE COURT:  Very good.  Then I will hear from

25  you, Mr. Finch.  I know you've been eager to speak and I

1  would like to address both Parker and Anderson, if we

2  could.

3          MR. FINCH:  Yes.

4          THE COURT:  I'll let you decide in what order.

5          MR. FINCH:  What this --

6          THE COURT:  Oh.  We're going high tech right

7  away.

8          MR. FINCH:  No doubt about it.  At the end of

9  the day, Your Honor, this case involves an overlay of

10  Wisconsin substantive causation law and Daubert.

11          THE COURT:  I really don't care to be lectured

12  on Daubert or on causation law.  I spend a fair amount

13  of time with those issues.  I would really like to get

14  to the heart of the motion before the Court.

15          MR. FINCH:  The heart of the testimony is they

16  keep saying quantify, quantify, quantify.  There is no

17  requirement in medicine, there is no requirement --

18          THE COURT:  Well, that's not before me.  What's

19  before me is whether or not there is --

20          MR. FINCH:  A reliable --

21          THE COURT:  -- a basis, a scientific basis for

22  your two experts -- and now we're just talking about the

23  two, we'll hold off on the third, Mr. Abraham, and see

24  if we need to hear from him.  We're talking about those

25  two and whether or not they had a basis to express their

1 opinions.  The argument is that as to opinion 6, all

2 Mr. Parker -- and I'll start with him since you haven't

3 started with one or the other -- all he is doing is

4 repeating factual testimony.  He's not actually opining

5 as an expert at all, and if he is, has no basis to do

6 so.

7            MR. FINCH:  Okay.  The basis that he has to

8 give an opinion about what a fact witness testifies to,

9 a fact witness testifies --

10            THE COURT:  I know what a fact witness

11 testifies to.  What's his basis --

12            MR. FINCH:  His basis is --

13            THE COURT:  -- for opining that the community

14 was frequently and routinely contaminated with asbestos

15 as a result of plant emissions and transportation of

16 asbestos out of this plant?  That is to say, the -- I

17 guess I don't know how you -- do you refer to it as the

18 Roddis Plywood plant?  The Weyerhaeuser plant?  What's

19 your --

20            MR. FINCH:  Weyerhaeuser plant.

21            THE COURT:  I figured you'd want to go with

22 that.  Better for the jury.  So out of the Weyerhaeuser

23 plant.

24            MR. FINCH:  Out of the Weyerhaeuser -- his

25 basis is what he knows about how asbestos fiber moves

1  through the environment from his 40 years of experience

2  in being an industrial hygienist who has studied

3  asbestos --

4         THE COURT:  The complaint is that yes, he knows

5  those things and he can testify generally that this is

6  how it works generally.  But he can't say out of the

7  plant because he does not know how it spread from this

8  particular plant.  He can testify that generally this is

9  how a plant like this disseminates or contaminates a

10 community with asbestos, but he can't speak to what this

11 particular plant did because he didn't do any studies of

12 this particular plant.

13        MR. FINCH:  That's almost always the case, Your

14 Honor.  But here we have actually a --

15        THE COURT:  Okay.  So you're fine with him

16 being limited to general testimony about how a plant of

17 this kind generally contaminates a community.  That's as

18 far as he's going to respond.

19        MR. FINCH:  Well, he has specific facts for

20 each person as well.

21        THE COURT:  That's what I'm asking.  Well,

22 that's not what -- again, I want to focus both sides.

23 I'm ruling on opinions here.  I'm not ruling on the

24 overarching testimony.  Whether or not he can express

25 certain opinions, 6 -- and I'd really encourage you to

1    look at 6 -- does not say anything about the individual

2    plaintiffs.  It's a general statement.  And as I

3    understand it, the complaint is that he can't opine as

4    to what happened with respect to this community and this

5    plant based on a general understanding of what happens

6    in communities generally.

7            MR. FINCH:  But he can because he has some

8    historical measurements of asbestos fiber concentrations

9    out in the world in the 70's that they did and he knows

10   based on that that that's a significant level of

11   asbestos exposure in the air from memorandum and testing

12   done.  That's a point test which --

13           THE COURT:  I'm with you and I follow that.

14           MR. FINCH:  -- rarely occurs.  He did a

15   separate report for each plaintiff where he talks

16   about --

17           THE COURT:  You keep trying to get to each

18   plaintiff and we're not there yet.

19           MR. FINCH:  Okay.  Fine.  On the general thing,

20   he has historical testing.  He has his knowledge of

21   asbestos fiber drift.  He has his dust dispersion

22   studies that he's done.  He knows that you have these

23   historical measurements.  He knows that people are

24   talking about dust, moving from an asbestos -- that was

25   used in an asbestos facility out in dump trucks

1    throughout the community.

2         An industrial hygienist --

3         THE COURT:  What you're saying is he can at

4    least rely on those other statements in support of this

5    opinion, on top of the actual investigation or the

6    actual data that was available from this plant.

7         MR. FINCH:  Correct.

8         THE COURT:  Anything else?

9         MR. FINCH:  And he can also say that this

10   situation is not unique.  This kind of thing happens,

11   and he can rely on the other industrial hygiene and

12   medical literature out there in the world that shows

13   when you have a factory that's a point source of

14   emissions, you see a concentric ring of disease around

15   it, and some of those, they have fiber measurements and

16   some of them doesn't.  As an industrial hygienist, if

17   he's out there in the real world outside of the court,

18   Daubert means, if anything else, does the expert apply

19   the same standards in the courtroom as outside.  In the

20   real world he sees an asbestos factory using tons of

21   asbestos to make these fire doors.  They put it in

22   trucks and they ship it down the street and dump it.

23   Guys go home with dust all over their clothes.  Some of

24   that dust is asbestos dust.

25        In the real world, an industrial hygienist sees

1   that and says that's a dangerous level of exposure.  I

2   know that if there's visible dust that has any kind of

3   asbestos component to it, that's going to be orders of

4   magnitude above ambient.  Their comment about ambient,

5   you don't know Wisconsin ambient, that's irrelevant to

6   this.  The ambient standards is, if you get back to

7   epidemiology, there's really no truly purely unexposed

8   asbestos population in the world.  But if you use what's

9   the next best thing to it, which is nationwide averages

10  of ambient rural air, from the National Academy of

11  Sciences which put out a big thick book in 1984 which

12  looked at asbestos fiber and nonoccupational disease

13  risk, that's what Mr. Parker relies on for his

14  background ambient.  He knows, based on his training in

15  industrial hygiene, he knows based on the historical

16  measurements that they did, he knows based on the

17  asbestos fiber drift studies that when these things

18  happen, you're going to have an enormous exposure

19  compared to background ambient air.  That is what

20  Mr. Parker can testify to, not only generally, but as to

21  if any particular witness comes in and says my dad was

22  dusty when he came in the door or we played on the

23  playground and that was dusty, he knows based on

24  historical measurements back in the day, based on how

25  the asbestos behaves in environments in other plants

1  like the one in Egypt that he talked about, like from

2  the very first paper in 1960, the Wagner paper, where a

3  lot of the disease arose outside of the mine, people

4  that had no connection of coming to the mine, he knowing

5  all that that this is a dangerous exposure that

6  industrial hygienists would try to minimize it or stop

7  it.  That's the testimony from the industrial hygienist

8  perspective.

9           THE COURT:  All right.

10           MR. FINCH:  As it had --

11           THE COURT:  You wanted to talk about the

12  specific plaintiffs.

13           MR. FINCH:  Do I want to talk about the

14  specific --

15           THE COURT:  You said he also relied on --

16           MR. FINCH:  He also relied --

17           THE COURT:  -- or I should say opines with

18  respect to each plaintiff.

19           MR. FINCH:  He will opine through each

20  plaintiff, based on either hypotheticals based on their

21  testimony or their depositions or if they testify live,

22  he will be able to say okay, that situation where

23  someone talks about dust coming in the home every day,

24  once the dust gets in the home, once the asbestos dust

25  is in the home, I know based on my years of training

1  that it never leaves unless you have an asbestos

2  abatement company come in.  At least it doesn't leave

3  for a significant period of time.  Eventually yes, it

4  goes down to vanishingly small levels.  So if you test

5  for it 40 years later, you may not find it.  But in the

6  60's and 70's --

7         THE COURT:  Something you didn't do regardless;

8  right?  Mr. Parker didn't do that regardless.  He didn't

9  test for it 40 years later.

10        MR. FINCH:  Correct.  So where the issue boils

11  down to is okay, so you have that kind of qualitative

12  industrial hygiene testimony with lay witness testimony.

13  Then you get to the doctor testimony.  At the end of the

14  day, it's the doctor testimony on which the case rises

15  or falls because --

16        THE COURT:  Well, before we move to

17  Dr. Anderson, let's just dwell a moment with respect to

18  Parker.  You're agreeing that 12 through 14 of his

19  opinions are no longer relevant in light of the Court's

20  rulings?

21        MR. FINCH:  Let me confer with Mr. --

22        THE COURT:  Okay.  Well, why don't you do that

23  and you can advise me later.  I think that's all I have

24  with respect to Parker.  Now, if you'd like to go on to

25  Dr. Anderson, I would appreciate hearing.

1          MR. FINCH:  Yes.  Okay.  So now we're going

2    back to the high tech chart that I drew on the board.

3    In any, almost any asbestos case, this issue of

4    disentanglement, there's no requirement that you

5    disentangle it.  The question is if you've got a

6    situation where --

7          THE COURT:  Let's assume there's a requirement

8    that it be a substantial --

9          MR. FINCH:  Correct.  I agree with you on that.

10   So --

11         THE COURT:  Well, good.  So we're moving along

12   then.

13         MR. FINCH:  Your Honor -- I apologize, Your

14   Honor.

15         THE COURT:  No, no.  Don't apologize. I mean

16   I --

17         MR. FINCH:  I didn't mean to be flip.

18         THE COURT:  On the contrary, your response was

19   fine.  I didn't mean to be flip either.  Like I said, I

20   meant to be humorous.  I want to just bring us to a head

21   as to where the real disagreement is.

22         MR. FINCH:  Okay.

23         THE COURT:  And since we can assume for this

24   purpose that the real nub of this case, as you said, is

25   going to be medical testimony with respect to a

1   substantial impact or exposure --

2          MR. FINCH:  Substantial --

3          THE COURT:  I think it done proven -- as I read

4   the case law, it probably could be proven either way;

5   that is, if you had evidence that this individual

6   plaintiff was substantially exposed, that might get you

7   there if you also have proof that substantial exposure

8   has a substantial impact.  Or you might be able to prove

9   simply that there is evidence of substantial impact,

10  although I'm not quite sure how you get there without

11  substantial exposure.

12         MR. FINCH:  Okay.  There is medical literature

13  in epidemiological literature that --

14         THE COURT:  Well, but fortunately we're not

15  dealing with what there is generally.  We're talking

16  about Dr. Anderson's qualifications and --

17         MR. FINCH:  Dr. --

18         THE COURT:  -- facts that he relied upon in

19  order to opine that -- and here I want to be clear.  I

20  don't read him to opine with respect to any individual

21  plaintiff that they -- that the nonoccupational

22  exposure, and here I include whatever the workers may

23  have brought home from the plant, I don't read him to

24  opine that the nonoccupational exposures were a

25  substantial -- had a substantial impact on the

1  plaintiffs' condition.

2          MR. FINCH:  I think he is offering that

3  opinion.

4          THE COURT:  Well, where in his report does he

5  say that?

6          MR. FINCH:  In his report he talks about the

7  various kinds of subcomponent exposures that can cause

8  mesothelioma.

9          THE COURT:  Well, this isn't rocket science.

10 There's five opinions.  They're numbered.  That's what

11 Rule 26 is all about.  Which of those opinions does he

12 opine that this nonoccupational exposure was a

13 substantial or had a substantial impact on his disease?

14         MR. FINCH:  It's in the -- it's -- in the case

15 -- it's in the case specific reports.

16         THE COURT:  Perfect.  Let's go to those.

17         MR. FINCH:  Okay.  So, for example, if you take

18 the case specific report for Milton Boyer.

19         THE COURT:  I don't usually use this courtroom.

20 Hang on a second.  Which of them are you pointing me to?

21         MR. FINCH:  Milton Boyer.  This is -- I can

22 hand up a copy of it.

23         THE COURT:  That's all right.  I think I have

24 it here.  Docket number?

25         MR. FINCH:  If you just give me the docket

1  number, we'll be in business.  It's document 242.

2           THE COURT:  Thank you.

3           MR. FINCH:  Thank you, Counsel.

4           THE COURT:  If you have an extra copy, I'll

5  take it too, but I don't want to delay things if I'm

6  going to hold up progress.

7           MR. FINCH:  May I approach?

8           THE COURT:  Please.

9           MR. FINCH:  This doesn't have the docket number

10 on it.

11          THE COURT:  That's fine.  I have it in front of

12 me as well electronically.  And the specific opinion is?

13          MR. FINCH:  Number 4.  The occupational,

14 household and community exposures Mr. Boyer experienced

15 from his work involving asbestos-containing core

16 materials at Roddis/Weyerhaeuser plant, emissions into

17 the community air from the use of those materials as a

18 result of plant operations, and transfer of fibers from

19 the plant which caused household exposures, each

20 substantially contributed to his cumulative lifetime

21 asbestos exposure which caused --

22          THE COURT:  So the whole key is the language

23 each --

24          MR. FINCH:  Substantially contributed --

25          THE COURT:  -- substantially contributed to his

1  lifetime asbestos exposure.

2          MR. FINCH:  Which caused his malignant

3  mesothelioma.

4          THE COURT:  All right.

5          MR. FINCH:  And so the next question -- that's

6  the opinion.  What's the scientific basis for that?  The

7  scientific basis for that is that a day to a few days of

8  occupational level exposure, whether that's from working

9  in a plant, working in the home, having household

10 asbestos dust in the home or being in a community, that

11 tiny fractional amount of asbestos exposure by itself

12 can cause mesothelioma.  If that by itself can cause --

13 there is medical literature that he cites in his general

14 report that he can talk about here today.  That level of

15 exposure can cause mesothelioma.

16     There is medical literature, both epidemiologically

17 and case series that shows that when asbestos dust gets

18 into the house, it can cause disease, including

19 mesothelioma.  It can cause even asbestosis, which is a

20 disease that requires a substantially elevated level of

21 asbestos fibers.  So that kind of exposure -- if a

22 patient presented to him and all they had was a

23 household exposure, he would say that's an

24 asbestos-related mesothelioma.

25     If a patient presented to him and all they had was

1    exposure from living a half mile from the Weyerhaeuser

2    plant and when you've got these historical measurements,

3    if there was elevated asbestos in the community, a

4    doctor in the real world applying the Helsinki criteria

5    which is aimed at doctors in the real world would say

6    that's an asbestos-related mesothelioma.  If you had

7    somebody that worked just in the plant, didn't have the

8    other two, that would be an asbestos-related

9    mesothelioma.  So each of those can cause mesothelioma

10   by themselves.

11        Each of them can be a substantial contributing

12   factor because if you take --

13             THE COURT:  I get it.

14             MR. FINCH:  If you take --

15             THE COURT:  Anything more that you wish to add

16   generally before we go to testimony?

17             MR. FINCH:  No, sir.

18             THE COURT:  All right.  Very good.  I'm going

19   to assume that each of the experts here will testify

20   consistent with their reports and so I am going to ask

21   -- and I guess it should be Dr. Anderson would be

22   plaintiffs' request because he has the one who has the

23   tightest schedule -- I would ask him to come forward and

24   be sworn.  Thank you.  Dr. Anderson, you can actually

25   step around here.

1        MR. FINCH:  And Your Honor, I have prepared a

2   PowerPoint that might make this go a lot faster.

3        THE COURT:  Well, you're wrong because we will

4   assume that he'll testify consistent to his report.  So

5   we will not be starting with you.  We'll be starting

6   with the movant who will cross-examine and then you can

7   qualify as you wish.  But we're not going through a

8   dog-and-pony show this morning on a Daubert motion.  And

9   you may be seated.  Thank you very much, Counsel.

10       And you may be sworn in.

11       **HENRY ANDERSON, PLAINTIFFS' WITNESS, SWORN,**

12       THE COURT:  Very good.  You may be seated,

13   Doctor.  And I assume that you do stand behind the

14   formal reports that have been filed in this case --

15       THE WITNESS:  Yes.

16       THE COURT:  -- that you prepared?

17       THE WITNESS:  Yes.  And there was an expansion

18   on that during the depositions.  I was asked, so that's

19   additional information that augments the reports.

20       THE COURT:  It does.  And I'll consider that

21   and I'm confident that your counsel will expand on that

22   as well.  At this point, I would like you to focus

23   specifically on the questions that are being asked by

24   defense counsel and answer those questions.  If you can

25   answer them yes or no, you should.  If you need to

1   expand on them in order to be accurate, I'll allow you

2   to do that.  But I want you to be fair to the

3   questioner, assuming that counsel for the plaintiffs

4   will have an opportunity to allow you to expand or

5   qualify if necessary.  Do you understand?

6           THE WITNESS:  I understand, yes.

7           THE COURT:  All right.  You may proceed,

8   Counsel.  Is it Ms. Ellis who will be cross-examining?

9           MS. ELLIS:  Yes, Your Honor.  One moment,

10  please.  Thank you.

11                  CROSS-EXAMINATION

12  BY MS. ELLIS:

13  Q    Good morning, Dr. Anderson.  How are you?

14  A    Okay.

15  Q    Good.  You've issued specific causation opinions in

16  each of the eight cases we're here to talk about today;

17  correct?

18  A    Yes.

19  Q    Okay.  And in each of the cases, you've opined that

20  the plaintiffs' cumulative exposure to asbestos caused

21  the disease; correct?

22  A    Yes.

23  Q    And as a part of the cumulative exposure, you

24  opined that occupational exposure contributed; correct?

25  A    Yes.

                    HENRY ANDERSON - CROSS

1   Q      The household exposure contributed; correct?

2   A      Yes.

3   Q      And environmental exposure contaminated --

4   contributed; correct?

5   A      Yes.

6   Q      And that's in each of the cases; right?

7   A      Yes.

8   Q      And that opinion is the same in each of the cases

9   even though some of our plaintiffs never lived in

10  Marshfield; correct?

11  A      Yes.

12  Q      Okay.  And that opinion is the same even though

13  some of our plaintiffs never lived with another worker

14  who worked at the plant; correct?

15  A      I would have to go through the specifics of it.

16  The same in the community, they all pass through the

17  community and there was some community exposure.  But I

18  focused mostly on those that -- on the residences within

19  1.2 miles of the factory.

20          THE COURT:  Said another way, you didn't assume

21  that one of the plaintiffs lived with another co-worker.

22          THE WITNESS:  No, I did not assume that.  I

23  only used the information I had.

24          THE COURT:  Right.  You didn't rely on that in

25  reaching your opinion.
              HENRY ANDERSON - CROSS

42

1           THE WITNESS:  No.

2           THE COURT:  Next question.

3   BY MS. ELLIS:

4   Q    Okay.  And so -- and you do agree that there were

5   several plaintiffs who did not live within the radius

6   that you identified as the radius --

7           THE COURT:  That's been asked and answered,

8   Counsel.

9           MS. ELLIS:  Okay.

10  BY MS. ELLIS:

11  Q    And now in reaching your community causation

12  opinions, you didn't go to Marshfield; right?

13  A    I've been to Marshfield many times, but I didn't go

14  there.

15  Q    To conduct your opinions.

16  A    Right.  I looked at the maps and I looked at where

17  the houses were and we measured the distances.  So we

18  looked at a lot of that kind of thing and information

19  that we had on where the residences were during the

20  period that the factory was operational.

21          THE COURT:  And you've answered the question.

22  Thank you.

23          THE WITNESS:  Thank you.  Sorry.

24  BY MS. ELLIS:

25  Q    And you testified at your deposition that in order
                    HENRY ANDERSON - CROSS

1  to reach a community-causation opinion, you looked at a

2  couple of different factors; right?  You considered the

3  residence of the plaintiff; right?

4  A     Yes.

5  Q     You considered evidence of release of asbestos from

6  the plant; correct?

7  A     Yes.

8  Q     Okay.  And you considered the complaints in the

9  community of dust; right?

10  A     Yes.

11  Q     And you looked at epidemiological literature;

12  correct?

13  A     Yes.

14  Q     But you issued community-causation opinions in

15  these cases without any of that information; correct?

16  A     I don't --

17         THE COURT:  In other words, when you issued

18  your original opinion you had, you didn't have any of

19  that information.

20         THE WITNESS:  I did have that information.

21         THE COURT:  Next question.

22         MS. ELLIS:  Okay.  Well, Your Honor, if I may,

23  I'd like to present --

24         THE COURT:  Of course you can.

25         MS. ELLIS:  Thank you.
                HENRY ANDERSON - CROSS

44

BY MS. ELLIS

Q    Your first report that you issued in these cases
was issued in the Jacobs case in 2013; correct?

A    I don't recall.

Q    Okay.  I'm going to get that out and we'll get you
a copy of it and I'd like to put it up, if I may.

          THE COURT:  Why don't we assume for the moment
that that's when it was issued unless plaintiff
disagrees with that.  I'll ask the witness to assume
that the first of your reports in this case was for
Jacobs and that it was in 2013.  Does that sound wrong
to you?  You don't know.

          THE WITNESS:  Jacobs, I'm not sure that's one
of the cases here.

          MS. ELLIS:  Got it.

BY MS. ELLIS:

Q    Okay.  It's Ms. Treutel.  So the case name is
Jacobs and --

A    I didn't issue a report on a Jacobs is what I'm
saying.

          THE COURT:  I'm with you.  So why don't you
rephrase --

          MS. ELLIS:  It's Treutel.

          THE COURT:  Why don't you rephrase then,
Counsel.

                    HENRY ANDERSON - CROSS

1          MS. ELLIS:  Okay.

2     BY MS. ELLIS:

3     Q    Your report regarding Mrs. Rita Treutel was issued

4     in June of 2013 and in the report you concluded that

5     Mrs. Treutel's mesothelioma or cumulative exposure

6     caused the disease and that was comprised of

7     occupational, community and household exposure.

8          The information that you reviewed in reaching that

9     report, however, contained no information about the

10    plant.  Do you recall us talking about that at your

11    deposition?

12    A    I didn't summarize that in my medical report on did

13    the person have mesothelioma and was it related to

14    asbestos exposure.

15    Q    This is the exposure summary that you looked at to

16    reach your opinions in this Treutel case.  And I'm going

17    to bring you a copy of your report, Dr. Anderson.

18          MR. FINCH:  Object to form.  This is his

19    initial report.  He did a subsequent report.

20          THE COURT:  I'll overrule that.  You can

21    approach.

22    BY MS. ELLIS:

23    Q    I'm going to give you a copy of the report just so

24    we're all on the same page.  And what I have on the

25    screen is the exposure summary that you were provided
                    HENRY ANDERSON - CROSS

1  with the factual information to consider to render your

2  opinions; correct?

3  A    Yes.

4  Q    Okay.  And if we look -- we look in your report, I

5  think it either says in here or we looked at your

6  invoices that you spent an hour-and-a-half looking at

7  the materials and drafting your report; correct?

8  A    Yes.

9  Q    Okay.  And you concluded here -- we can flip to

10  your conclusions -- that Mrs. Treutel's mesothelioma was

11  caused by occupational, household and environment;

12  correct?

13  A    Yes.

14  Q    Okay.

15  A    Occupational bystander and environmental exposure.

16  Q    Okay.  And if we look at the material that you were

17  provided and reviewed in connection with this report,

18  there is no information about releases of asbestos from

19  the plant; correct?

20  A    No.

21  Q    Okay.  And there is no information about complaints

22  in the community about dust; correct?

23  A    Not in my report, no.

24  Q    Okay.  And not in the information that you

25  considered in coming up with your reports; right?

                HENRY ANDERSON - CROSS

1  A     No.

2  Q     Okay.  So you issued a community-causation opinion

3  that someone was exposed to asbestos in Marshfield and

4  it contributed to causing their mesothelioma without any

5  information on whether or not this plant actually put

6  asbestos into the air; right?

7  A     My assumption from the exposure history I had and

8  in talking with the attorneys was that there were these

9  releases.  I didn't have those documents as that was

10 what Mr. Parker was working with.

11 Q     Okay.  And you testified in your deposition that

12 all you needed to know was that the plant was using

13 asbestos in order to reach that opinion; right?

14 A     That asbestos caused the mesothelioma and that it

15 was related to the plant, yeah, that's all I needed to

16 know was were they using it and where the people lived

17 and what was going on.

18 Q     Okay.  Well, that brings me to my second point

19 here.  If you look at the information you were provided

20 about Mrs. Treutel, you are not provided with a single

21 address for her, were you?

22 A     I didn't mention their addresses that were here.  I

23 can't tell you back from two years ago what information

24 and discussion with the attorneys, what they told me.

25 Q     Well, all we have are the materials that were

                    HENRY ANDERSON - CROSS

1   provided to us that you relied on in coming up with your

2   reports, which is this exposure summary which you based

3   your report on.  And you'll agree with me that there's

4   no information in there about where Mrs. Treutel lived;

5   correct?

6   A    Right.

7   Q    And there's no information in your report about

8   where Mrs. Treutel lived; correct?

9   A    No.

10  Q    Okay.  So you didn't have any information about the

11  plant emitting asbestos and you didn't know where

12  Mrs. Treutel lived; right?

13  A    That's correct.

14  Q    But yet you issued a community-causation opinion in

15  the case; right?

16          THE COURT:  I think it's been asked and

17  answered.

18          THE WITNESS:  I have here a summary of the --

19          THE COURT:  You don't need to respond.

20          THE WITNESS:  Okay.

21          THE COURT:  It's cumulative and we should move

22  on.

23  BY MS. ELLIS:

24  Q    And Dr. Anderson, you've actually published an

25  article on how to go about determining whether or not an

                    HENRY ANDERSON - CROSS

1  environmental contaminant can cause a disease; right?

2  A    No, I don't believe so.

3  Q    Do you recall the CDC article that we discussed at

4  your deposition?

5  A    That was on responding to public concerns and

6  requests about clustering of disease.

7  Q    Right.  It is an article --

8  A    Which isn't a how to go about investigating an

9  individual claim here.  You have to have --

10        THE COURT:  All right.  I've got it.  You've

11  answered.  And you should ask your next question,

12  Counsel.

13  BY MS. ELLIS:

14  Q    In your report, Dr. Anderson, you concluded that

15  this group of cases in Marshfield was indeed a cancer

16  cluster; right?

17  A    Well, any time there's more than two it's a

18  cluster.

19  Q    Okay.  So you refer to this as a cancer cluster and

20  you've written an article on how to evaluate cancer

21  clusters; right?

22  A    Publicly requested community concerns about cancer.

23  This is not a cancer cluster relevant to that article.

24  Q    Okay.

25        THE COURT:  So the article wasn't about that

                 HENRY ANDERSON - CROSS

1   specifically, and you should ask your next question,

2   Counsel.  Perhaps getting over the preliminary of why he

3   wrote the article, you have some point to make with

4   respect to it.

5          MS. ELLIS:  Yes, Your Honor.  And I will note

6   that the article also says that --

7          THE COURT:  You don't need to note anything.

8   You should be asking questions of this witness.

9          MS. ELLIS:  Okay.  Yes, Your Honor.

10  BY MS. ELLIS:

11  Q    The article you wrote says that this article should

12  be used by epidemiologists anywhere who are

13  investigating cancer clusters; right?

14  A    Who request community cancer cluster concerns.

15  Q    If we look right here, "In addition, these

16  guidelines might be helpful to a wider community of

17  responders and epidemiologists who were concerned with

18  such inquiries"; right?

19  A    Yes.

20  Q    Okay.  And this article goes about a list of steps

21  to determine whether or not a cancer cluster can be

22  linked to an environmental contaminant; right?

23  A    Yes.

24  Q    And in the article you say that it is very rare

25  that you are able to link an environmental exposure to a

                 HENRY ANDERSON - CROSS

1 cancer cluster; right?

2 A    The kind of requests that come in from the public

3 about there's a lot of cancer in my -- on my block or in

4 my small community, very generic, those do not find

5 causes in the most cases.  This -- these cases are

6 sentinel cases.  It depends on what the cancer is as you

7 read this.

8 Q    Yeah, because the article --

9 A    So very obviously if there's a mesothelioma, 85 to

10 90 percent of those you'll find asbestos, so that isn't

11 the kind of investigation here.  This is -- this paper

12 was to address communities calling and say three kids in

13 my school have cancer.

14        THE COURT:  And Dr. Anderson, I really would

15 like you to focus on the question that's asked so we can

16 get through this.

17        THE WITNESS:  Okay.  I'm sorry.

18        THE COURT:  Thank you.  You may ask your next

19 question, Counsel.

20 BY MS. ELLIS:

21 Q    And the article says that even when you think you

22 have a signature disease of a certain toxin or a certain

23 exposure, even in those cases you have to follow these

24 steps because it could just be a coincidence; right?

25 A    It doesn't say you must follow these steps.
                    HENRY ANDERSON - CROSS

1  Q     Okay.  Well, it recommends that these steps be

2  followed; right?

3  A     Recommends this is an approach, this is a model or

4  a method to approach these kind of generic requests.

5  Q     Okay.  And you yourself have actually evaluated

6  whether or not vermiculite factories in Wisconsin, which

7  also involve asbestos; right?

8  A     Yes.

9  Q     Whether or not those vermiculite factories impacted

10  the communities around them; right?

11  A     Yes.

12  Q     And when you undertook that investigation, you went

13  about the steps that were outlined in your cancer

14  cluster article; right?

15  A     We followed -- I mean we followed the approach that

16  the federal government that contracted for the work told

17  us to do.

18  Q     And that was to go out and look at the incidence of

19  disease in those communities; right?

20  A     Yes.

21  Q     And then compare that to an unexposed population;

22  right?

23  A     There wasn't any unexposed, but yes, it was to

24  compare that to the state averages.

25  Q     Right.  And see if are there any increases in these

                    HENRY ANDERSON - CROSS

1  certain diseases that can be caused by asbestos that

2  will point us in the direction of related to this

3  vermiculite plant; right?

4  A    Yes.

5  Q    And you followed those steps, right, with your

6  vermiculite study?

7  A    Yes.

8  Q    And you didn't do any of those things in these

9  cases, did you?

10  A    Not in these cases.  These were individual case

11  reports, not community --

12           THE COURT:  I get it, Doctor.  You just need to

13  say yes or no and you answered it yes.  You didn't do

14  those things; right?

15           THE WITNESS:  No.  Right.

16           THE COURT:  Thank you.

17  BY MS. ELLIS:

18  Q    And you're not aware of a single person in

19  Marshfield -- at the time you issued these

20  community-exposure opinions, you had no information on a

21  person in Marshfield who has mesothelioma simply from

22  living in the community; right?

23  A    Yes.

24  Q    That's correct?

25  A    That's correct.

                    HENRY ANDERSON - CROSS

1   Q    Okay.  And the epidemiological studies that you

2   rely on that we discussed at length at your deposition,

3   those all hinge on -- they're based on the fact that in

4   those communities there are mesos, people with

5   mesothelioma with no other exposure than living next to

6   those point sources; correct?

7   A    Yes.

8   Q    Okay.  And you acknowledged you didn't compare the

9   factories and mines in those studies to Marshfield;

10  correct?

11  A    They had mesotheliomas in the plants is where it

12  started from and they looked for other mesotheliomas and

13  they have registries different that we do not have a

14  registry.

15  Q    So to answer my question, you did not compare those

16  facilities to the facility in Marshfield; correct?

17  A    Just the impact of those facilities similar to

18  Marshfield.

19  Q    You didn't make any comparison of the impact on

20  those communities and the impact that the Marshfield

21  plant has on Marshfield though, did you?

22  A    I didn't do an impact on Marshfield.

23  Q    Right.

24  A    The broader Marshfield.

25  Q    Right.  So there was no comparison between those

                    HENRY ANDERSON - CROSS

1    studies and Marshfield.

2         THE COURT:  I think we've established that.

3    But let me ask a related question:  Wouldn't it have

4    been helpful to you to have done such an examination in

5    order to express the opinion that this additional

6    exposure from nonoccupation or I should -- let me

7    rephrase that.  That the nonoccupational exposures were

8    a substantial factor?  Wouldn't it have been helpful to

9    have looked at the population in the Marshfield area as

10   compared to the state average?

11        THE WITNESS:  That's not a yes or no because --

12        THE COURT:  I'm not asking it --

13        THE WITNESS:  No.  But the samples -- the size

14   of the Marshfield population isn't sufficient to give

15   you power to find anything.  The general issue is these

16   types of circumstances around the world have been found

17   to cause mesothelioma between four and eight times

18   higher than any comparison population.

19        THE COURT:  Which means that a population the

20   size of Marshfield you would have a chance of what?

21   What would be the odds?

22        THE WITNESS:  Well, the background rate of

23   mesothelioma is about one in a million.

24        THE COURT:  Okay.

25        THE WITNESS:  So you've got 18,000 people --
                    HENRY ANDERSON - CROSS

1          THE COURT:  So it would be four or five -- hang

2     on.  So it would be four or five in a million.  And so

3     in a population of 35,000, it would be some fraction of

4     one.

5          THE WITNESS:  One, yeah.  It wouldn't be --

6     yeah.  You would have to have a very high rate in order

7     to find a single one, again, within a mile-and-a-half of

8     the plant.  All 18,000 people don't live there.

9          THE COURT:  So it wouldn't prove anything like

10    we have.

11         THE WITNESS:  It wouldn't prove anything one

12    way or the other.

13         THE COURT:  All right.  I understand.  Next

14    question.

15    BY MS. ELLIS:

16    Q    And to the point that Your Honor was addressing

17    with Dr. Anderson, in your vermiculite study though,

18    Dr. Anderson, you were looking at communities in

19    Marshfield; right?  Excuse me, communities in Wisconsin;

20    right?

21    A    It was Milwaukee, Racine, Kenosha.

22    Q    Right.  And those communities are larger than

23    Marshfield; right?

24    A    Yes.

25    Q    But not terribly larger; right?
                    HENRY ANDERSON - CROSS

1        THE COURT:  Well, yes, they are terribly

2   larger.

3        MS. ELLIS:  Well, okay.  Fair enough.

4   BY MS. ELLIS:

5   Q    There is a database in Wisconsin that provides

6   information on the incidence of disease in the state and

7   in certain counties; correct?

8   A    Yes.

9   Q    Okay.  And it also provides information on the

10  incidence of mesothelioma in the state; right?

11  A    Yes.

12  Q    And in certain counties; right?

13  A    Yes.

14  Q    It provides information on the incidence of

15  mesothelioma in Wood County and Marathon County; right?

16  A    Yes.

17  Q    The two counties that are involved in these cases;

18  right?

19  A    Yes.

20  Q    You didn't even look at that data before you issued

21  these opinions, did you?

22  A    I was aware of the data by county.  But again, that

23  data doesn't sort it out by the type of exposure.

24  Q    Right.  But the point being to look and see how

25  does the information on mesothelioma in these counties

                    HENRY ANDERSON – CROSS

1    compare to the state.  You didn't consider that data,

2    did you?

3    A    I didn't consider that data to be particularly

4    relevant.  These counties are higher than the state

5    average.

6    Q    You testified in your deposition, Dr. Anderson,

7    that you did not look at that data before issuing these

8    opinions; right?

9    A    That data didn't -- wasn't particularly or was not

10   relevant to --

11           THE COURT:  So the answer is you didn't look at

12   it.

13           THE WITNESS:  I didn't utilize it.  I certainly

14   was aware --

15           THE COURT:  You didn't rely on it.

16           THE WITNESS:  I didn't rely on it as a basis

17   for my opinion.

18           THE COURT:  Next question, Counsel.

19           MS. ELLIS:  Okay.

20           THE WITNESS:  Thank you, I'm sorry.

21   BY MS. ELLIS:

22   Q    So one of the studies that you relied on was a

23   meta-analysis called *Bourdés*; right?

24   A    Yes.

25   Q    You're familiar with the study.  And Bourdés looked

                    HENRY ANDERSON - CROSS

1   at six different studies that evaluated risk for

2   mesothelioma in communities; right?

3   A    Six or eight I think it was, yeah.

4   Q    Okay.  And I just want to put this up for you to

5   take a look at.  Okay.  And this study that you rely on,

6   it states "Comparison of RRs" -- which would be relative

7   risks; right -- "between different study populations is

8   feasible if the populations experienced similar levels

9   of exposure, as is probably the case in our

10  meta-analysis"; right?

11  A    Right.

12  Q    And you agree with that statement; right?

13  A    Yes.

14  Q    You didn't make any comparison in the studies that

15  you looked at, the exposures that happened there with

16  the exposures that happened in Marshfield; right?

17  A    Again, this is not measurement of exposure, it's a

18  circumstance of exposure.  These six studies were done

19  with different facilities, different types of factories,

20  and different communities, and so it's the circumstance

21  that's similar to Marshfield.  You have a manufacturing

22  facility.  These were manufacturing facilities.

23  Q    And --

24  A    And that puts them in a class of communities, class

25  of exposure that's similar to make a comparison to

                    HENRY ANDERSON - CROSS

1    Marshfield.

2    Q     And --

3          THE COURT:  But you didn't make any specific

4    comparison as to the level of exposures that existed in

5    these meta-data studies and the level of exposure that

6    these --

7          THE WITNESS:  Most of these studies didn't --

8          THE COURT:  Let me finish the question.

9          THE WITNESS:  Sorry.

10         THE COURT:  That you didn't make any comparison

11   between the level of exposure in these meta studies and

12   the level of exposure that occurred in Marshfield.

13         THE WITNESS:  Neither of them had measurements.

14         THE COURT:  So the answer is you did not.

15         THE WITNESS:  Yeah, I did not.  No.

16         THE COURT:  All right.  Next question.

17         MS. ELLIS:  Okay.

18   BY MS. ELLIS:

19   Q     I'm going to put up a chart here and I've keyed in

20   a couple of pieces of information from some of the

21   studies that you relied on and compared them to

22   Marshfield and the information that you are opining on

23   Marshfield.  And so we're -- so we have Marshfield and

24   in our case is right, you're not aware of any what I'm

25   calling community mesos, right, where the only known

                    HENRY ANDERSON - CROSS

1  exposure is living in Marshfield; right?

2  A    That's correct.

3  Q    And you'll agree that there was no crocidolite

4  asbestos used in Marshfield; right?

5  A    I'm not the expert on that.  If it's -- that's my

6  understanding.  Again, I'm a physician, medical.  I'm

7  not a product specialist.

8  Q    Okay.  So you don't have any information on

9  crocidolite being used at the plant; right?

10  A    I don't have any information.

11  Q    And according to you, the potential for community

12  exposure spanned 22 years; right?

13  A    Yes.

14  Q    Okay.  And Mr. Parker issued a report and opined

15  that based on some calculations he did, that the annual

16  use of asbestos at the Marshfield plant was 352 tons;

17  right?

18  A    I'll take your word for it.

19  Q    Okay.  That's in Mr. Parker's reports.  Now, we're

20  going to compare this now to the studies that you relied

21  on, and so you looked at a couple of studies relating to

22  some crocidolite mines in South Africa; right?

23  A    Yes.

24  Q    Okay.  And you looked at a series of Italian

25  studies surrounding an asbestos cement plant; right?

                    HENRY ANDERSON - CROSS

1  A    Yes.

2  Q    And then the last one is the Tarres study that you

3  also looked at which was in Spain and involved a Spanish

4  cement plant; right?

5  A    Yes.

6  Q    And there were other studies in fairness I know

7  that you looked at.  These were the ones where we could

8  pull information from.  So if there are others that you

9  want to talk about, we can do that as well.

10         THE COURT:  And counsel, just for my benefit

11  when you say *pull information from*, you're representing

12  that these studies actually provided exposure or tons of

13  asbestos information?

14         MS. ELLIS:  Correct, Your Honor.  These numbers

15  were pulled from the studies.

16         THE COURT:  And I don't know, is this something

17  that one of your experts is going to opine on?

18         MS. ELLIS:  No, Your Honor.

19         THE COURT:  I don't know where you -- I don't

20  know how I assume that this is accurate, the right-hand

21  column.  Certainly this witness can't tell me that.

22         MS. ELLIS:  Well, I think, Your Honor, that

23  Dr. Anderson could tell us.

24         THE COURT:  All right.  Well, let's explore

25  that because he just testified he didn't have that

                HENRY ANDERSON - CROSS

1   information and couldn't get it.

2        MS. ELLIS:  Okay.  If we need to pull the

3   studies up, I will try to do --

4        THE COURT:  Why don't we do that.

5        MS. ELLIS:  Okay.  So let's put this study --

6        THE COURT:  I'm sorry.  Why don't you explore

7   with this witness.

8        MS. ELLIS:  Okay.  Okay.

9

10  BY MS. ELLIS:

11  Q    So Dr. Anderson, in the Wagner is the first entry

12  we have there.  Again, it's the South African

13  crocidolite mines; correct?

14  A    Yes.

15  Q    And Wagner identified nine people with no other

16  exposure than living around or being around those mines;

17  right?  Who had mesothelioma; right?

18  A    Yes.

19  Q    And it was a crocidolite mine, so obviously there

20  was crocidolite there; right?

21  A    Yes.

22  Q    Okay.  And I used 50 as a conservative number, but

23  those mines were in operation for I think upwards of 70

24  or 80 years.  Does that comport with what you know about

25  those mines?
                    HENRY ANDERSON - CROSS

1  A     Yeah.  I mean there's ore in the area, in the

2  community.

3  Q     Right.  And Wagner reported in his followup in '65

4  that there were 80,000 tons of crocidolite mined there

5  per year.  Does that surprise you?

6  A     I don't know.

7  Q     Okay.  And again, if we want to pull it out and

8  look at it, we can do that.

9        And then Webster is another South African study and

10 there he identified 76 mesotheliomas with no other

11 exposure other than living near the mines; right?

12 A     I would have to look specifically.

13 Q     Okay.  Let's pull this out.

14        THE COURT:  We're not going to spend time

15 having this witness read from a document.

16        MS. ELLIS:  Okay.  I'll leave it alone.

17        THE COURT:  Simply -- fine.  Let's move along.

18        MS. ELLIS:  I'll move along.

19 BY MS. ELLIS:

20 Q     And the point being that to make a comparison

21 between these facilities in the studies and the mines in

22 the studies in Marshfield, Marshfield doesn't compare to

23 those locations; right?

24 A     It compares to having a factory that emitted

25 asbestos into the community near -- the people lived

                    HENRY ANDERSON - CROSS

1   near the facilities.  They did the same here.  As far as

2   the volume of asbestos, it's different.

3   Q    Okay.  And in terms of there being the existence of

4   people in the community with mesothelioma with no other

5   exposure, it's different; right?

6   A    Again, a study hasn't been done to look at are

7   there other mesotheliomas in the community in

8   Marshfield.  But there have -- as far as the cases here,

9   there are no only-community cases.

10  Q    Okay.  And so -- and it's also pretty dramatically

11  different in terms of the years of use of asbestos;

12  right?  I mean Marshfield had 22 years.

13  A    Certainly the opportunity for people to be exposed

14  over a longer period of time and have a much longer

15  latency, if you look at when these facilities operated,

16  they were all operating before Marshfield started.  And

17  Marshfield closed fairly recently.  Again, all of the

18  cases we have are really recent cases, not earlier

19  cases.  So the latency period, the ability to see

20  community mesos in these other studies are in relation

21  to how long it was there, how long the people lived

22  there.

23         THE COURT:  Are there occupational studies of

24  individuals who would not have otherwise been exposed to

25  asbestos?  In other words, who would not have been

                    HENRY ANDERSON - CROSS

1  exposed to asbestos except on the job or with respect to

2  asbestos fibers that they brought home with them from

3  the job?

4         THE WITNESS:  Yes, there are studies like that.

5  And those -- that's determined with a case control study

6  where you look at the mesotheliomas and see what their

7  exposures were.  And about between 14 percent in the

8  mesothelioma registries in Australia or France, there's

9  only an exposure for the community or for household.

10        THE COURT:  Actually you just answered the

11 opposite question.  But I thought you said that for

12 community or household you expect to see -- I think you

13 said one in a million?

14        THE WITNESS:  Well, that's the so-called

15 background, totally unexposed one in a million.

16        THE COURT:  And then nonoccupational, you'd

17 expect to see --

18        THE WITNESS:  About four times.  Four to seven

19 or eight times as many.

20        THE COURT:  All right.  And then with respect

21 to occupational exposures.

22        THE WITNESS:  That's 80 percent of the mesos

23 are coming out of occupational.

24        THE COURT:  In a million people who worked in

25 asbestos --

                   HENRY ANDERSON - CROSS

1          THE WITNESS:  Well, that's maybe 26 to -- it

2    depends.  It all depends on the --

3          THE COURT:  Level of concentration.

4          THE WITNESS:  But it's at least probably ten

5    times more than in the community.

6          THE COURT:  So that would give you 40 in a

7    million.

8          THE WITNESS:  I mean some of the studies, ten

9    percent of the work force have developed mesothelioma.

10          THE COURT:  Which is 100,000 in a million.

11          THE WITNESS:  Yes.

12          THE COURT:  That's what I'm trying to get at.

13          THE WITNESS:  Yeah.  I mean for workers, it

14    depends how long they were there and whether it was --

15          THE COURT:  It depends on all the same factors

16    that you'd look at with respect to community, which is

17    frequently, regularity, and proximity of the exposures.

18          THE WITNESS:  Severity of the exposure, yeah.

19          THE COURT:  Okay.

20          THE WITNESS:  How long they survive afterwards.

21          THE COURT:  But are there studies that tell us

22    the likelihood for a worker who has substantial exposure

23    to asbestos, what the range is in terms of the number

24    that develop the mesothelioma disease?

25          THE WITNESS:  All of the studies have of the
                    HENRY ANDERSON - CROSS

1   worker populations --

2           THE COURT:  Right.

3           THE WITNESS:  And that's the challenge is there

4   aren't that many that have been able to delineate -- we

5   don't know how many people worked in Marshfield.  We

6   don't have that list.

7           THE COURT:  Understood.

8           THE WITNESS:  So we can't say what --

9           THE COURT:  I'm not asking you that.  I'm

10  asking you generally in meta studies, is there data as

11  to the likelihood of contracting the disease based on

12  occupational exposures?

13          THE WITNESS:  It's usually looked at in

14  medicine when you see the disease, what's the

15  likelihood.

16          THE COURT:  But you have data one in a

17  million --

18          THE WITNESS:  Is the background.

19          THE COURT:  -- which is the background.

20          THE WITNESS:  Right.

21          THE COURT:  You have data four in a million if

22  it's nonoccupation.

23          THE WITNESS:  Four --

24          THE COURT:  Do you have data for occupational?

25          THE WITNESS:  In the studies --
                    HENRY ANDERSON - CROSS

1          THE COURT:  The answer could be no, I don't.

2          THE WITNESS:  Well, I don't have it because

3    it's different in each plant.  It's a different

4    approach.  So it's not a four in a million.  That is

5    based on like the population in Wisconsin.  So in

6    Wisconsin --

7          THE COURT:  I get it.

8          THE WITNESS:  -- if we had no asbestos --

9          THE COURT:  Well, but you could extrapolate

10   from studies of an individual plant.  If it was, as you

11   suggest, ten percent, it would be 100,000 in a million.

12         THE WITNESS:  Yes.

13         THE COURT:  If we extrapolate for a million

14   workers working in the same place, if you did enough

15   separate studies, you would come up with a fairly

16   reliable percentage for per million; right?

17         THE WITNESS:  There are so many different types

18   of asbestos exposure.  So the vast majority of the

19   asbestos exposures are like in construction workers so

20   that -- and that's --

21         THE COURT:  And do we know what percentage of

22   construction workers --

23         THE WITNESS:  No.

24         THE COURT:  -- have developed or contracted the

25   disease?
                    HENRY ANDERSON - CROSS

1        THE WITNESS:  No.

2        THE COURT:  Seems like that would be a pretty

3   helpful piece of information if you're trying to

4   determine what the marginal impact is of the community

5   exposure; right?

6        THE WITNESS:  The way that's investigated

7   epidemiologically is to look at all of the meso --

8   capture all of the mesotheliomas, interview those

9   people, and that's what I'm saying these relative --

10       THE COURT:  But no one has done a study of

11  population of workers?

12       THE WITNESS:  All different workers.

13       THE COURT:  Right.

14       THE WITNESS:  Right.  So --

15       THE COURT:  So what percent of construction

16  workers, for example, have developed --

17       THE WITNESS:  You don't know how many

18  construction workers there are.

19       THE COURT:  Right.  What about people working

20  in a plant like the one in Marshfield?

21       THE WITNESS:  Nobody studied that plant.

22       THE COURT:  Like Marshfield.

23       THE WITNESS:  Well, like.  The only -- the only

24  plants that have been studied are the ones I'm

25  referencing here where they then went out and looked at

                    HENRY ANDERSON - CROSS

1    the community as well.

2          THE COURT:  It's never been studied by a plant

3    of workers.  That's just astounding, don't you think?

4          THE WITNESS:  Very few.  Very few.  It's very

5    expensive and very difficult to do.  It's like in

6    Marshfield.

7          THE COURT:  And as you sit here today, you've

8    never seen a study of a particular population of

9    workers.

10         THE WITNESS:  Oh, there's studies I was

11   involved in with the asbestos workers' union.

12         THE COURT:  Okay.  That's a good example.

13         THE WITNESS:  10,000 people.

14         THE COURT:  And how many of those --

15         THE WITNESS:  And those are the ones where we

16   saw very high exposures --

17         THE COURT:  Which means what?

18         THE WITNESS:  -- of ten percent.

19         THE COURT:  Ten percent.

20         THE WITNESS:  Yeah.  Is the highest in those

21   people who live long enough and have the longest

22   duration of exposure.

23         THE COURT:  So let me ask a question --

24         THE WITNESS:  And that's the highest group.

25         THE COURT:  And that might not be the
                    HENRY ANDERSON - CROSS

1  percentage applicable to this plant, but --

2           THE WITNESS:  We don't know how many people

3  have lived at the plant and died.  You've got to know

4  that.  You've got to know many of them.

5           THE COURT:  You don't have the data.  You don't

6  have the medical --

7           THE WITNESS:  We don't have the denominator --

8           THE COURT:  -- for each.

9           THE WITNESS:  -- data.  Yeah, we don't have the

10 population there.

11          THE COURT:  How do you have it for the four and

12 one million for nonoccupational because other countries

13 track the specific disease?  Or are you assuming that

14 they --

15          THE WITNESS:  Right.  And that's what the

16 literature suggests.

17          THE COURT:  And in the United States we just

18 haven't tracked that.

19          THE WITNESS:  We have not tracked that.

20          THE COURT:  I'm with you now.  All right.  Any

21 future questions for this witness, Counsel?

22          MS. ELLIS:  I want a couple of closing points.

23 BY MS. ELLIS:

24 Q    And moving on from this, these are studies that did

25 find community mesos around plants; right?
                    HENRY ANDERSON - CROSS

1   A    Yes.

2   Q    That you talked about; right?  There are also

3   studies that have been done around plants emitting

4   asbestos that found no community mesos, no risk for

5   mesothelioma in the community; right?

6   A    Yes.

7   Q    Right.  Dr. Selikoff did a study in 1979, right, in

8   Patterson, New Jersey --

9   A    Right.

10  Q    -- right?  Around the plant that you studied;

11  correct?

12  A    Yes.

13  Q    The Amazon plant.  And they even tested homes

14  around the plant; right?  For asbestos; correct?

15  A    I think we looked for that asbestos as we looked

16  for it in the workers' homes and we found it.

17  Q    You did.  And they found amosite in the homes

18  around the plant; right?

19  A    If you have the paper.  I would have to dig that

20  out.

21  Q    All right.  Let's take a look at it.

22  A    I think you're referring to our family homes that

23  we went into.

24  Q    Okay.  This is a pretty raw copy and I apologize if

25  it's not clear.  Here we go.  Many years later, we

                    HENRY ANDERSON - CROSS

1   collected samples of houses near the factory.  It still

2   contained appreciable numbers of amosite asbestos

3   fibers; right?

4   A    That was our household people.

5   Q    Okay.  And this is reported in Dr. Selikoff's

6   community paper; right?

7   A    Do you have the title up there?

8   Q    Yes.  I'm sorry.  "Mortality Experience of

9   Residents in the Neighborhood of an Asbestos Factory";

10  right?

11  A    Yes.

12  Q    So they sampled and found dust in the community;

13  right?

14  A    In the households of the workers.

15  Q    Right.  But found no increased risk in that

16  community for mesothelioma; right?

17  A    Not in the general community, no.

18  Q    Okay.  And then there are other studies that have

19  looked at communities around plants and also found no

20  increased risk for mesothelioma; right?

21  A    I think there have been a few.  Usually they're

22  like what would be Marshfield, much smaller.

23  Q    Okay.  Well, you didn't compare Marshfield to the

24  facilities and towns in those studies either, did you?

25  A    I chose the best studies that had data in them that

                    HENRY ANDERSON - CROSS

1  we could use to assess populations.  Those other studies

2  didn't have that.

3  Q    Okay.  So that's a no.  You did not compare

4  Marshfield to the facilities in those studies?

5  A    No.

6  Q    Okay.  Thank you.  And I will move to your

7  household study that you also conducted in relation to

8  this same amosite plant in Patterson, New Jersey; right?

9  A    Yes.

10  Q    And you looked at the household members who lived

11  with workers from that plant; right?

12  A    Yes.

13  Q    And you identified household workers who had no

14  other known occupational exposure; right?

15  A    Yes.

16  Q    Only exposure was living in the house.  And you

17  identified increased levels of asbestos-related disease

18  in the household members; right?

19  A    Yes.

20  Q    And there you tested the homes of those

21  individuals; correct?

22  A    A few homes.

23  Q    You tested the homes 30 years after the worker no

24  longer worked in the plant; right?

25  A    Yes.
                    HENRY ANDERSON - CROSS

1   Q    You found asbestos in the homes; right?

2   A    Yes.

3   Q    Asbestos of the type that was in the factory;

4   right?

5   A    Yes.

6   Q    And according to your paper, that corroborated that

7   the exposures occurred in the home; right?

8   A    It suggested the persistence of asbestos in the

9   homes.

10  Q    Okay.

11  A    They weren't the homes where the mesothelioma

12  occurred.

13  Q    Well, this paper doesn't say that; right?

14  A    No, we just -- the homes that we could get into

15  that were still standing, went into the attics and the

16  rafters and found some of the asbestos.

17          THE COURT:  And you didn't do that here.

18          THE WITNESS:  No.

19          THE COURT:  All right.  Next question.

20  BY MS. ELLIS:

21  Q    Okay.  And you're aware that Mr. Parker tested

22  houses and soil right on the perimeter of the plant in

23  Marshfield; right?

24  A    I haven't seen that, no.

25  Q    Okay.  I'll represent to you Mr. Parker tested

                    HENRY ANDERSON - CROSS

1  recently, I believe in 2014, tested, what is it, 16 --

2  nine houses on the perimeter of the plant, attic dust

3  there, and found no asbestos in those homes.  And seven

4  soils samples around Marshfield, some at the waste

5  deposit sites and found no asbestos.  Does that impact

6  your opinions in any way?

7  A    No.

8           THE COURT:  Why not?

9           THE WITNESS:  What it would pertain to is the

10 persistence of it in the home and have the people

11 adequately cleaned it up.  From a public health

12 standpoint that would be helpful to suggest that we

13 wouldn't need to be warning people about living in these

14 homes because they didn't identify asbestos.

15          THE COURT:  Wouldn't it help to identify

16 exposure if you're looking at the soil?  I mean if

17 you're able to identify the period of time that the

18 plant was in operation, wouldn't that show you

19 exposures?

20          THE WITNESS:  If there were in the plants,

21 what, stopped in '74?

22          THE COURT:  Right.  No --

23          THE WITNESS:  So 32 years ago.  If it was

24 tested at the time --

25          THE COURT:  You know what?  I withdraw the
                    HENRY ANDERSON - CROSS

1  question.  Anything more for this witness?

2          MS. ELLIS:  I'm going to wrap up.  I promise.

3  Two points.

4  BY MS. ELLIS:

5  Q    The vermiculite study that you did in the towns

6  that are bigger than Marshfield to see if there was an

7  impact on the community, you tested the soil for

8  vermiculite in that study, didn't you?

9  A    We did not.

10 Q    Okay.  Well, let's look at your paper on that.  I'm

11 going to show you the front cover of it just to give us

12 some context here.  Does that look familiar to you,

13 Dr. Anderson?

14 A    Yeah.  That's our grant application that didn't get

15 funded.

16 Q    And then you state here, this is on page five,

17 "Several soil samples were collected; analysis for

18 asbestos is in progress." Right?

19 A    The EPA did that.  That wasn't us.

20 Q    Okay.  Well, do you recall what the results of the

21 soil samples were?

22 A    No.

23 Q    Okay.  Did you consider that in looking at the data

24 that you were looking at in these towns about

25 vermiculite?

                    HENRY ANDERSON - CROSS

1  A    No.

2  Q    I'm going to close with a point and talk about lung

3  cancer for a moment.  We've been talking about

4  mesothelioma this entire time.  There are two lung

5  cancer cases that are part of this group; right?

6  A    Yes.

7  Q    Okay.  That's the Heckel case and the Prust case;

8  correct?

9  A    Yes.

10 Q    Okay.  And you've issued the same opinion in those

11 two cases that we were talking about all along; right?

12 A    Yes.

13 Q    The amount of exposure with the three pieces

14 contributing; right?

15 A    Yes.

16 Q    Okay.  And you agree that Mrs. Heckel and Mr. Prust

17 were both heavy smokers; right?

18 A    I think there is some -- were former smokers, but

19 yes, they had smoked.

20 Q    So they have this additional component of cigarette

21 smoke as part of their causation; right?

22 A    Yes.

23 Q    Okay.  And you would also agree with me that -- so

24 asbestos is a dose-response disease; right?

25 A    Yes.
                    HENRY ANDERSON - CROSS

1   Q     The higher the dose, the higher the risk for the

2   disease; right?

3   A     Yes.

4   Q     And lung cancer generally requires a higher dose

5   than mesothelioma, right, to attribute to asbestos

6   exposure; right?

7   A     I would say the new data coming out is it's going

8   down lower doses.  But typically, yes, you would see

9   lung cancers with higher exposures.

10  Q     Okay.  And you didn't cite a single study that

11  evaluated populations around plants or mines that found

12  an increased risk for lung cancer in those communities;

13  right?

14  A     I did have the one study in Japan.

15  Q     Right.  The Kumagai study?

16  A     Yes.  Where they had a community excess there.

17  Q     And that study said in the general community around

18  the plant, there is no increased risk for lung cancer

19  just from living around this plant; right?

20  A     Just near the plant, yes.

21  Q     Right.  And then they kind of reconstructed the

22  data and they looked at lung cancers in one particular

23  quadrant of the plant; right?

24  A     The quadrant with the highest estimated exposure.

25  Q     Right.  And I think they considered prevailing
                    HENRY ANDERSON - CROSS

1  winds and various other factors about this plant

2  relative to that quadrant; right?

3  A    Yes.

4  Q    And they found an increased risk, a slightly

5  elevated risk for lung cancer just in the men that lived

6  in that quadrant; right?

7  A    Yes.

8  Q    Not in the women; correct?

9  A    No, there were very new women.

10 Q    This is the study you're relying on; right?

11 A    Yes.

12 Q    Okay.  And that's the basis for your opinion in

13 these cases that the lung cancers can be linked in any

14 meaningful way to community exposure; right?

15 A    That it's part of the cumulative exposure.

16 Q    And you didn't analyze whether Mrs. Heckel or

17 Mr. Prust lived in a particular quadrant relative to the

18 plant where their exposures would be higher, did you?

19 A    No.

20 Q    And you don't know the dose of any of these

21 plaintiffs' exposures in the community; correct?

22 A    Just the length of time.

23 Q    Just the length of time.

24 A    Time is a surrogate for dose.

25 Q    And what's your source for stating that time is a

                    HENRY ANDERSON – CROSS

82

1   surrogate for dose?

2   A     The literature looks at how long people have -- all

3   of them report how long people live in the homes; how

4   long people live in the community in these community

5   studies; what they do is they say the person has to have

6   lived at least one year in the community to be included.

7   So that's -- that's how you use it.  You look at all of

8   the old literature, the reports are the person lived or

9   worked, how long they worked at the plant, and that's a

10  surrogate for exposure.

11  Q     Well, you would also agree that in these studies

12  they found disease at multiple different intervals

13  across the time spectrum; right?

14  A     Yes.

15  Q     Right.  So there were disease found in shorter

16  durations of residents or whatever factory you're

17  looking at; right?

18  A     Most of them -- everybody is together.  They're

19  unable to sort out the length of time people lived

20  there.

21  Q     Which --

22  A     In the Japanese one, they actually did a survey of

23  all the people living in the community and were able to

24  gather that information and that's what they used.

25  Q     And didn't find a risk, an elevated risk in that
                    HENRY ANDERSON - CROSS

1    community; right?

2    A     Just the areas immediately adjacent to the plant.

3    Q     And you don't know how much or what the dose or

4    level of exposure for any of these plaintiffs was in

5    their household; right?

6    A     No.

7    Q     And you don't know their dose associated from their

8    own work clothes in their household; right?

9    A     No.

10   Q     And you don't know the dose associated from any

11   exposure from a family member's work clothes; right?

12   A     You don't know the quantitative dose.

13   Q     You don't know any type of dose; right?

14   A     What we have is a dose, is we have these are people

15   who were part of a risk population.  So they meet the

16   criteria of being individuals who lived in homes with

17   workers or lived near communities.  That is a group of

18   people who the various studies have shown are at

19   increased risk and actually have had that risk expressed

20   as disease occurring.  So you look at the studies that

21   are done on case control for the mesothelioma

22   registries, one of the factors where people with

23   mesothelioma are more likely than those without it to

24   have household or community exposure.  So they're part

25   of a class of individuals who are at greater risk.

                    HENRY ANDERSON - CROSS

1    Q    Right.  And to take that step any further than

2    that, you would then have to make that comparison that

3    we've been talking about this time; right?  About the

4    levels and exposure from the plants you're looking at in

5    the studies and the plant we have here; right?

6    A    In order to be in the class you need to live in an

7    area --

8    Q    Right --

9    A    -- for a given period of time.

10   Q    Right.

11   A    You don't need to know -- and that's all the

12   classification that's been done.  And with that

13   classification, we find that as a class of people they

14   are at greater risk of developing disease.  You don't

15   need to know what the dose is.  If you want to project

16   what's the likelihood that if you live in this area

17   you're going to develop disease, that's a different

18   approach.  But once you have the disease --

19            THE COURT:  Do you recall what the population

20   was that was studied in this -- is it Kamatsu (ph)

21   study?

22            THE WITNESS:  Yeah.

23            THE COURT:  Do you recall what the total

24   population was?

25            THE WITNESS:  Gee, I would have to -- I don't
                         HENRY ANDERSON - CROSS

1   know.  No, I don't know.

2           THE COURT:  All right.  Is it of concern to you

3   that there's only this single study given the relatively

4   low manifestations of mesothelioma -- I keep

5   mispronouncing that.  Why don't you say it once.

6           THE WITNESS:  Mesothelioma.

7           THE COURT:  Mesothelioma.  Is it of concern to

8   you that there's only this single study given the very

9   low percentage of disclosure?  You could just have, I

10  suppose, an anomalous single event in a quadrant close

11  to the plant and that would skew into -- if you

12  extrapolate from that.

13          THE WITNESS:  Here we're talking about lung

14  cancer -- mesothelioma is quite different.

15          THE COURT:  Right.  I'm sorry.  That's fair.

16  But the lung cancers that present themselves from

17  asbestos exposure, from mesothelioma exposure, is

18  substantial less likely to happen than presented from

19  cigarette exposure; right?

20          THE WITNESS:  That's the difficulty in studying

21  the lung cancer.  Why --

22          THE COURT:  Well, that's why I'm asking --

23          THE WITNESS:  -- there's only one study is for

24  lung cancer, there's many other contributing causes.

25          THE COURT:  So that's why I'm asking --
                    HENRY ANDERSON - CROSS

1          THE WITNESS:  For mesothelioma there's only

2     asbestos.

3          THE COURT:  That's what I'm asking you.  Isn't

4     it a concern to you that there's only this single study,

5     that that's all you have to opine that it was a

6     substantial contributing factor to either of Heckel or

7     Prust's exposure.

8          THE WITNESS:  It's the same contribution to the

9     exposure.  I would say the disease -- there's less

10    information developed on community exposure alone.

11         THE COURT:  Right.

12         THE WITNESS:  Now --

13         THE COURT:  Is that a concern to you.

14         THE WITNESS:  That's a concern.  Part of the

15    story here also is they had enough exposure to develop

16    the pleural plaques.  So there's other indications for

17    asbestos exposure in these individuals.  Now yes, the

18    attribution or how much, if it was just the household

19    exposure for the lung cancers, if that was their only

20    exposure, that would be a challenge and then the only

21    thing we have is this one study.  But we do know that

22    there's exposures occurring that are above an ambient

23    sort of exposure, a house without any asbestos worker in

24    it or in a community.  So it adds to the cumulative

25    exposure.  And that's what causes -- its cumulative

                    HENRY ANDERSON - CROSS

1  exposure is more important for lung cancer than

2  mesothelioma since we see mesothelioma after only a

3  single day of exposure.

4          THE COURT:  All right.  Anymore questions for

5  this witness?

6          MS. ELLIS:  I'm about to wrap up.

7  BY MS. ELLIS:

8  Q    To carry on that point, you see mesothelioma after

9  a single day of exposure, and that's in the occupational

10 setting; right?

11 A    Yes.

12 Q    So there are no community household exposures with

13 just a single day in those settings where mesothelioma

14 has been identified; right?

15 A    Living in the household that long, no.

16 Q    Right.  Or living in the community; right?

17 A    No.

18 Q    Okay.  And you're not aware of any study that

19 attributes risk for people around a plant or a mine who

20 just travel in and out of the town; right?  Who don't

21 live there, but they're just coming in to shop and doing

22 errands and things likes that.  There's no study like

23 that; is there?

24 A    No.

25 Q    Okay.  For several of our plaintiffs like
                    HENRY ANDERSON - CROSS

1    Mr. Masephol, for example, he never lived in Marshfield;

2    right?

3    A      Right.

4    Q      He lived 12 miles outside of town in Chili his

5    entire life; right?

6    A      Yes.

7    Q      And the only allegations here are that he drove

8    back and forth to work and that he would come to town

9    about once a week to run an errand or go to a hardware

10   store; right?

11   A      Yes.

12   Q      And you called that a substantial exposure that

13   contributed to his cumulative; correct?

14   A      I say that if he breathed the air in the same area

15   the people lived there for that proportional time that

16   he was there, that's contributing to his exposure and

17   that's an environmental exposure.

18   Q      Okay.  And you called it substantial; right?

19   A      Yes.

20   Q      Okay.  And then Mr. Seehafer, for example, he never

21   lived in Marshfield; correct?

22   A      Yeah.  I mean with all of these guys --

23   Q      Okay.  Fair enough.

24   A      -- how much they lived and what they did, but if he

25   didn't live there, yeah, it would be the same thing.
                      HENRY ANDERSON - CROSS

1   They all shopped in the area.  I don't know if he's the

2   one that went to school across the street.  Grade school

3   was right across the street from the plant.  So one of

4   them went to school there and that would be community

5   exposure.

6   Q    And so in your report you stated that there was an

7   increased risk for disease in Marshfield within 1.25

8   miles of the plant; right?

9   A    That's the area where I felt there would be a

10  substantial contribution of exposure.

11  Q    And you used that radius based on those studies

12  that we just talked about; right?

13  A    All of these, yeah.  The studies would calculate

14  the excess risk at 2,000 meters.  500 meters it's even a

15  higher risk.

16  Q    Okay.

17  A    But it begins to taper out with the distance.

18  Q    And you didn't base that radius on where the

19  diseases occurred in Marshfield; right?

20  A    No.

21  Q    Okay.  So you didn't plot out where these

22  plaintiffs lived to determine how that impacted your

23  radius; right?

24  A    No.

25  Q    Okay.  And so my point being you -- that's the zone
                    HENRY ANDERSON - CROSS

1   of risk, I will call it in your opinion, but yet you

2   attributed community exposure in cases for people who

3   never lived in that area; right?

4   A    The zone of exposure is the 1.2 miles and the time

5   you spent within that 1.2 miles contributes to exposure.

6   If you were living there in that community, you

7   obviously spent a lot more time there than somebody

8   passing through.

9   Q    Okay.  And that risk you testified at your

10  deposition was for mesothelioma; right?  The 1.2 miles;

11  right?

12  A    Yes.

13  Q    And so you attributed causation in cases we have

14  here, Mrs. Heckel and Mr. Prust, even though those cases

15  were lung cancer; right?

16  A    Again, it contributed.  That's a significant source

17  of exposure to the cumulative exposure.

18  Q    Okay.

19  A    Calculated the same way.

20  Q    Okay.

21          THE COURT:  Very briefly, Counsel.  Was there

22  something more, but it better be new.

23          MS. ELLIS:  Okay.  I think I am done.  I will

24  rest, Your Honor.  Thank you.

25          THE COURT:  All right.  We are going to take
                    HENRY ANDERSON - CROSS

1  our morning break at this time.  We'll reconvene at

2  11:05 and continue until 12:30.  I have a one o'clock

3  hearing and we -- so we'll take our lunch break at 12:30

4  and reconvene at 1:30.  That hearing will be in another

5  courtroom, so you don't need to move your materials.

6       The only other thing I want to -- point I want to

7  make is that defendants have made reference to a number

8  of materials without making clear what they are for

9  purposes of the record.  I would ask that you label

10  anything that was put before this witness as an exhibit

11  and I'll ask you to put that or make a statement on the

12  record as to what those are.  I'm going to simply accept

13  them for purposes of continuity of this record, not on

14  an evidence basis at this point.  Exhibits -- but they

15  should be made a part of the record and they should be

16  labeled beginning with the letter A.  Plaintiffs may do

17  the same thing beginning with the number 1.

18       And I'll ask if there's anything more before we

19  take our break from the plaintiff.

20          MR. FINCH:  Not before we take a break.  I

21  would prefer to do my redirect after the break if we're

22  taking a break now.

23          THE COURT:  When else did you -- well, I'm not

24  even going to go there.  What about the defendants?

25  Anything more?

                HENRY ANDERSON - CROSS

1          MS. ELLIS:  No, Your Honor.

2          THE COURT:  All right.  Very good.  We'll take

3    our break now.  We'll reconvene at 11:05.

4          (Recess 10:51-11:05 a.m.)

5          THE COURT:  All right.  You may proceed.

6          MR. FINCH:  May it please the Court.

7                    REDIRECT EXAMINATION

8    BY MR. FINCH:

9    Q    Dr. Anderson, I believe the Court has recognized

10   you as an expert.  But does this slide set forth some of

11   your most relevant --

12         THE COURT:  We're not going to spend any time

13   on his experience.  You should have assumed that all of

14   this was already in because we've already done a direct.

15   I've already read his report.  All of that is in.  What

16   you're doing is, as you accurately put it so I didn't

17   make the point, a redirect, and so you should be getting

18   to the heart of what's been raised by plaintiff (sic).

19   BY MR. FINCH:

20   Q    There was a series of questions that basically the

21   heart of it goes to quantification of exposure or level

22   of exposure.  Do you recall those questions?

23   A    Yes.

24   Q    Okay.  Do you need a quantitative estimate of

25   exposure to make a causal determination that a given

                  HENRY ANDERSON - REDIRECT

1   type or nature of asbestos exposure is sufficient to

2   cause mesothelioma?

3   A    No.

4   Q    Can you explain to the Judge why not?

5           THE COURT:  I get that already and I'm going to

6   allow him to testify that it's a cause of mesothelioma,

7   even if I can't pronounce it.  The question is whether

8   it's enough to opine that it substantially contributed

9   to the mesothelioma.  Mesothelioma.

10  BY MR. FINCH:

11  Q    Do you need a quantitative estimate of dose in

12  order to opine that if you have a situation where there

13  are multiple sources of exposure, each of which is of

14  the nature and the type that is being deemed sufficient

15  to cause mesothelioma alone, do you need a quantitative

16  estimate of dose to say that a particular subcomponent

17  is a substantial contributing cause of some person's

18  mesothelioma?

19  A    No.

20  Q    Can you explain to the Judge why not?

21  A    That's because independently you assess length of

22  time, what the individual did, where they were.  That

23  qualitative assessment is consistent with what's been

24  reported in the literature as being causal.  There's

25  enough of those kind of cases, enough of those studies

                    HENRY ANDERSON - REDIRECT

1  out there that, in fact, each of those are significant

2  contributors.

3       THE COURT:  Let me ask you this:  You're

4  expressing a medical opinion, not a legal opinion.

5       THE WITNESS:  Yes.

6       THE COURT:  So when you say substantial

7  contributing factor, you're saying that it is among the

8  factors that you, as a medical expert, would look at to

9  determine the cause of the individual's mesothelioma.

10  I'm still not going to get it.

11       THE WITNESS:  Yes.

12       THE COURT:  In any event, that's what you're

13  opining on.

14       THE WITNESS:  Yes.  Basically I'm saying there

15  are some exposure circumstances that you specifically

16  look for that add to that.  And you look for them

17  because they've been shown to be significant in the

18  literature, different from driving on the street.

19       THE COURT:  I'm with you.  But you, as a

20  medical expert, would also begin with the most obvious;

21  right?  So the most obvious, the greatest cause that you

22  know about from these studies and from your own practice

23  is occupational exposure; right?

24       THE WITNESS:  The highest proportion of people

25  with mesothelioma have had an occupational exposure.

HENRY ANDERSON - REDIRECT

1           THE COURT:  All right.

2           THE WITNESS:  But it can be many years or a few

3      years.  If it falls in between, you may have had short

4      years, but you lived in the community for 75.

5           THE COURT:  I got it.  All right.

6           THE WITNESS:  Okay.

7           THE COURT:  But that's what you would look at

8      first.

9           THE WITNESS:  Yes.

10          THE COURT:  All right.  And then you would look

11     for other exposures; right?

12          THE WITNESS:  Yes.

13          THE COURT:  What I've been calling

14     nonoccupational but what the parties have called

15     community or specific residential home exposure.

16          THE WITNESS:  Yes.

17          THE COURT:  Okay.  And we know from the studies

18     that the likelihood that it is occupationally caused is

19     much greater than that it's a nonoccupational cause;

20     right?

21          THE WITNESS:  The contribution to this

22     cumulative exposure --

23          THE COURT:  Is much greater.

24          THE WITNESS:  -- is more likely to be the

25     largest component from the occupational component unless

                    HENRY ANDERSON - REDIRECT

1  the exposure or the length of time of work is very

2  short.

3          THE COURT:  Right.  But none of the -- none of

4  the individuals here that you've opined on fit that

5  category.  We know that they all worked a long period of

6  time in this plant; right?

7          MR. FINCH:  Some of them didn't, Your Honor.

8          THE WITNESS:  Some of them didn't.

9          THE COURT:  Counsel, you'll have an opportunity

10  to explain.  I'm simply asking the question.

11          THE WITNESS:  I think some were like five

12  years, which is a short period of a working lifetime.

13          THE COURT:  But you're not talking about a

14  working lifetime, you're talking about exposure -- this

15  is medical.  This isn't argumentative.  For medical

16  purposes, it's your opinion that five years is not a

17  long exposure period?  You've never testified to that.

18  It's a long period of time, five years.

19          THE WITNESS:  It's a long period of time --

20          THE COURT:  For exposure to asbestos on the

21  job.

22          THE WITNESS:  It is, but it's not a long period

23  of time compared to all the people who work with

24  asbestos.

25          THE COURT:  All right.  Is it a long period of
                    HENRY ANDERSON - REDIRECT

1  time compared to someone who lives in a community with

2  communal exposures of 20 years?  Five years on the job,

3  every day, eight hours a day, direct exposure to

4  asbestos.

5       THE WITNESS:  If it's somebody who lives right

6  nearby who's writing letters, complaining about the

7  cloud of dust coming through, it could be very

8  comparable percentagewise.  I mean the doles (ph) could

9  be better controlled in the factory because they have

10  processes to reduce that where in the community it just

11  blows right out.

12       THE COURT:  All right.  Now, you are asked for

13  an individual who works, let's assume, 20 years or more

14  in this plant, the relative contribution of those two

15  occupational and nonoccupational exposures, the relative

16  contribution.  Can you say anything about the relative

17  contribution?

18       THE WITNESS:  What I did do, and that's in the

19  deposition because that's frequently what the jury gets

20  asked is you have to apportion this.

21       THE COURT:  Right.

22       THE WITNESS:  And really the disease is caused

23  by the total cumulative.  It's --

24       THE COURT:  So what's your answer?  I know

25  you've been asked.
         HENRY ANDERSON - REDIRECT

1           THE WITNESS:  My answer is you can do that and
2    you can do that by converting the length of time in the
3    community to work years.
4           THE COURT:  Okay.  And how --
5           THE WITNESS:  So at 20 years, what I use is
6    it's about -- when you look at the hours in a workday,
7    you work 40 hours a week and you have all these other
8    hours that you're spending, so the level that you need
9    to develop a workday would be about .4 in a community.
10   So if you're living within a mile and a quarter, 1.2, a
11   mile, give or take, I would multiply those years by .4
12   and add those to the worker years, sum those up, and
13   then divide it.  Same would be for the household.
14          THE COURT:  And I want to stick with that for a
15   second.  So that would be living within 1.25 miles.
16          THE WITNESS:  Yes.
17          THE COURT:  Which you're assuming would, I
18   guess, be what -- how many hours per day?
19          THE WITNESS:  Well, if you're 8 hours -- 40
20   hours --
21          THE COURT:  You're not going to spend the rest
22   of your time in your house.
23          THE WITNESS:  Well, you're going to be in the
24   community.  In the air --
25          THE COURT:  But you just got done saying we're
                        HENRY ANDERSON - REDIRECT

1  looking at the exposure within 1.25 miles.  But that's

2  the sole exposure --

3            THE WITNESS:  If you live in that area.  If you

4  live in that area --

5            THE COURT:  Yeah.

6            THE WITNESS:  -- and you're spending those

7  hours --

8            THE COURT:  What hours?  Eight hours?

9            THE WITNESS:  You're probably spending most of

10  the hours that you're not at the workplace.

11            THE COURT:  Why do you say that?

12            THE WITNESS:  Well, you're going to come home

13  from work.

14            THE COURT:  Right.

15            THE WITNESS:  How many hours do you spend in

16  your house?

17            THE COURT:  Eight, ten.

18            THE WITNESS:  Yeah.  Well, probably more than

19  that.

20            THE COURT:  Actually, no.

21            THE WITNESS:  You work longer hours than a lot

22  of people.  I don't know.

23            THE COURT:  So I don't know --

24            THE WITNESS:  You drive.  And you drive to the

25  park --

                    HENRY ANDERSON - REDIRECT

1          THE COURT:  Hang on.

2          THE WITNESS:  -- and you go here --

3          THE COURT:  Hang on.  Are you equating the

4    eight hours of exposure on the job as the equivalent to

5    the same number of hours within 1.25 miles of the plant?

6          THE WITNESS:  No.  The hours -- I'm equating it

7    to the -- using the 16 hours that you're not at work

8    plus --

9          THE COURT:  We just got done saying you can't

10   assume 16 hours.  But let's assume 12.

11         THE WITNESS:  I mean you can --

12         THE COURT:  Are you equating eight hours

13   working with 12 hours within 1.25 miles of the plant?

14         THE WITNESS:  More than 12 hours because --

15         THE COURT:  Fine.  Okay.  Hang on.  Hang on.

16   You're just not getting to the question I'm trying to

17   ask.  My question is on what basis do you equate those

18   two?  How do you know that exposure with 1.25 miles for

19   12 plus hours is the equivalent of eight hours on the

20   job in terms of exposure?

21         THE WITNESS:  Okay.  What I do is I look to the

22   literature.

23         THE COURT:  And that's what I'm asking you for.

24         THE WITNESS:  So I look to the literature and I

25   look at the relative -- the ratio of the relative risk.
                    HENRY ANDERSON - REDIRECT

1  So we have these studies and this one paper that

2  averaged them all and said -- or the workers have 27

3  full risk in that particular plant.  And in the

4  community, within the 1.2 miles, it was 10.  So that's

5  about a third.

6      So one day in the plant, and of course when you're

7  in the plant you're not exposed at a high level all the

8  time, it's just hours in the plant, you're exposed

9  differently than in the community.  So --

10          THE COURT:  All right.  And --

11          THE WITNESS:  -- the study in the community --

12          THE COURT:  Hang on now.  The study that you're

13  relying on for the ten-fold exposure is a cumulative

14  study?

15          THE WITNESS:  Yes.  And then broken --

16          THE COURT:  Hang on.  And for the 27-fold is

17  from this cumulative study.

18          THE WITNESS:  From the workers.  Actual

19  mesotheliomas compared to an unexposed group --

20          THE COURT:  Well, you just got done saying

21  there was no such thing as an unexposed group.  The

22  average group.

23          THE WITNESS:  You're right.  So it's probably

24  higher.  The actual -- but it is what we have.  You work

25  with what you've got.
                HENRY ANDERSON - REDIRECT

1          THE COURT:  Well, that's what I'm asking you

2     for.  So the definitive study you'd rely on would be

3     this cumulative or study of studies as they sometimes

4     say.

5          THE WITNESS:  Yeah.

6          THE COURT:  And that study is what?  The name

7     of that study is?

8          THE WITNESS:  It's the Bourdés.

9          THE COURT:  Okay.  Bourdés with a "B"?

10          THE WITNESS:  "B."  Yeah.  B-o-u-r-d--

11          THE COURT:  Okay.  And that study says 27-fold

12     risk, meaning 27 times more likely than the general

13     population --

14          THE WITNESS:  Yes.

15          THE COURT:  -- for someone who has worked how

16     long in the plant?

17          THE WITNESS:  Ever work in the plant.

18          THE COURT:  Ever.

19          THE WITNESS:  Yeah.

20          THE COURT:  Even for a short period of time.

21          THE WITNESS:  It's everybody who worked in the

22     plant.  It's -- yeah.

23          THE COURT:  All right.  Compared to a ten-fold

24     risk for someone who never worked in the plant.

25          THE WITNESS:  And lived in the community,
                    HENRY ANDERSON - REDIRECT

1  within 2,000 meters.

2           THE COURT:  2,000 meters being?

3           THE WITNESS:  1.2 miles.  That's where I got

4  the 1.2.

5           THE COURT:  I get it.

6           THE WITNESS:  The European studies all do it

7  like that.

8           THE COURT:  I got it.  I just want you to stay

9  with me.  And that's ten-fold for what period of time?

10 Any period they lived there, any time in their lives?

11          THE WITNESS:  When they lived one or more

12 years.

13          THE COURT:  One or more years.

14          THE WITNESS:  Many of them lived there far

15 longer.

16          THE COURT:  So based on that, it's your opinion

17 that there's roughly a one-third contribution of risk --

18          THE WITNESS:  Yes.

19          THE COURT:  -- between nonoccupational and

20 occupational.

21          THE WITNESS:  Right.

22          THE COURT:  So another way, you would be two

23 times more likely if you worked there than if you

24 didn't.

25          THE WITNESS:  Three times more likely.
                    HENRY ANDERSON - REDIRECT

1          THE COURT:  Three times --

2          THE WITNESS:  Yeah.

3          THE COURT:  -- because it's 27 versus 10.

4          THE WITNESS:  Yeah.

5          THE COURT:  No.  But you're right.

6          THE WITNESS:  Well, I mean all of this is -- I

7    mean you can choice what you want and what I use is what

8    I --

9          THE COURT:  That's what I'm getting at is

10   because you earlier testified that in a population of a

11   million, occupational would be between 1,000 and 100,000

12   per million, which is 1 to 10 percent.  And for

13   nonoccupational, it would be 4 --

14         THE WITNESS:  Yeah.

15         THE COURT:  -- million which is .0004 percent.

16   That testimony and what you've just told me from the

17   study are completely diametrically opposed.

18         THE WITNESS:  They're different approaches.

19   It's a different -- I mean the one in a million is a

20   population of a million people.

21         THE COURT:  Right.

22         THE WITNESS:  Where the 10 percent is if you

23   look at a specific population, when they die not

24   everybody -- I mean mesothelioma is a very -- that's the

25   one in a million.  It's a very rare disease.  You only

                   HENRY ANDERSON - REDIRECT

1    have 80 deaths in Wisconsin a year --

2            THE COURT:  I get it.  Let me try one more

3    time.

4            THE WITNESS:  -- out of 20,000.

5            THE COURT:  If you were presented with a

6    patient with mesothelioma, your testimony is that you

7    would -- the odds are one in three that they didn't ever

8    -- that they never worked in a plant.  That's just

9    unbelievable to me.  They never worked in a plant where

10   they were exposed.  But that's what you testified to.

11           THE WITNESS:  Well, what I'm saying is of -- if

12   you have people with mesothelioma --

13           THE COURT:  Yes, sir.

14           THE WITNESS:  -- 80 percent of them will have

15   an identified asbestos exposure of one of these three

16   categories.  Others of them --

17           THE COURT:  No, I get it.

18           THE WITNESS:  -- won't remember whether they

19   were exposed or not or don't know.

20           THE COURT:  Right.  Understood.  So certainly

21   if you were a bookie in Vegas, and I don't mean to

22   minimize the seriousness of this case to that end.

23           THE WITNESS:  No, I understand.

24           THE COURT:  But if you were, the highest

25   that -- you would give the worst odds to those who
                    HENRY ANDERSON - REDIRECT

1    worked in the plant --

2              THE WITNESS:  Yes.

3              THE COURT:  -- as the cause.

4              THE WITNESS:  Yes.

5              THE COURT:  But you would still think there was

6    a substantial chance that they never worked in the plant

7    but were rather exposed nonoccupationally.

8              THE WITNESS:  Yes.

9              THE COURT:  And for that proposition you're

10   relying on the Brody study.

11             THE WITNESS:  That's how I'm coming up with the

12   proportion to attribute between it.

13             THE COURT:  All right.  I apologize, Counsel.

14   You may proceed.

15             MR. FINCH:  Okay.

16   BY MR. FINCH:

17   Q    The Judge's questions were all about risk.  Once

18   somebody has the disease and you're looking back at

19   cause, can you explain how that differs?

20   A    Well, once you have the disease like --

21             THE COURT:  I think I remember in statistics,

22   it's the buyer's -- is it buyer's risk?  Buyer's study?

23   The statistical difference between an actual result

24   versus the general risk.  That's what you're really

25   talking about.  The statistics are very different for
                    HENRY ANDERSON - REDIRECT

1    the two.

2              THE WITNESS:  Yes.  I mean it's -- and if you

3    have the disease and the disease is only caused by one

4    thing, it's -- that's a likely cause of that thing.

5    It's mesothelioma.  So even a brief exposure --

6              THE COURT:  Was probably the cause.

7              THE WITNESS:  Yeah.  I mean more likely than

8    not.  Without even knowing if there's an exposure, you

9    would bet -- your bookie bet would be -- you'd say I --

10   call on the phone and somebody says I have a relative

11   with mesothelioma.  I would say I will bet that person

12   was exposed to asbestos.

13             THE COURT:  Right.

14             THE WITNESS:  And then you'd have to hunt to

15   find what it is.

16             THE COURT:  And the only difficulty I'm having

17   is with your arriving at the odds you do.  For example,

18   here we have the combined effects, but where we know

19   there is no exposure to occupational effects, we're

20   seeing a substantially -- and I realize that I'm mixing

21   the two and I'm just having trouble measuring the

22   combined effect.  But if we take a population with

23   mesothelioma present, we know for the population as a

24   whole it's far greater likelihood that it was a result

25   of an occupational exposure.  We know nothing else.
                    HENRY ANDERSON - REDIRECT

1          THE WITNESS:  Yeah.  I mean most of them have

2     had an occupational exposure.  But I mean part of the

3     further complication here is your risk of developing

4     disease is --

5          THE COURT:  Low.

6          THE WITNESS:  -- very low to start with, but

7     it's proportional or cumulative.  So if all you have is

8     the occupational component, you're going to have fewer

9     people develop disease than if you have occupational and

10    you include community and you include the household or

11    the exposures.

12         THE COURT:  We just don't know how much more or

13    less.

14         THE WITNESS:  Yeah, how much.  And my expert

15    judgment is what I gave you as to how I would look at

16    apportioning it.  Now, you can adjust that other ways,

17    but I like to use it based on some of the literature and

18    the literature that includes the appropriate numbers in

19    each of them.

20         THE COURT:  All right.  I'm truly done.  Go

21    ahead.

22    BY MR. FINCH:

23    Q    Okay.  But the relative apportionment you were

24    talking about, you were using epidemiology to try to

25    come to some kind of apportionment in an individual

                    HENRY ANDERSON - REDIRECT

1  person.  Is that sort of what you're doing?

2  A    Yes.  It's a qualitative.

3  Q    It's a qualitative analysis.  Now, explain briefly

4  what is individual susceptibility and how that plays

5  into the causation of mesothelioma.

6  A    Well, we don't know whether some people are more

7  susceptible to it because of their genetics:  Could be

8  their work practices; could be how fast they breathe;

9  whether they're a mouth breather or a nose breather.  So

10  there's all sort of factors that go into how careful you

11  are and where you work in the environment.

12  Q    Okay.  Now, I want -- and am I correct that an

13  individual's susceptibility, your likelihood of getting

14  disease, getting exposure, that's something that's not

15  just specific to asbestos or mesothelioma, that cuts

16  across all kinds of diseases.

17  A    Right.  It's everything.

18  Q    That's why a lot of people who smoke two packs of

19  cigarettes a day never get lung cancer.

20  A    Yes.

21  Q    Okay.  Now, I want to try to get to the interplay

22  between the Judge's questions about population-based

23  risk and in an individual person.  So am I correct that

24  this chart shows generally the greater the type of

25  exposure or the different type of exposure, the greater

                    HENRY ANDERSON - REDIRECT

1    the risk?  Explain this chart that you and I put

2    together, Dr. Anderson.

3    A    Yes.  This is a qualitative comparison, again, what

4    we talked about --

5          THE COURT:  Just so we're clear, this is not a

6    relation that you're testifying to, so it's not a

7    straight line increase with each of these exposures.

8          THE WITNESS:  No.

9          THE COURT:  But you're saying that exposure

10   rises with more exposure.

11         THE WITNESS:  Right.

12         THE COURT:  Or I should say the likelihood of

13   causation, the likelihood of the disease rises with

14   greater exposure.

15         THE WITNESS:  Yes.

16         THE COURT:  Next question, Counsel.

17         MR. FINCH:  Okay.

18   BY MR. FINCH:

19   Q    And am I correct that each of those different types

20   of exposure:  Environmental exposure, household

21   exposure, occupational-bystander exposure,

22   occupational-user exposure, each of those -- if you're

23   presented with a patient and that's all they had, you

24   would say that is an asbestos-related mesothelioma.

25   A    Yes.
                HENRY ANDERSON - REDIRECT

1  Q     Each of those --

2  A     Again, it would depend on how long.  But yes.

3         THE COURT:  It's more likely than not.

4  Q     More likely than not.

5  A     There.  There you got it.

6  Q     Okay.  Now, can you explain to the Judge what is

7  the significance in terms of latency and in terms of

8  likelihood of getting disease of additional asbestos

9  exposure?

10        MS. ELLIS:  Your Honor, I want to object to

11 this because, one, we weren't provided with this; two, I

12 don't know what the foundation is.

13        THE COURT:  I don't know what this is.  It's

14 just a demonstrative.  It has no mathematical accuracy.

15 He's just showing relative exposure.  If you're

16 objecting that it's not part of his report, I'd listen

17 to that.

18        MS. ELLIS:  That is accurate.

19        THE COURT:  But he is actually just talking

20 about -- I think his expression was severity of

21 exposure, so -- which it is something that was in his

22 report.  So I'm going to let him testify.

23 BY MR. FINCH:

24 Q     Could you explain how the severity of increasing

25 exposure affects latency and likelihood of getting

                    HENRY ANDERSON - REDIRECT

1  disease, which is what this chart is about?

2  A     The greater the exposure -- a latency is the period

3  of time between when you're first exposed when you

4  develop disease.  This is a malignancy that has a very

5  long latency, which is why all of the people that

6  develop and die from it are elderly.  So the higher the

7  exposure, the shorter the latency.  So if you have a

8  very high exposure, your period of time for those types

9  of people, they start to develop their disease at an

10  earlier age or earlier period from onset.

11  Q     Okay.  Now, let's take it to the case of an

12  individual person and I want you to assume that these

13  are three different people that have mesothelioma and

14  the different colored bars are different sources of

15  exposure that in the literature have been shown that

16  that nature and type of exposure can cause mesothelioma

17  by itself.  Can you explain to the Judge how cumulative

18  exposure results in disease in a particular individual?

19  A     Well, it's the total exposure so that you can

20  look -- in arriving at the total exposure, you arrive

21  there by asking questions and gathering information

22  about these other exposures that have been shown to be

23  sufficient to cause disease.  So you start by doing --

24  medically you do your occupational history, you talk to

25  other relatives, you talk to next-of-kin, you talk to --

HENRY ANDERSON - REDIRECT

1    or you get information from co-workers because people

2    often don't know whether they've been exposed or not.

3    And then that's how you arrive at your total exposure.

4    Q    Okay.  Now, I want you to assume that this person

5    in the middle -- my laser pointer doesn't seem to work

6    -- is Mr. Boyer.  Mr. Boyer someone who had occupational

7    exposure, household exposure, and community exposure; is

8    that correct?

9    A    Yes.

10   Q    Okay.  And I think -- maybe we haven't clearly

11   defined it.

12           THE COURT:  I think this is really starting at

13   a very low level and you don't -- I understand --

14           MR. FINCH:  Okay.  Fine.

15           THE COURT:  -- what he has testified to.  I

16   understand his report, his expert report.  There's

17   nothing mysterious about it.  It's straightforward, as

18   is this combination.  So maybe you could go from there

19   to something that --

20           MR. FINCH:  Sure.

21   BY MR. FINCH:

22   Q    My question is for Mr. Boyer, if you were to --

23   let's say the occupational exposure is blue, the

24   household exposure is red and the exposure from living

25   in the community is yellow.  If you were to eliminate

                    HENRY ANDERSON - REDIRECT

1    one of those exposures from his life, could you still

2    say that it would be more likely or not he would have

3    developed mesothelioma when he did?

4    A    Yes.

5    Q    What would you --

6    A    Oh, no.  It might have -- now when he did --

7    Q    Yes.

8    A    -- would have probably changed.  It might well have

9    changed, I can't tell you how much.

10   Q    And he might not have gotten the disease at all.

11   A    He might not have gotten the disease because the

12   risk is somewhat lower if you had lower total exposure.

13   Q    Once someone has the disease, is there any way

14   scientifically that you know of that you can say okay, I

15   can back out some significant component of his exposure

16   and still say it was -- that he would have developed the

17   disease?

18   A    No.

19   Q    Do you need a quantitative measurement or estimate

20   of any subcomponent exposure as long as they are the

21   nature and type of exposure that has been shown in

22   literature to cause mesothelioma?

23   A    No.

24   Q    The Helsinki criteria is something that we talked

25   about in our papers, but I don't think we've had a

HENRY ANDERSON - REDIRECT

1  witness explain it.  Can you just explain what the

2  Helsinki criteria is and how you use it to analyze

3  exposure in the cases here from mesothelioma?

4  A    This is a consensus report, an international group,

5  a large group of experts that got together to come up

6  with statements that, as you were talking, for

7  clinicians and others to use in evaluating exposures,

8  and they're summarizing in fairly clear terms the

9  literature and the experience up to that point.

10 Q    And are these the key takeaway points from the

11 Helsinki criteria:  The history of significant

12 occupational, domestic or environmental exposure to

13 asbestos will sufficient for attribution?

14 A    Yes.

15 Q    And do you apply that to each of the types of

16 exposures in somebody's life to say whether it's a

17 substantial or significant exposure to them?

18 A    Yes.

19 Q    And was the Helsinki criteria consensus document

20 something the work of scientists from around the world

21 who published it first in 1997?

22 A    Yes.

23 Q    And it was updated and essentially the criteria

24 reconfirmed and republished in 2014?

25 A    Yes.
                    HENRY ANDERSON - REDIRECT

1   Q    And you regard that as reliable and authoritative

2   in a medically sound way to assess causation in

3   mesothelioma cases?

4   A    Yes.

5   Q    Okay.  Are you familiar with a textbook called *Dail*

6   *& Hammar's Pulmonary Pathology*?

7   A    Yes.

8   Q    Do you regard that as reliable and authoritative on

9   the question is cumulative exposure-causing disease a

10  question?

11         MS. ELLIS:  Your Honor, I'm going to object to

12  this because this was not cited in his report or

13  discussed at all.

14         THE COURT:  Counsel.

15         MR. FINCH:  Your Honor, it wasn't cited in his

16  report, but it is a piece of medical literature he's

17  aware of; he can testify is reliable and authoritative.

18  It's supportive --

19         THE COURT:  If it wasn't in his report or in

20  his supplemental report, he's not testifying about it.

21  So that's easy.

22         MR. FINCH:  Can I lay a foundation that it is

23  reliability and authoritative?  This is -- for purposes

24  of a Daubert hearing if this is a hearing that's

25  conducted under Rule of Evidence 104, sources beyond

                    HENRY ANDERSON - REDIRECT

1  what the expert has in their report can be considered by

2  the court to assess the reliability.

3           THE COURT:  I'll hear it for that reason.

4           MR. FINCH:  You will do that?

5           THE COURT:  Yes.

6           MR. FINCH:  Thank you, Your Honor.

7  BY MR. FINCH:

8  Q    You're familiar with this textbook, Doctor?

9  A    Yes.

10 Q    Okay.  So you're not going to obviously --

11          THE COURT:  Before we go to that textbook, does

12 the Helsinki study say that nonoccupational exposure is

13 sufficient -- at whatever level, is sufficient to assume

14 cause?

15          THE WITNESS:  Yes.

16          THE COURT:  Because I didn't see that in the

17 quote.  Is that somewhere else in the --

18          MR. FINCH:  It's in the Helsinki document.

19          THE COURT:  But not the one you pulled up.

20          MR. FINCH:  What it says is that "A history of

21 significant occupational, domestic or environmental..."

22 domestic is --

23 BY MR. FINCH:

24 Q    Doctor, is domestic another word for household?

25 A    Yes.
                   HENRY ANDERSON - REDIRECT

1   Q    And is environmental another word for neighborhood

2   exposure?

3   A    Yes.

4          MS. ELLIS:  Your Honor, I'm going to object to

5   leading and for counsel explaining the paper as opposed

6   to having the doctor testify.

7          THE COURT:  Well, I'll sustain the objection,

8   although this is not for purposes of -- I mean I'm going

9   to allow some leeway given the nature of the Daubert

10  hearing.  Having said that, looking at those two

11  statements, the first one says an occupational history

12  of brief or low-level exposure is sufficient, but the

13  next one says a history of significant occupational,

14  domestic or environmental exposure.  So Helsinki

15  distinguishes between brief or low-level occupational

16  history, which is contrary to what you said which is

17  that even a short occupational exposure is apparently

18  sufficient, but you have to show a history of

19  significant occupational -- of domestic or environmental

20  exposure to make the same attribution.

21  BY MR. FINCH:

22  Q    What does significant mean?

23  A    I mean they don't define what significant is, but

24  it's a period of time.  More than one day.

25          THE COURT:  It must be different than brief or
                    HENRY ANDERSON - REDIRECT

1    low-level exposure; right?  There's a difference in what

2    Helsinki says.

3              THE WITNESS:  I would say no.

4              THE COURT:  So you're not relying on the

5    Helsinki --

6              THE WITNESS:  I'm relying on this and it's how

7    you interpret and parse what they're saying.

8              THE COURT:  That's what I'm being asked to do.

9    I'm being asked to find if there's any scientific data

10   behind your opinion and I'm concerned that you're not

11   recognizing in your own paper, the one you rely on, the

12   distinction between even a brief or low-level

13   occupational history versus a low or brief or low-level

14   exposure, domestic or environmental.  In other words,

15   one allows the assumption and the other doesn't.  That's

16   what that's saying, isn't it?

17             THE WITNESS:  I don't interpret it that way.  I

18   mean the key is you have to consider it to be -- I mean

19   a significant occupational is brief or low level or

20   whatever, or it can be a significant domestic or

21   environmental exposure.  And it's --

22             THE COURT:  So in other words --

23             THE WITNESS:  -- up to the clinician or the

24   expert to decide is it a significant exposure.

25             THE COURT:  In other words, in order to find or

                       HENRY ANDERSON - REDIRECT

1  to attribute an exposure of asbestos being the cause or

2  being an attributable factor for the mesothelioma, you

3  would have to have a significant exposure, domestic or

4  environmental.

5          THE WITNESS:  Yeah.

6          THE COURT:  Whereas you only need brief or

7  low-level exposure in your occupation.

8          THE WITNESS:  But that's considered

9  significant.

10          THE COURT:  Right.

11          THE WITNESS:  I mean so --

12          THE COURT:  No, no, no, Doctor.  Either you

13  agree or you disagree with my statement that for

14  domestic and environmental exposure, you need to have a

15  significant exposure in order to attribute to -- in

16  order to be attributed to the resulting mesothelioma,

17  whereas an occupational history need only be brief and

18  low level.  You agree with that statement or at least

19  you agree there's what the Helsinki consensus says.

20          THE WITNESS:  I would say these are linked.

21  The first one defines a significant occupational

22  exposure.  The second one says once you've determined

23  it's a significant -- I mean it says significant

24  occupational --

25          THE COURT:  All right.  Does it anywhere --
                    HENRY ANDERSON - REDIRECT

1          THE WITNESS:  -- which is not different from a

2     brief or low-level exposure.

3          MR. FINCH:  Your Honor, I think it would be

4     actually helpful to actually highlight the two sections

5     of the -- okay.

6     BY MR. FINCH:

7     Q    Doctor, is this the portion of the Helsinki

8     criteria that says "in the absence of markers," and

9     markers they're talking about pleural plaques or

10    asbestosis?

11    A    Yes.

12    Q    And then it says "a history of significant

13    occupational, domestic or environmental exposure to

14    asbestos will suffice for attribution."  That's the

15    point we were just talking about; right?

16    A    Yes.

17    Q    Okay.  Then further on down here, does it talk

18    about the level or nature of type of asbestos exposure

19    in the further text?  What does it say under

20    mesothelioma can occur?

21    A    Well, the lowest asbestos exposure.  However --

22    Q    Then what does it say about however?

23    A    And then it says "very low background.

24    Environmental exposures have only an extremely low

25    risk."

                    HENRY ANDERSON - REDIRECT

1  Q    Okay.  If you were presented with a patient with

2  mesothelioma and the only asbestos exposure they had in

3  their life was an environmental asbestos exposure living

4  within a mile of a factory or plant, would you -- under

5  the Helsinki criteria would you determine that was an

6  asbestos-related mesothelioma?

7  A    Yes.

8  Q    Okay.

9         MR. FINCH:  And then the second quote, Your

10 Honor, is "the occupational history of brief or

11 low-level exposure should be considered sufficient for

12 mesothelioma to be designated as occupationally

13 related."

14 Q    Is that the second point we were talking about on

15 the bigger call out?

16 A    Yes.  The other two wouldn't be considered

17 occupational.

18 Q    Okay.  And am I correct that both -- am I correct

19 that it's the breathing the asbestos that causes the

20 disease, not what your job title is?

21 A    Yes.

22 Q    Okay.  And am I correct that the medical literature

23 where people have gotten mesothelioma after a day of

24 exposure weren't in those cases -- for example, in

25 Greenberg/Davies, wasn't that somebody sawing up

                HENRY ANDERSON - REDIRECT

1  asbestos sheets at their house?

2  A    Yes.

3  Q    And so that wasn't their job to do that, they were

4  doing that in their side -- in their spare time; right?

5  A    Yes.

6  Q    Okay.  And back to this cumulative exposure point.

7  We were -- His Honor had, for purposes of the record,

8  allowed me to talk with you a little bit about Dail &

9  Hammar.  This is a widely used pulmonary pathology

10 textbook?

11 A    Yes.

12 Q    And you regard it as reliable and authoritative on

13 the question of mesothelioma causation?

14 A    Yes.

15 Q    What does Dail & Hammar tell us about the threshold

16 level of exposure to asbestos that is necessary to cause

17 mesothelioma?

18 A    Basically that there hasn't been a lower threshold.

19 There's no threshold for the risk.

20 Q    And what does Dail & Hammar tell us about when

21 there are multiple asbestos exposures, how those relate

22 to causation of mesothelioma?

23 A    They each contribute to the cumulative exposure.

24 Q    One factor that emerges from the Peto model and its

25 modifications is that when there are multiple asbestos

                    HENRY ANDERSON - REDIRECT

1  exposures, each contributes to cumulative exposure and

2  hence to the risk and causation of malignant

3  mesothelioma within an appropriate latency interval?

4  A     Yes.

5  Q     Now, you were asked some questions about -- they

6  had a chart that had the studies out of the Bourdés

7  paper.  B-o-r-d-e-s.  You were asked some questions

8  about those studies and why they were or were not

9  comparable.  Do you recall that?

10  A     Yes.

11  Q     Okay.  In your work here for the Marshfield case,

12  did you use Mr. Parker's report about the sources of

13  asbestos emissions into the community, the historical

14  measurements, the fugitive emissions, did you use that

15  as a basis to establish that the Marshfield plant was a

16  point source for asbestos emissions in the same type of

17  way that a factory or a plant or a mine that had been

18  studied in the literature was a point source for

19  emissions?

20          MS. ELLIS:  Your Honor, I'm objecting to the

21  leading nature of this about what the witness did.

22          THE COURT:  I'll treat it as preliminary.  It's

23  a yes or no question.  You can ask your next question.

24          THE WITNESS:  Yes.

25  BY MR. FINCH:
               HENRY ANDERSON - REDIRECT

1    Q    Okay.  Why did you find the studies to be -- the

2    studies that you relied upon in the Bourdés analysis to

3    be comparable to Marshfield?  And can you explain to the

4    Judge how you relied upon them?

5    A    I think it was because the plant is a manufacturing

6    facility for making an asbestos product.  They were

7    importing, bringing in raw asbestos.  The other plants

8    or the mines focused on raw asbestos.  And I think the

9    key thing in the Marshfield is we have the description

10   of the very -- the dust being released, the fugitive

11   emissions.  All that information that in many of these

12   other reports you don't see them, but there's all the

13   complaints about dust, the plants are releasing dust

14   into the community.

15   Q    What's the significance of visible dust when it

16   relates to asbestos?

17   A    It means that there's an excessive amount of

18   asbestos in the air.

19   Q    Do any of the published epidemiology studies that

20   deal with community exposures to asbestos or even

21   household exposures to asbestos, do they routinely

22   report on in-house fiber types or the level of exposure

23   in the house?

24   A    No.

25   Q    And yet you, as a medical doctor and an

                    HENRY ANDERSON - REDIRECT

1    epidemiologist, rely on them in the normal course of

2    your work outside of the courtroom to help you

3    understand asbestos disease causation?

4    A    Yes.

5    Q    We've been talking a lot about community exposure,

6    which is somebody living in the neighborhood.  But how

7    do you -- what studies have you done specifically on the

8    concept of household exposure?  By that I mean once the

9    dust gets into the house from whatever vector, whether

10   it's a worker bringing it home on the clothes or coming

11   in through the air, what studies have you done in your

12   career that are relevant to that?

13   A    We studied the family members of workers in the New

14   Jersey plant doing chest x-rays, clinical exams, and

15   interviews on them and that's where we -- in that group,

16   we found four mesotheliomas in family members.  But we

17   also found a lot of pleural plaques, 35 percent of them,

18   40 years after they were living in the household had

19   developed disease.

20   Q    What is the significance of finding pleural plaques

21   and asbestosis in that kind of environment?

22   A    That's another marker of asbestos exposure.

23   Finding actual asbestosis also is a marker there was

24   some very substantial exposure.

25   Q    And does that type, nature and level of exposure
                    HENRY ANDERSON - REDIRECT

1  mean that that kind of environment can cause

2  mesothelioma?

3  A    Yes.

4  Q    What does that tell you as it relates to the lung

5  cancer cases, the fact that you found that there was --

6  that household members who were exposed to asbestos

7  through other people bringing it into the house

8  developed asbestosis or pleural disease, how does that

9  relate to your opinions about the two lung cancer cases

10  here?

11  A    Well, actually in our study we did find an excess

12  of lung cancer in family members as well; found out over

13  the years of that, along with the mesotheliomas.  But

14  what it says is the asbestos exposure contributes and

15  that there is a risk of lung cancer development because

16  there is substantial asbestos exposure.

17  Q    Okay.

18  A    In this -- as I say, in this example in small

19  numbers, we did have a statistical excess of lung cancer

20  in the family members.

21  Q    The Judge -- I think he may have asked you this,

22  but if he hasn't -- if he hasn't, I'm sure he will.

23  He's going to ask about --

24          THE COURT:  That's quite a preface.  Why don't

25  you just ask the question.
                    HENRY ANDERSON - REDIRECT

1  Q    The smoking.  The smoking factor.  One or two of

2  the -- there were two lung cancer cases and they were

3  former smokers for some period of time.  Is there

4  epidemiology that shows the interplay between cigarette

5  smoking and asbestos exposure and lung cancer disease?

6  A    Yes.

7  Q    And what does that literature generally show us?

8  A    Generally it shows that by itself, asbestos

9  increases the risk of lung cancer roughly a factor of

10  five and that the two do interact in a additive, little

11  bit more than an additive relationship.

12          THE COURT:  I don't know what that means, a

13  little bit more.

14          THE WITNESS:  Well, it's between -- just

15  summing it up.  Like the cumulative exposure of asbestos

16  you just sum them up, one plus one is two.  Here with

17  lung cancers, the risk of asbestos plus tobacco is

18  greater than one plus one, but it's a little less than

19  the two multiply each other.  Early literature showed

20  that the two multiplied.  So cigarettes by themselves,

21  you have a ten-fold increase in lung cancer.  Asbestos

22  by itself five-fold.  Early studies suggested the

23  combined risk was 50 rather than 15.  So now it's a

24  little bit closer to the 15 than it is to the 50.

25  BY MR. FINCH:
                HENRY ANDERSON - REDIRECT

1    Q    And --

2    A    If you stop smoking, the risk goes down.

3    Q    And if you have someone who smoked and also had

4    asbestos exposure, is it possible to -- in a person that

5    has lung cancer, is it possible to say that the asbestos

6    exposure made no contribution to the disease?

7    A    No.

8    Q    You were asked some questions about the information

9    that you had when you wrote your 2013 report for a case

10   called Treutel.  Do you recall those questions?

11   A    Yes.

12          MR. FINCH:  Your Honor, may I --

13          THE COURT:  You may approach.  But while you're

14   doing that, there is a mention of the pleural plaques in

15   the lung cancer of Heckel or Prust or in those cases?

16          THE WITNESS:  Yes.

17          THE COURT:  Was there -- would the pleural

18   plaques be or can the pleural plaques be present whether

19   or not there was an asbestos exposure?

20          THE WITNESS:  The kind that we're seeing,

21   again, more likely than not are asbestos related.  But

22   yes, you can get pleural plaques if you had a gunshot

23   wound or you had severe tuberculosis.  But there's no

24   clinical indication to explain them as caused by

25   something else.
                HENRY ANDERSON - REDIRECT

1          THE COURT:  Is there a link between pleural

2    plaques or greater likelihood of contracting lung cancer

3    with pleural plaques when you smoke cigarettes than if

4    you don't smoke cigarettes?

5          THE WITNESS:  I don't think there's --

6    cigarettes don't contribute to the pleural plaques.

7          THE COURT:  Next question, Counsel.

8    BY MR. FINCH:

9    Q    I'm not sure I -- if someone has pleural plaques,

10   they had an increased risk of lung cancer as opposed to

11   someone who doesn't if they both smoke.

12   A    Yes.

13   Q    Okay.  All right.

14         MR. FINCH:  Now may I approach the witness?

15         THE COURT:  You may.

16   BY MR. FINCH:

17   Q    You were asked some questions about a 2015 report

18   from --

19         THE COURT:  I assume counsel was provided this

20   already?

21         MR. FINCH:  Yes, yes.  They have the 2015

22   report.

23   Q    This is an update report on Mr. -- on Mrs. Treutel;

24   is that right?

25   A    Yes.

                 HENRY ANDERSON - REDIRECT

1  Q     All right.  When you did your original report, did

2  you have conversations with the lawyers from the Casino

3  Vaughn firm where you learned generally about the nature

4  of the exposures in the Marshfield area?

5  A     Yes.

6  Q     Okay.  But then when you did your update report,

7  which is the report that's at issue here, did you go

8  through and summarize the various information that you

9  had been provided with in the first page of the report?

10          MS. ELLIS:  Your Honor, I'm objecting to this

11  as leading and he's not asking the doctor what he

12  actually did and he's leading him into it.  The doctor

13  has already testified that he did --

14          THE COURT:  I'm just -- for purposes of this

15  hearing, it's preliminary to the question that I assume

16  he's next going to ask.

17          MR. FINCH:  Yes.

18  BY MR. FINCH:

19  Q     Doctor, did -- does this report set forth the

20  facts, data, and assumptions considered in formulating

21  your report on page one?

22  A     Yes.

23  Q     Okay.  And among the materials are a list of Rita

24  Treutel's worksites, exposure summary, community map

25  provided by the Casino Vaughn law offices?

                    HENRY ANDERSON - REDIRECT

1    A    Yes.

2    Q    CD containing all case-specific materials?

3    A    Yes.

4    Q    That would include things like interrogatory

5    answers and then Mr. Parker's report?

6    A    Yes.

7          THE COURT:  Is it your testimony that you

8    relied on all of those things when you first expressed

9    your opinion but didn't list them?

10          THE WITNESS:  They weren't available at the

11    first time.

12          THE COURT:  Okay.  I understand.  Next

13    question.

14    BY MR. FINCH:

15    Q    So is fair to say you had a general understanding

16    at the time you did your first report, but you got much

17    more specific information for your final report?

18    A    Yes.

19    Q    Okay.

20          MR. FINCH:  Your Honor, I don't have any

21    further questions of the witness unless Your Honor has

22    some more that we need to follow up with.   (11:55 a.m.)

23          THE COURT:  I do not.  We should then turn to

24    Mr. --

25          MR. FINCH:  Parker?
                    HENRY ANDERSON - REDIRECT

1          THE COURT:  -- Parker, yes.

2          MS. ELLIS:  Your Honor, any chance you would

3   give me a moment to have a brief reexamination of the

4   witness to follow up on a few points?

5          THE COURT:  It's going to have to be really

6   brief and it's going to have to be very specific.

7          MS. ELLIS:  Okay.

8          THE COURT:  But I'll give you a few minutes.

9          MS. ELLIS:  Before I actually address the

10  witness, Your Honor, I wanted to say we do have a motion

11  before the Court.

12         THE COURT:  With respect to striking this later

13  report.

14         MS. ELLIS:  Yes, Your Honor.

15         THE COURT:  I'm aware of that motion.

16         MS. ELLIS:  Okay.  Thank you, Your Honor.

17                     RECROSS-EXAMINATION

18  BY MS. ELLIS:

19  Q    I want to touch on, Dr. Anderson, the formula or

20  calculation that you've talked about with the Court and

21  counsel just now and the relationship between the risks

22  that you used to create them on.  And that relationship

23  actually came out of one of the Italian studies; right?

24  A    Yes.

25  Q    Okay.  It didn't come out of the Bourdés study;
                    HENRY ANDERSON – RECROSS

1  right?  It came out of Maule from 2007; right?

2  A     The Bourdés study I used to say that the household

3  risk was very similar or was -- I used the same risk for

4  household as for community because those two summary

5  figures were the same.  I used the occupation to

6  community exposure from the Maule paper.

7  Q     So you took the occupational risk and the community

8  risk from the Italian paper; right?

9  A     Yes.

10  Q     And you disregarded the household risk that was

11  reported in the Italian paper; right?

12  A     I don't think it was in the same paper.

13  Q     All right.  We've got it right here.  We'll take a

14  look.  And I'll represent to you that the household risk

15  was 1.4 for the household contacts with regard to the

16  same plant and I've got that circled for you right

17  there; right?

18  A     Yeah.

19  Q     Okay.  So you have 27.5 times risk for the

20  employees?

21  A     After it had been adjusted to remove the community

22  exposure.

23  Q     Right.  10-and-a-half for the community piece;

24  right?  Risk.

25  A     Right.

                    HENRY ANDERSON - RECROSS

1   Q     And then a 1.4 for the household piece.

2   A     Right.

3   Q     And like we said, you discarded the 1.4; right?

4   A     I thought the summary of all of the studies was a

5   better estimate for all the various community

6   exposures --

7   Q     So you went to --

8   A     -- for the household.

9   Q     Okay.  Pardon me.  You went to the Bourdés study,

10  which is the meta analysis; right?

11  A     Yes.

12  Q     And the household risk in Bourdés from the summary

13  of that paper, and we have that up here, was 8.1; right?

14  A     Yes.

15  Q     And the summary risk for environmental from this

16  paper was 7; right?

17  A     Right.

18  Q     So several -- lower than the 10-and-a-half that was

19  found in the Italian study; right?

20  A     Right.

21  Q     Okay.  But you didn't use the 7 that was reported

22  in Bourdés, right, for the environmental?

23  A     No.  Because you needed to have -- they don't have

24  a figure for all of the occupational groups.

25  Q     Okay.  But --
                    HENRY ANDERSON - RECROSS

1    A    So I mean you can't get -- the 27, you can't get

2    from here.  And in some of these 27, it's much lower if

3    you actually look -- some actually the occupation is

4    only 6.

5    Q    But we're not talking about the occupational piece,

6    we're talking about the environmental piece.  So the 27

7    occupational you got from the Italian study and you took

8    the 10-and-a-half environmental from the Italian study;

9    right?

10   A    Yes.

11   Q    There is a 7 in this paper for the environmental

12   risk; right?

13   A    Yes.

14   Q    You didn't use that one; right?

15   A    No.

16   Q    And this paper says the risk for household is 8.1;

17   right?

18   A    Right.

19   Q    You likewise didn't use that one, did you?

20   A    I used this to say -- if you look at the range --

21   you can go and look at -- go to the summary.  If you put

22   up the --

23            THE COURT:  It's all right.  You've answered

24   the question.

25            THE WITNESS:  It's --
                    HENRY ANDERSON - RECROSS

1          THE COURT:  Next question.

2          THE WITNESS:  I had a range of values and this

3  is the central value.

4  BY MS. ELLIS:

5  Q    I understand.

6  A    So I'm saying the central value, the two are

7  relatively comparable.  But the range is quite different

8  in the various studies.  They used the 27, I had to use

9  the figure from that study.

10 Q    And you --

11 A    That's the epidemiological approach.

12 Q    And you used 10-and-a-half for environmental and

13 then you plugged in a 10-and-a-half for the household is

14 my point; right?

15 A    I said from the Bourdés study, the two appeared to

16 be very similar.  8 versus 7.  And actually 10 isn't

17 that much different from the 8 or 7.

18 Q    Well, it is different when you're talking about

19 your risk, your probability for developing a disease.

20 It's about a third of a difference; right?

21 A    Eight percent --

22        THE COURT:  We've spent as much time as I care

23 to on this question.  Anything more?

24        MS. ELLIS:  Okay.  No, Your Honor.  Not on that

25 point.
                    HENRY ANDERSON - RECROSS

BY MS. ELLIS:

Q    I guess I'll just ask this question:  Is there any published study or source that we could go look to that would describe the methodology you used here to take the different risks from the different studies and create your formula?

A    I think that's basically what these various study did when they subtract out and they do the comparative risk numbers and they talk about the household having this risk compared to the others, and that's basically what I did.  And that's a comparative risk model.

Q    Which study did what you did by taking different risks from different papers and then creating a formula from them?

A    The numbers are there.

Q    That's not my question.

A    But I'm saying --

        THE COURT:  And at this point it's rhetorical. You've made your point, Counsel.

        MS. ELLIS:  Okay.

        THE COURT:  We'll then excuse you, Doctor. Thank you for your time today.

        THE WITNESS:  Thank you.

        THE COURT:  And you're free to leave at this point.
                    HENRY ANDERSON - RECROSS

1       (Witness excused at 12:00 p.m.)

2           THE COURT:  I would ask that Mr. Parker come

3   forward for cross-examination.  While he's doing that,

4   let me just be clear for plaintiff that I will expect

5   among your exhibits the Brody study, the Helsinki, the

6   Dail & Hammar chapter, the Anderson study, and the Maule

7   study.  If you want to simply designate where in the

8   docket I can find them, that's fine as well.  But I

9   expect those to be among your numbered exhibits.

10          MR. FINCH:  Okay.  Some of those we have here,

11  Your Honor, but some of them may have to get printed or

12  sent to you electronically.  Is that okay -- if we give

13  them to you by the end of the day, is that okay?

14          THE COURT:  Yeah.  I just want to make sure

15  they're part of the record and at the end of the day

16  tomorrow is fine as long as --

17          MR. FINCH:  As long as you have it --

18          THE COURT:  Here is what I would ask:  I would

19  ask both sides to exchange their lists; see if you can

20  agree.  If you can, then just provide them to me.  If

21  you can't, then try to let me know before we close the

22  hearing today.

23          MR. FINCH:  Can I just -- I've got four of the

24  six.  I've got Helsinki, Dail & Hammar --

25          THE COURT:  We'll go over this.  I don't want
                        HENRY ANDERSON - RECROSS

1    to keep Mr. Parker any further.  You may stand to be

2    sworn.

3         **FRANK PARKER, PLAINTIFFS' WITNESS, SWORN,**

4              THE COURT:  Please be seated.  And let me just

5    say that I hope this will not be a cross-examination as

6    you might do at trial.  In particular, I hope we don't

7    spend a lot of time on what this witness did not do but

8    rather explore the weaknesses in what he did do and what

9    he did rely on.  I'm not going to preclude you from

10   making the point, but I don't want to spend a lot of

11   time on what he didn't do.  To me that's argument you

12   can make and I will give a chance for limited argument

13   at the close of this hearing.

14        You may proceed, Counsel.

15                    CROSS-EXAMINATION

16   BY MR. METCALF:

17   Q    Mr. Parker, you're not an epidemiologist; right?

18   A    That's correct.

19   Q    And you're not -- you're not here to offer any

20   opinions on epidemiology; right?

21   A    No, other than how it applies to industrial hygiene

22   or is used by industrial hygiene.

23   Q    You issued your reports in this case primarily in

24   January of this year; correct?

25   A    Yes.  I issued an overall review, technical review,
                    FRANK PARKER - CROSS

1   and then a series on each individual.

2   Q    And at the time you issued your reports you had not

3   talked to any witnesses; right?

4   A    That is correct.

5   Q    You never visited the plant either.

6   A    That's correct.

7   Q    And every one of the plaintiffs in these cases that

8   you've issued an opinion on was an employee at the

9   Weyerhaeuser facility; right?

10  A    At least part of their time, that's correct.

11  Q    And it's your opinion that each of them received

12  significant exposures to asbestos during their

13  employment; correct?

14  A    That's correct.

15  Q    You have not done any studies to determine the

16  background levels of asbestos in Wisconsin; correct?

17  A    That is correct.  But can I explain?

18          THE COURT:  You'll be given an opportunity.

19  I'm confident that plaintiffs' counsel will elaborate.

20  Why don't you ask your next question.

21  BY MR. METCALF:

22  Q    Putting together your reports in these cases, you

23  did not prepare any models of exposures in plaintiff

24  homes or in the community; right?

25  A    That is correct.  But I'd like to explain.
                    FRANK PARKER - CROSS

1          THE COURT:  It's going to be more efficient if
2   you allow counsel to do it.  And I do appreciate your
3   focusing on what's being asked.  And so we're clear, I
4   have read your report, your general report.  I haven't
5   read each individual opinion for each plaintiff, but you
6   can assume that you've already explained much of how you
7   arrived at your opinions.

8          THE WITNESS:  Okay.

9          THE COURT:  And you should proceed, Counsel.

10  BY MR. METCALF:

11  Q    Is there anything that you can point the Court to

12  in terms of quantifying the actual exposures that you

13  believe took place in Marshfield?

14  A    Yes.  I think part of my -- my January report

15  includes the appropriate and applicable literature plus

16  what information we have from the plant that provides us

17  a few numbers.

18         THE COURT:  Leaving the literature aside, is

19  the principal piece of information specific to exposures

20  in Marshfield as a result of this plant the data that

21  you took from -- we'll call it the Weyerhaeuser plant, I

22  don't know if it was at the time -- the data from that

23  plant in terms of the number of tons of -- I don't think

24  it was asbestos, the number of tons that were being

25  dispersed each day?

                    FRANK PARKER - CROSS

1          THE WITNESS:  Well --

2          THE COURT:  In other words, let me ask a better

3   question.  What specifically did you rely on, if

4   anything, as to data regarding this plant?

5          THE WITNESS:  Well, again in my report, the

6   specifics that the testimony gave us, the few

7   measurements we have, the background information on the

8   quantity of asbestos products being processed, the

9   information that we have, pretty poorly, but information

10  we have on some of the ventilation, information we have

11  on the receipt of those, especially the raw asbestos in

12  Drinkhart and how that's offloaded and transported, the

13  information we have on the waste materials being

14  transported off property, there's a few numbers

15  associated with it that they did some studies.  There's

16  information talking about -- as Dr. Anderson said,

17  there's information about reports from the neighborhood

18  of visible emissions from the plant.

19         THE COURT:  In terms of quantitative as opposed

20  to qualitative descriptions, anything else you relied on

21  on a quantitative basis other than the amount of

22  material being processed out of that plant?

23         THE WITNESS:  Quantitative, we do have a few

24  numbers in here.

25         THE COURT:  But doesn't that have to do with
                    FRANK PARKER - CROSS

1    the amount that was being processed?  I mean your

2    extrapolation of the tonnage exposure from this plant

3    per day, isn't it from the data that Weyerhaeuser or

4    whoever was running the plant at the time had prepared?

5    Is there any other quantitative information?

6            THE WITNESS:  I am not aware of any other

7    quantitative data other than what we got out of

8    Weyerhaeuser.

9            THE COURT:  Very good.  Thank you.  Next

10   question, Counsel.

11   BY MR. METCALF:

12   Q    Mr. Parker, you would agree that the processes that

13   went on at that facility changed significantly over the

14   years; correct?

15   A    Yes.

16   Q    In the early years, the facility was only using

17   cores that came from someone else; correct?

18   A    That is correct.

19   Q    And starting in 1968 they started to make some of

20   their own cores; correct?

21   A    Correct.

22   Q    So prior to 1968, raw asbestos would not have been

23   delivered to the facility; correct?

24   A    That is correct.

25   Q    And you can't --
                    FRANK PARKER - CROSS

1    A    But it was delivered as panels which then had to be

2    processed; that's correct.

3    Q    All right.  And in terms of coming up with a waste

4    factor, an amount of waste, asbestos waste that you

5    believe was given off from the facility, you can't point

6    the Court to any particular study to support that one

7    percent waste factor, can you?

8    A    There was no studies at Weyerhaeuser.  One percent

9    in my experience and knowledge of industrial processes

10   is a fairly low number.

11   Q    But you can't point the Court to any study that you

12   base that on; right?

13   A    That is correct.  Let me back up.  I don't have a

14   published study, but over my years of experience I've

15   seen lots of studies about efficiency in process plants;

16   not in an asbestos door plant, but in other kinds of

17   manufacturing plants and so on.  That's what I'm basing

18   that on.

19   Q    Can you tell the Court is there anything besides

20   your experience that you draw that one percent from?

21   A    Like I said, I don't -- I did not have a published

22   paper on that.  I'm not aware of any.  Just one percent

23   is an extremely low waste factor for any processing

24   plant.

25   Q    But you don't have any literature that you think --

                     FRANK PARKER - CROSS

1            THE COURT:  I think he's answered your

2    question, Counsel.  Next question.

3    BY MR. METCALF:

4    Q    Let's talk for a minute about the sort of bands of

5    exposure around this facility.  You did not rely on any

6    industrial hygiene principles to set a distance from the

7    facility within which you think a certain exposure

8    occurred; correct?

9    A    Well, I did not attempt to, given the paucity of

10   data we had, I did not attempt to put together a

11   quantitative estimate of concentrations in the community

12   versus distance, that's correct.

13   Q    And you would agree that the further you get away

14   from a point source, the lower the concentration of the

15   substance that started that source turns into; right?

16   A    Usually.  I mean sometimes you can have unique

17   situations like taking this stuff to the dump.  That

18   creates a secondary point source.  But, yes.

19   Q    The further you get away, the lower it generally

20   is; correct?

21   A    Unless there's -- yes, unless there's some real

22   reason for it.

23   Q    And you've testified that dust can be carried as

24   much as thousands of miles away from the original

25   source; correct?

                   FRANK PARKER - CROSS

1  A    Yes, that's actually true.

2  Q    And you did nothing from an industrial hygiene

3  perspective to quantify or to establish how far those

4  asbestos particles would have gone from this facility;

5  right?

6  A    Correct.

7  Q    So they could have stopped at 100 feet; they could

8  have gone to 100 miles, right?

9  A    No, they are not -- with this type of plant, you

10 are not going to stop them in 100 feet.  I mean their

11 own data even shows they didn't do that.

12          THE COURT:  I think the real question is you

13 didn't do it for any period of feet.

14          THE WITNESS:  That's correct, I did not do

15 that.

16 BY MR. METCALF:

17 Q    You have testified in previous cases similar to

18 this one involving exposure -- community exposures to

19 chemicals and substances; correct?

20 A    Correct.

21 Q    And in those cases you have done attic dust

22 sampling; correct?

23 A    Correct.

24 Q    You've also done soil sampling; correct?

25 A    Correct.
                    FRANK PARKER - CROSS

1   Q     You did it in the Algoma cases that involved a

2   similar fire door facility; right?

3   A     Correct.

4   Q     And in that case, you indicated that you believe

5   that attic dust samples are a very good way for telling

6   whether a facility emitted asbestos; correct?

7   A     Correct.  Depending on -- if you have the right

8   houses and the right time frame, those types of things,

9   yes.

10  Q     And in the Algoma case, you designed the study to

11  test houses along the route the dump trucks took to the

12  landfill; correct?

13  A     Correct.

14  Q     And you found asbestos in four of the seven samples

15  taken in that case; right?

16  A     That's my recollection, yes.

17  Q     And you testified that that supported your opinion

18  that the facility was emitting asbestos dust into the

19  air; correct?

20  A     Correct.

21  Q     And you testified that if you would have found all

22  seven of those not containing asbestos, then that would

23  have been an indicator to you that there was not an

24  asbestos source in the area; correct?

25  A     Correct.  Based on the age of the houses and all of

                     FRANK PARKER - CROSS

1  the testimony, that is correct.

2  Q    And in this case, we asked you if you had done any

3  attic dust or similar testing in the Marshfield area;

4  correct?

5  A    Correct.

6  Q    We sent you a subpoena for records like that;

7  right?

8  A    Correct.

9  Q    And you did not provide any testing to us, did you?

10 A    No -- well, we did in deposition eventually.

11 Q    But in response to the subpoena, you did not

12 provide any of that.

13 A    That's correct.

14 Q    And at the deposition when I originally asked you

15 have you -- did you have any testing data, you said no

16 you didn't.

17 A    I had not done any testing of this project, that is

18 correct.

19 Q    Someone in your office had done that testing;

20 right?

21 A    Yes.

22 Q    And you were requested by the Casino Vaughn firm to

23 have someone in your office do testing; right?

24 A    That's correct.

25 Q    And I believe you testified Mr. Tabrizi did that

FRANK PARKER - CROSS

1  testing?

2  A     Correct.

3  Q     And that when he came back from doing the testing

4  and got the results back, he told you that those results

5  were negative; right?

6  A     As we talked in my deposition, I don't remember any

7  real discussion about it, but at least I think I got the

8  impression they were negative.

9  Q     But you testified at your deposition that he told

10  you the results were negative.

11  A     Okay.

12  Q     But --

13           THE COURT:  Do you have a line?

14           MR. METCALF:  Yes, Your Honor.  Page 46, line

15  14.

16           THE COURT:  Would you have the courtesy of just

17  displaying it to the witness?

18           MR. METCALF:  Yes, Your Honor.

19           THE COURT:  Thank you.  And you can just read

20  the question and answer.

21           MR. METCALF:  Question was:  "Did you --

22           THE COURT:  Are you able to see that blown up?

23  Otherwise right behind you might be --

24           THE WITNESS:  No, I can see it over here.

25           THE COURT:  That's fine.  Go ahead.
                    FRANK PARKER - CROSS

BY MR. METCALF:

Q    "Question:  How did you find out that they came back negative for asbestos?"

      And your answer was:  "Mr. Tabrizi told me."

A    Where are we here?

            THE COURT:  He said line 14.

            THE WITNESS:  Okay.  Well, I think it was the first answer up on line one.

            THE COURT:  The question is simply did he accurately read from line 14 through line 16, and this is represented to be page 46, that Mr. Tabrizi told you; in other words, that's what you said at the time of your deposition.

            THE WITNESS:  That is correct.

            THE COURT:  Very good.  Next question.

BY MR. METCALF:

Q    You didn't include that in the report that you provided in this case, did you?

A    No, wasn't part of my study.

Q    But someone in your office went and did it; right?

A    Correct.

            THE COURT:  You've already established that. Something more you want to ask regarding it?

            MR. METCALF:  That's fine.

BY MR. METCALF:
                    FRANK PARKER - CROSS

1   Q     Besides testing those homes and that soil, you

2   never tested any of the plaintiffs' residences; right?

3   A     That is correct.

4          THE COURT:  Also something you've already

5   established.

6   Q     You also did not test any witnesses' residences?

7   A     Correct.

8   Q     We also discussed at your deposition stack testing

9   that Weyerhaeuser did of the boiler stack.  Do you

10  recall that?

11  A     Yes.

12  Q     And Weyerhaeuser in 1974 took samples from the

13  stack and sent it off to be analyzed for the presence of

14  asbestos; do you recall that?

15  A     Yes.

16  Q     And those results came back negative; correct?

17  A     That's correct as I remember it.

18  Q     And you don't have any information that stack

19  testing ever came back with positive results for

20  asbestos; correct?

21  A     From the boiler?  I mean that's the only stack

22  testing we've seen.  We didn't see any from the bag

23  houses or any of the ventilation ducts or any of that.

24  All we seen is these one sample on a boiler.

25  Q     And you also indicated -- we discussed at your
                    FRANK PARKER - CROSS

1  deposition that Joe Wendlick, the industrial hygienist

2  at Weyerhaeuser, took samples from multiple cities

3  around central Wisconsin; correct?

4  A    It's been awhile.  My recollection is Wendlick took

5  some samples in Marshfield.  I don't think we ever saw

6  the data from any other samples, at least I don't

7  recollect it.  Correct me if I'm wrong.

8  Q    He also went to Stevens Point, Stratford and

9  Wisconsin Rapids; correct?

10  A    That's what he said, but I don't think we ever saw

11  any data.

12  Q    And if his testing in those facilities -- those

13  cities matched the testing that he did in Marshfield,

14  you wouldn't have any reason to dispute those results,

15  would you?

16  A    I'd have to look at them, figure out how he took

17  them.

18  Q    But you've not expressed any opinion in your report

19  critiquing those samples that he took in cities around

20  central Wisconsin.

21  A    That is correct.  I don't have the data.

22  Q    Have you asked for that data from the Casino Vaughn

23  law firm?

24  A    I don't know that I used uniquely for that, but I

25  asked for whatever data they had from the plant.

                    FRANK PARKER - CROSS

1  Q     So it's your testimony at this point you've not

2  reviewed that data.

3  A     My recollection is I have not seen the data.  I

4  remember some discussion about other testing, but the

5  only offsite testing we have results for that I

6  recollect seeing are the studies, the Wendlick five

7  samples he took in town which we know maybe two of, and

8  the samples he took at the waste site and a few samples

9  he took on plant.

10 Q     And you don't have any background studies from

11 Wisconsin to compare his data to, do you?

12 A     There are none.  That is correct.  As far as I know

13 there are none.

14 Q     In this case, you expressed an opinion that you

15 believe that dust came off of the dump trucks going to

16 the landfills; correct?

17 A     Correct.

18 Q     You've not found any plaintiffs to have lived

19 within, let's just say, half a mile of any of the

20 landfills; correct?

21 A     Well, the record is what it is.  I don't recollect

22 off the top of my head, but --

23 Q     And you've not calculated any kind of dispersal

24 rate from the dump trucks as they went to the landfills;

25 correct?

FRANK PARKER - CROSS

1   A     That is correct.

2   Q     And you've not found any correlation between where

3   the plaintiffs lived and the routes to the landfills;

4   correct?

5   A     I don't know what you mean by correlation.

6   Q     Well, there's no increased number of plaintiffs,

7   substantial number of plaintiffs who live on the routes

8   to the landfills as opposed to in any other part of this

9   Marshfield area; correct?

10  A     I don't know.  I did not try to do that study, that

11  analysis to compare it to everybody else.

12  Q     You can't quantify the kind of exposure that

13  someone would have just driving into town in Marshfield

14  for any given year; correct?

15  A     I have not quantified it, that is correct.

16  Q     And you have not estimated it either; correct?

17  A     We have not quantified it.  I mean that's the same

18  thing as estimating.

19  Q     Okay.  You can't point the Court to any industrial

20  hygiene studies or environmental studies that would give

21  an amount that would be expected to be present in a town

22  like Marshfield with an asbestos plant that uses

23  asbestos in its products; correct?

24  A     Well, not correct.  I mean I quoted I think at

25  least one study that we looked at.  Hang on a second

                    FRANK PARKER - CROSS

1    here.  We -- or in my report I looked at this Awad study

2    that should give some concentrations from around a

3    asbestos cement plant; somebody would be using asbestos

4    and it does have some concentrations associated with it.

5    Q    And you would agree with me that the concentrations

6    from the Awad study were related to a plant that used

7    significantly more asbestos than the Weyerhaeuser

8    facility did; correct?

9    A    I would agree; correct.  But I did learn of that

10   travel.

11   Q    And you have made no attempt to follow any kind of

12   industrial hygiene procedure laid out in any of those

13   studies.  Let's just take the study that you just

14   mentioned there, the Awad study.  You didn't make any

15   attempt to follow what they did in order to compare what

16   happened in Marshfield to that study; right?

17   A    That's correct.  But again, I'd like to explain.

18            THE COURT:  You will have an opportunity.

19            THE WITNESS:  I'm sure.

20            THE COURT:  Why don't you go ahead, Counsel.

21   BY MR. METCALF:

22   Q    You have not performed any calculations of exposure

23   levels that any of these plaintiffs would be expected to

24   have been subjected to in their homes; right?

25   A    I haven't calculated any, but I think the

                    FRANK PARKER - CROSS

1    literature gives us a pretty good idea what it most

2    likely was.

3    Q    But you did not include any of that in your report,

4    did you?

5    A    Yes, I did.

6    Q    The level for any particular plaintiff, what they

7    would have been exposed to in their home?

8    A    You mean on the individual plaintiff reports?

9    Q    Yes.

10   A    No.  I included that in my overall report.  I

11   didn't duplicate it.

12   Q    You didn't calculate that for any particular

13   plaintiff.

14   A    That is correct.

15   Q    And you actually don't know when asbestos started

16   being used at this facility; right?

17   A    There's no -- the record does not show a clear

18   indication and the indication is that they started

19   somewhere probably in the 50's.

20   Q    But you can't say what amount of asbestos would

21   have been used in any given year; right?

22   A    Well, there is some data that we pulled out of the

23   record indicating this 320 tons I think that was quoted.

24   Q    Okay.

25   A    But that came out of the Weyerhaeuser records.

                     FRANK PARKER - CROSS

1  Q    Right.  But you can't point -- let's just say 1955,

2  if we pick it as a year, you can't tell me how much

3  asbestos you believe would have been emitted from that

4  plant in 1955; right?

5  A    Quantitativewise that is correct.  I mean if they

6  are using asbestos, they're going to emit some.  But we

7  don't know the quantity.  I mean there's nothing in the

8  record.

9  Q    And if we don't know the quantity, then you can't

10  know how far that asbestos traveled from the facility;

11  right?

12  A    Quantity does not have much to do with

13  concentration.

14  Q    Okay.  Would --

15  A    Go ahead.

16  Q    Would wind direction have something to do with

17  concentration?

18  A    No.  Wind direction would have to do with the

19  distribution, transport, those types of things.  But

20  even if you -- which I included in my report the wind

21  rose, you basically have wind coming from every

22  direction sometime during the year.

23  Q    But you made no effort actually in your report to

24  analyze the wind direction and to take that into account

25  in coming up with your opinions; correct?

                    FRANK PARKER - CROSS

1   A    That's not correct.  I had included the wind rose

2   information in my report and I used that in looking at

3   this community in coming up with my opinion.

4   Q    You don't reference that wind rose within your

5   report anywhere, do you?

6   A    It's attached to the report.  It was part of the

7   report.

8   Q    In the report itself, you don't do any analysis of

9   the wind rose data, do you?

10  A    You mean did I write a paragraph on Appendix 6?

11  No, I did not.  I just included Appendix 6 as part of my

12  reference material.

13  Q    You simply make no reference whatsoever to the

14  direction of the wind within your report itself.

15          THE COURT:  I think he's answered the question.

16  Why don't you ask your next one.

17  BY MR. METCALF:

18  Q    You would agree with me that wind direction would

19  affect the dispersal of asbestos from this facility;

20  correct?

21  A    Yes.

22  Q    And you made no attempt to compare the wind in

23  Marshfield to any of the studies that you referenced in

24  your report; correct?

25  A    That is correct.
                    FRANK PARKER - CROSS

1   Q    And you would agree that within your individual

2   reports, that in the exposure facts and assumption

3   section that was written entirely by the lawyers in this

4   case; correct?

5   A    My recollection -- I want to make sure --

6   Q    Just to help, if you look at the individual

7   reports, they say that it was incorporated verbatim from

8   plaintiffs' counsel.

9        THE COURT:  In other words, you assumed those

10  facts.

11       THE WITNESS:  That's correct.  It seems to me I

12  went back at some point and read some depositions.  But

13  yeah, the reports were based initially on assumed facts

14  from the lawyers.

15  BY MR. METCALF:

16  Q    In terms of the take-home piece of your opinions in

17  this case, you did not quantify the amount of asbestos

18  that you believe any family member took home on their

19  clothes; correct?

20  A    That is correct.  I relied on the literature.

21  Q    And there are a number of those family members that

22  you can't say to a reasonable degree of scientific

23  certainty whether they actually were working with

24  asbestos in the Marshfield facility at the time that

25  their family member, let's say, was a child?

                    FRANK PARKER - CROSS

1   A    Well, given all of the people involved in it,

2   there's a great variety of information on those kinds of

3   issues.  Some of them we have -- I think we have who was

4   a child in the house where her father worked in the

5   plant.  But I agree, it's all over the board.

6   Q    And you would agree that for any particular

7   plaintiff, you cannot segregate or apportion the

8   exposures that you believe they had at home in the

9   environment or in the workplace.

10  A    Apportion in what way?

11  Q    You can't say this amount of exposure came from the

12  workplace, a separate amount of exposure came from the

13  home, and a separate amount of exposure came from the

14  environment.  You can't quantify those; right?

15  A    I have not quantified those, that is correct.

16  Q    And several of the plaintiffs in these cases

17  actually lived outside of Marshfield for a majority of

18  their life; correct?

19  A    Correct.

20  Q    And there were several who lived in Chili 12 to 14

21  miles to the west of Marshfield; correct?

22  A    Correct.

23  Q    Ms. Treutel lived six miles outside of town;

24  correct?

25  A    Correct.
                        FRANK PARKER - CROSS

1    Q    Mr. Seehafer almost lived in town almost not at

2    all; correct?

3    A    Let me get the report.  Based on my information, he

4    was -- lived a few months into town, that's correct.

5    Q    And you obviously can't put any estimate on what

6    you think he would have been exposed to in those couple

7    months; right?

8    A    You mean quantify it?

9    Q    Yes, Your Honor -- yes.

10   A    I have not quantified it.

11   Q    And in fact, you actually don't even know how far

12   he lived from the facility when he was living in

13   Marshfield; correct?

14   A    That's correct.

15   Q    A number of the plaintiffs did not have a spouse

16   who worked in the Marshfield facility; correct?

17   A    A number -- well, I have to go back -- I mean the

18   record is what it is.  I mean I'd have to go back and

19   see.  But you say a number -- what was the number?

20   Q    Let me just put it this way:  It is not the case

21   that not every one of these plaintiffs also had some

22   kind of spousal or familial exposure in their home.

23   A    That is correct.

24   Q    And you can't separate out the exposure from

25   asbestos that they would have brought home on their own

                    FRANK PARKER - CROSS

1   clothes as an employee from what their spouse or

2   employee would have brought home; correct?

3           MR. FINCH:  Objection.  Asked and answered.

4           THE COURT:  I'll sustain that objection.  Let

5   me ask at this point, Mr. Ellis (sic), how much you have

6   for this witness?

7           MR. METCALF:  I'm also done, Your Honor.

8           THE COURT:  Almost done for a lawyer can mean

9   anything.  Roughly.

10          MR. METCALF:  No more than five minutes.

11          THE COURT:  All right.  Why don't we complete

12  it then if we could.

13  BY MR. METCALF:

14  Q    You would also agree that there were numerous types

15  of dust emitted from this facility; correct?

16  A    Correct.

17  Q    There was dust from particle board operation;

18  right?

19  A    Correct.

20  Q    There was sander dust from the facility; right?

21  A    Well, there were -- whatever they were sanding,

22  dust was emitted, that's correct.

23  Q    And they weren't only sanding asbestos-containing

24  materials; right?

25  A    That's correct, but they were sanding asbestos too.
                    FRANK PARKER - CROSS

1   Q    There was also dust in the area from the unpaved

2   roads; correct?

3   A    In the -- I'm not -- on the plant was unpaved

4   parking lot as I remember and I suspect some of the

5   roads were unpaved too.  But again, the dust on them is

6   a cumulation of all the other dust that had been

7   deposited there.

8   Q    And there are witnesses who also testified to

9   cement dust being in the neighborhood; correct?

10  A    But that -- that there was some discussion about

11  cement -- cement and cement dust.  I don't think we ever

12  really pinned that down to be really significant in the

13  neighborhood.

14  Q    Let me show you the testimony of Milton Boyer.

15  He's one of the employees in this case.  I'll give you a

16  minute to look at that.

17         MR. METCALF:  For the record I'm looking at

18  page 70, line 12 on down.

19         THE COURT:  And this is from the testimony of

20  Milton Boyer?

21         MR. METCALF:  Yes, Your Honor.

22  BY MR. METCALF:

23  Q    Mr. Boyer testified that he had a car that he was

24  always polishing and that it would have light-colored

25  dust on it and that he believed that it was concrete

                    FRANK PARKER - CROSS

1  dust that was piling up on his car.  Do you see that?

2  A    Yes.

3  Q    And you didn't do anything to distinguish between

4  the types of dust in the community; right?

5  A    I don't understand that question.  I mean we

6  distinguished in the sense that the dust were a

7  combination of all the materials coming out of the plant

8  plus whatever else was in the computer.  I think we

9  didn't ignore that.

10  Q    You can't offer any opinion as to whether the dust

11  described in any particular person's house was cement

12  dust versus sander dust versus mineral core dust;

13  correct?

14  A    We don't -- we don't have -- analytically we can't

15  answer that question.  But factually from the testimony

16  I think you can reasonably conclude that at least some

17  of it was dust from the asbestos operations.

18  Q    You've never published any articles on asbestos

19  emissions from a factory, have you?

20  A    That is correct.

21  Q    In putting together your report, there is no --

22  there's no written protocol that you followed to

23  determine how far asbestos dust would have gone from

24  this facility; correct?

25  A    Correct.  As far as I know there is no written

                    FRANK PARKER - CROSS

1  protocol.

2           THE COURT:  Very good.  We will take our lunch

3  break at this time and reconvene at 1:30.  My criminal

4  matter at one o'clock is a bit unusual.  Counsel assure

5  me that it can be done in 15 minutes.  I'm fairly

6  confident it can be done in 30.  So I would ask you to

7  be back at 1:30, with advance apologies if it takes a

8  little longer.  If you want certainty, we could start at

9  1:45.  But just because we only have the day, I'd like

10  to make sure we apply as much as possible to this

11  matter.

12      So we will reconvene at 1:30.  And I believe those

13  are all the matters the Court wished to address except

14  the studies that I specifically mentioned that were

15  specifically asked by plaintiffs' counsel, Brody, I

16  believe that's the name.  It might have been a Broky

17  (ph) or a Brokaw as well.  Helsinki.

18           MR. FINCH:  Cores.

19           THE COURT:  There's a cores, yes.  Thank you.

20  Helsinki.  Dail & Hammar.  An Anderson study, that is to

21  say the study that he did himself which he reported on

22  elsewhere from statistics within Wisconsin, and the

23  Maule study.  Those are the ones the Court noted in

24  particular, but there could have been others.

25      I would ask both sides to assure that any

1  references to studies have been provided to the Court.

2  Again, I'm happy for the parties simply to give me a

3  list and docket number where I could find them.  If it

4  is a docket number but it's an exhibit to a docket

5  entry, it should show both for the benefit of the Court.

6        Anything for the plaintiff at this time before I

7  break?

8            MR. HERRICK:  Your Honor, I would just point

9  out when we set this hearing up, I was in communication

10  with the Court, and the Court's secretary, I believe,

11  and I told her that actually I have a hearing in

12  California tomorrow.  So I may or may not be able to be

13  back.

14            THE COURT:  I'm sure we can soldier on without

15  you, but I appreciate your advising the Court.

16            MR. HERRICK:  I thought you might not care, but

17  I thought I should raise it.

18            THE COURT:  Very good.  And that's fine, and if

19  you need to go, I'll certainly not hold it against you

20  or your clients.  Anything for the defendants at this

21  time?

22            MS. ELLIS:  No, Your Honor.

23            THE COURT:  Very good.

24            MR. FINCH:  Your Honor, can we stay in the

25  courtroom or do we have to clear out?

1          THE COURT:  Actually you can stay.  I apologize

2    to the court security officer, but we'll make sure that

3    you'll have access.  Generally we want to lock it down

4    to protect everyone's materials, but I'm not going to

5    require that here.  So...

6          MR. FINCH:  I don't want him to miss his lunch

7    break.

8          THE COURT:  They have others.  They have the

9    capacity to adjust to this.  So you may continue to use

10   the courtroom.  But it should be locked otherwise.

11       With that said, we will take our break and

12   reconvene at 1:30.  Thank you all.

13       (Recess              12:40-1:33 p.m.)

14          THE COURT:  All right.  If you would again take

15   the stand, I would appreciate it.  Thank you.  Before we

16   proceed with redirect, Mr. Parker, I will just ask a

17   couple things and try to give the parties some

18   direction.  The first is I have not located a copy of an

19   individual opinion, that is to say an opinion by

20   Mr. Parker individually for an individual plaintiff or

21   deceased individual and so if someone has a copy of one

22   of those, it would be helpful.  That's the first.

23       The second is that we will proceed with this

24   testimony by Mr. Parker and then we will take up the

25   question of the general admissibility, in particular the

1    opinions that are being challenged with respect to

2    Dr. Abraham.  If we conclude -- if the Court concludes

3    it's necessary to hear testimony from him, then we'll

4    take a break to get him on video conference, which I

5    understand can occur any time after 3 o'clock.  Is that

6    correct, Counsel?

7            MR. FINCH:  Yes.  I think the parties have kind

8    of agreed that the issues have been sufficiently flushed

9    out with Dr. Anderson and we don't need to hear from

10   Dr. Abraham.

11           THE COURT:  I don't disagree.  I anticipated as

12   much and we will take up argument on that issue.  If the

13   parties are in agreement, that probably simplifies it

14   entirely but I haven't decided that for certain.

15       With that said, unless there's something more for

16   the parties, we'll proceed with redirect, Mr. Parker.

17           MR. FINCH:  May I proceed, Your Honor?

18           THE COURT:  Please.

19           MR. FINCH:  May it please the Court, Counsel.

20   Can I have the PowerPoint?

21                    REDIRECT EXAMINATION

22   BY MR. FINCH:

23   Q    Mr. Parker, do you have your report with you still?

24   A    Yes.

25   Q    This is the -- you did a general report and then

                    FRANK PARKER - REDIRECT

1   you did a shorter specific report for each case; is that

2   right?

3   A    Correct.

4   Q    Okay.  Does this accurately summarize the type of

5   information you relied upon in order to do your general

6   report exposure assessment for Marshfield cases?

7   A    Correct.

8   Q    Okay.  Let's talk about the historical data and

9   documents you rely upon.  Do you recall you were asked

10  some questions by the Court about quantitative data in

11  terms of tons of asbestos?  Do you recall that?

12  A    That is correct.

13  Q    Okay.  In addition to data about the tons of

14  asbestos, was there also historical data from

15  Weyerhaeuser's files that had measurements of asbestos

16  fiber in the air at various points in time in various

17  places?

18  A    Correct.  It sure did.  That part is in my report

19  too.

20  Q    That's a quantitative data point that helped you

21  assess whether this was a factor that was emitting

22  asbestos into the environment?

23  A    Yes.

24  Q    Okay.  Can you explain to the Court generally what

25  that information was and what it showed.  If you need to

               FRANK PARKER - REDIRECT

1   refer to your report, it's not a memory test, but go

2   ahead.

3   A     Well, basically there are sort of two categories of

4   data, exposure data, in the record.  The first is of the

5   workers themselves who are handling and manufacturing

6   these plants -- these fire doors.  Those, like all

7   exposure, occupational exposures, are a distribution of

8   numbers, distribution of quantities.  You don't get just

9   one exposure number.  You get this distribution

10  depending on the tasks that are being done, the amount

11  of energy being put into the asbestos material, those

12  types of things; right?  Because of, as I understand it,

13  because of OSHA in 1970/'71, the plant started to do

14  sampling of their workers.  So that's -- we've got a

15  pretty significant amount of data there.

16        And what that data tells me, of course, is that

17  lots of asbestos fibers were being released in the

18  workplace.  And it's important to understand that every

19  fiber that was released in that workplace is somewhere

20  today.  There is no magic -- all right?  So that tells

21  us there's lots of stuff being put into the workplace.

22        The other data we have, we have a couple samples

23  taken in the community and we have a few samples taken

24  at a waste site and we have a few samples taken,

25  associated in the parking lot where they're having all

                    FRANK PARKER - REDIRECT

1  kinds of complaints of large amounts of dust coming down

2  out of the plant.  Every one of those shows a really

3  measurable significant concentration.

4      The other thing that all of them show you is that

5  as time went on and they started putting these

6  ventilation controls, they tried to remove -- they

7  basically tried to move the airborne concentrations

8  inside the plant out of the plant.  They did that by a

9  ventilation system; goes into a bag house eventually.

10 Bag house has all kinds of problems.  Frequently the

11 testimony is it's a guiser of this stuff coming out the

12 stack, vertically out of the stack which then gets

13 dispersed into the community.

14     All that data shows you that this plant, one, is

15 producing high concentrations of asbestos and it's not

16 well controlled.  I mean that's what the data tells a

17 guy like me.

18 Q    Okay.  And then did you also review the depositions

19 of some of the witnesses, the fact witnesses, to help

20 form your view about what was going on in this plant and

21 the neighborhoods around it?

22 A    Yes.  They basically confirmed.  Plus the really

23 unique thing here is you have people working in the

24 plants who see this dust from making these doors, these

25 asbestos doors, reporting that it's the same kind of

FRANK PARKER - REDIRECT

1  dust they see in the community.  So I think -- I mean

2  that to me was very important.

3  Q    In addition to reading depositions, did you

4  actually talk to some of the people involved, some of

5  the people who lived in the community back 20, 30, 40

6  years ago?

7  A    Yeah.  Yes.  I talked by telephone to Vick and

8  Prust, as I remember, just on the telephone talking to

9  them about what was going on in the community.

10  Q    And did that assist you in assessing whether the

11  dust you were seeing, the dust that witnesses reported

12  seeing would have asbestos in it?

13  A    Yes, most likely.  I mean again, it's very

14  consistent testimony in saying it was stuff that looks

15  like what we saw in the plant.  I mean they're just

16  identifying.

17  Q    And then also as part of your exposure assessment

18  and report, did you review the scientific literature,

19  the published literature out there, both industrial

20  hygiene literature and medical literature relating to

21  either household exposures or occupational exposures or

22  environmental exposures?

23  A    Yes.  From an industrial hygiene standpoint, that's

24  what I looked at, and those are all -- what have I got?

25  100 reference in here?  I don't remember how many

FRANK PARKER - REDIRECT

1   references I had.

2   Q    And we're not going to --

3   A    Yeah.

4   Q    -- clutter the record with all the references, but

5   I might direct you to a handful of them as we move along

6   here.

7   A    Okay.

8   Q    Let's get to some terminology before I go a little

9   bit further.  This is a chart that talks about exposure

10  pathways.  Is this a chart out of your report?

11  A    Yes, I created it.

12  Q    Okay.  There's a term on here called *fugitive*

13  *emissions*.  What does that mean?

14  A    Fugitive emissions are emissions that get away from

15  you in places that you didn't want them to get away.

16  They're not trying to avoid the policemen, but it's

17  doors, windows, whatever it might be versus like they

18  eventually put a bag house, a ventilation system, that

19  would be considered a point source, a stack.  The rest

20  of the way this material is getting into the plant and

21  out of the plant would be what we call fugitive

22  emissions.

23  Q    There's a term that's been used called *fiber drift*.

24  What's that?

25  A    Well, it's -- yeah.  Fiber drift just means that

                    FRANK PARKER – REDIRECT

1  these small fibers basically behave very much like a

2  gas.  They pretty much go anywhere you want.  The ones

3  that most people are familiar with cause allergies,

4  pollen.  These -- pollen tends to be five, ten times

5  bigger than these fibers.

6       So these very small fibers, like I say if you

7  release one in an absolutely still room with an eight

8  foot ceiling, probably takes somewhere around ten hours

9  to reach the floor.  So wherever they -- when they are

10 released into the air mass, they will go wherever the

11 air mass takes them until they find some sort of quiet

12 place that allows them to ultimately settle out or they

13 impact something or they get on the clothes or on the

14 wall or some horizontal surface.

15 Q    Can you elaborate for the Court -- the Court has

16 your CV and we don't need to go through your

17 qualifications.  But I think one thing that's not sort

18 of detailed in your CV is some of the dust dispersion

19 studies and experience that you have.  Can you elaborate

20 a little bit on that for the Judge.

21 A    Well, first academically, physics.  When I went to

22 School of Aerospace Medicine, I was introduced to dust

23 and air pollution and that kind of stuff.  I did a lot

24 of work on nuclear weapon dust dispersion from nuclear

25 weapons, accidents and that kind of stuff and exercises

FRANK PARKER - REDIRECT

1   and all that, biological, chemical weapon.

2         We did -- a major big -- a big project where we

3   burnt beryllium-enriched propellant waste in the Dugway

4   Proving Groundwork.  We did all the air sampling and

5   trying to disperse -- determine dispersion of beryllium

6   primarily in toxic metal.  I work on rocket grains,

7   firing rocket grains with beryllium in, looking at

8   distribution --

9             THE COURT:  And Counsel, if I haven't said it

10  before, I have no doubt as to the expertise of the

11  individuals that are being challenged.  The only

12  question is whether or not they are bringing it to bear

13  with regard to the specific relevant --

14            MR. FINCH:  I understand.  That was a lead in

15  to my next question which was --

16  BY MR. FINCH:

17  Q   You were asked some questions about the lack of

18  quantitative air modeling or modeling done here.  Why

19  didn't you regard that as necessary or relevant?

20  A    Well, there's two primary reasons, one of them very

21  technical.  And that is when you do a model, the first

22  question is what are you going to do with the number

23  that you come out with.  What are you going to compare

24  it to.  And with asbestos, the problem we have is we

25  don't have any number.  We have significant exposures

FRANK PARKER - REDIRECT

1    defined as a brief low-level exposure, something above

2    ambient; right?  So we don't have -- you don't have

3    anything to compare it to.  So you crunch all these

4    numbers and sort it.

5         The second thing is when I look at this, I don't

6    see a real value in it from an industrial hygiene

7    standpoint of trying to determine whether there were

8    significant emissions out of this plant, whether there

9    was opportunity -- whether there was a pathway, the

10   plant being the source, whether there was a pathway to

11   get out into the community, which is air dispersion,

12   carrying it out on clothes, cars, trucks, whatever it

13   is, and a receptor which is the worker, the people in

14   the community, the people in the house.  All those are

15   really straightforward in this case.  I mean there's --

16   I'm not sure doing a big model, which we would fight for

17   days over what the assumptions were, will add any more.

18   To me, it would not add any more information.

19   Q    From the perspective of an industrial hygienist,

20   was this a clear-cut case if you came to this factory in

21   1975 and were told to identify the dangerous things

22   going on, what would you say?  What would you tell --

23   A    You'd say you have to stop it.  You've either got

24   to get rid of the asbestos and clean everything up

25   because the exposures continue if you leave it out there

FRANK PARKER - REDIRECT

1   in the environment and the plant or you somehow have to

2   wall it off so it doesn't get away from you.

3            THE COURT:  Do you agree with Dr. Anderson's

4   assumption that a concentric circle around the plant of

5   1.25 miles is an appropriate area to consider the zone

6   of significant exposure or the area of greatest

7   concentration?

8            THE WITNESS:  Yes.  And that's based on -- the

9   real valuable science here is the epidemiology here in

10  my opinion.  That's what the epidemiology study says and

11  I think it's pretty reasonable.

12           THE COURT:  Despite the fact that it continues

13  to disperse, it can disperse in all kinds of --

14           THE WITNESS:  Oh, yeah.  It goes -- the issue

15  is concentration, maintaining a concentration that

16  provides you some sort of a dose, some sort of a

17  concentration times time that's significantly more than

18  typical ambient.

19           THE COURT:  Understood.  Thank you.

20  BY MR. FINCH:

21  Q    Before we get to levels of exposure and typical

22  ambient, I want you to define what is re-entrainment as

23  it relates to asbestos fibers.

24  A    Well, re-entrainment happens anywhere that asbestos

25  or any small particle settles out.  Probably the best

                    FRANK PARKER - REDIRECT

1    example I can give you is your wife.  On the dining room

2    table, she comes in, she sees the table, mine anyhow,

3    it's got dust on it, so she goes and wipes it down,

4    comes back an hour later, there's dust on it.  Probably

5    over half of that dust is dust that when she wiped it,

6    she pushed it up in the air and it settled back down.

7    That's re-entrainment.

8              THE COURT:  I bet your wife has never accepted

9    that explanation.  Next question.

10             THE WITNESS:  No, she hasn't, Your Honor.

11             MR. FINCH:  Yes, Your Honor.

12   BY MR. FINCH:

13   Q    How do environmentalist -- significant

14   environmental asbestos exposure such as some of the ones

15   that were measured by the Weyerhaeuser people back in

16   the 70's and since what you've seen in the literature

17   around a factory plant, how does that compare to ambient

18   air?  And that's what my next series of questions is

19   going to be.

20        And so first of all, we're talking about fibers per

21   cubic centimeter or fibers per cubic mm.  What is the

22   measurement to measure fibers for -- fibers in ambient

23   air?

24   A    Well, generally it's fibers per cubic centimeter,

25   which is about the size of a sugar cube.
                    FRANK PARKER - REDIRECT

1    Q    Okay.  You were asked some questions by defense

2    lawyers about why haven't you done any background,

3    ambient air studies around Marshfield.  And you said --

4    they asked you if you did them.  You said no, I didn't

5    think they were necessary and the Judge said can you

6    explain.  Can you explain why you didn't do background

7    study just for Marshfield?

8    A    Well, first off you can't go back and reinvent

9    history.  I mean the real question is what was the

10   background concentrations in Marshfield in the 1970's.

11   There's no way to recreate that.  I mean if we go out

12   there today and take air samples, the question is how do

13   I relate those; right?  The government, the company,

14   nobody went out and took except for these few samples

15   that I'm aware of.  We looked.  There's -- so you don't

16   have a database out there to compare it to.

17        So you're stuck with looking at --

18           THE COURT:  It would have some importance;

19   right?  I realize that you can't recreate the exact

20   conditions, but scientists are regularly looking at

21   dispersions.  I would think a 20-year period for

22   concentration levels, you could look at soil samples and

23   draw some reasonable corollaries.

24           THE WITNESS:  You can't.

25           THE COURT:  And why is that?
                  FRANK PARKER - REDIRECT

1        THE WITNESS:  Well, there's no scientific basis

2   for it.

3        THE COURT:  No one has ever attempted to do

4   that?

5        THE WITNESS:  I am not aware -- I mean the area

6   which probably had more study than anything is

7   radioactive materials, particles, and even there there

8   is not very good science on trying to do that.  And they

9   have spent millions of dollars trying to correlate a lot

10  of this stuff and it really --

11       THE COURT:  And is the difference between that

12  and, say, climate studies that use soil sampling that

13  we're talking about, much larger periods of time?

14       THE WITNESS:  Oh, yes.

15       THE COURT:  Essentially they do it on that

16  basis.

17       THE WITNESS:  That's correct.  They do it, but

18  it depends what you're looking for.  When you're looking

19  for these various -- most of the environmental things

20  you can look for with analytical methods that can look

21  at very small masses.  I mean the problem with fibers is

22  you are looking at an extremely small mass and an

23  extremely -- and you have to find them.  You can't

24  weigh -- you can't take a bunch of soil, put it through

25  a chemical process, and figure out how much sodium is in

                   FRANK PARKER - REDIRECT

1    there or how much sulfur or how much carbon.

2            THE COURT:  So it's similar for volcanic ash.

3            THE WITNESS:  Right.

4            THE COURT:  It's sufficiently heavy in mass and

5    detectable by testing, but you can draw some time

6    corollaries.

7            THE WITNESS:  That is correct.

8            THE COURT:  All right.  Next question.

9    BY MR. FINCH:

10   Q    Okay.  When you are using the term unpolluted

11   ambient air, what sources do you look through and what

12   are the ranges of unpolluted ambient air?

13   A    Well, there's two basic ones anymore.  If you look

14   backwards, the National Academy of Science looks at

15   00007 is what they came up with.

16   Q    0.00007 fibers per cubic centimeter?

17   A    Right.

18   Q    Okay.

19   A    And that's the range.  0002 to 0007.

20   Q    And then the ATSDR has some data that's roughly

21   comparable?

22   A    Right.  The EPA ATSDR is somewhere between 10 to

23   the minus 5 and 10 to the minus 8.

24   Q    Okay.  So that would be point four zeros and a one

25   or point seven zeros and a one?
                    FRANK PARKER - REDIRECT

1  A    Right.  So they're in there.  What we see in this

2  data is 1, 2, 3, 4 -- 4, even more.  I mean one of the

3  samples they took is point something, so that's --

4  Q    Okay.  So --

5          THE COURT:  Does that exist anywhere in the

6  United States, truly unpolluted ambient air?

7          THE WITNESS:  Yes.

8          MR. FINCH:  Do you mean by zero fibers or --

9          THE WITNESS:  You mean -- okay.  I apologize.

10         THE COURT:  I thought you were --

11         THE WITNESS:  Define unpolluted.  Zero?

12         THE COURT:  Exactly.  No, this.  If we accept

13 this definition of unpolluted ambient air, is this

14 typical for areas in the United States?  Is this the

15 average?  Because I thought it was higher.

16         THE WITNESS:  Well, you're always going to have

17 exceptions on both ends.

18         THE COURT:  Right.  But your understanding is

19 that this would be considered -- this is a standard of

20 unpolluted ambient air fibers per cubic centimeters.

21         THE WITNESS:  Generally accepted, that is

22 correct.  You're always going to have exceptions, but

23 rural air is going to be a lot cleaner, of course, than

24 somebody in downtown New York City with one of breaks.

25 But there's a big variation.

                   FRANK PARKER - REDIRECT

1        THE COURT:  Understood.

2   BY MR. FINCH:

3   Q    But it's the National Academy of Sciences 1984,

4   that's taken from a collection of data across a broad

5   variety of cities and they come up with that average; is

6   that how that --

7   A    That's what they came up with, that is correct.

8   Q    Okay.  And that's accepted by industrial hygienists

9   in your field as what you would look to for a background

10  ambient unpolluted air.

11  A    Correct.

12  Q    Unpolluted with big quotes around it.

13  A    Right.  I mean that's why I have more than one of

14  them.  There's other people argue about different

15  numbers, but that's about what we've got.

16  Q    Okay.  And then how do the measurements taken

17  contemporaneously in Marshfield outside the plant in the

18  neighborhood that you have in your report, how does that

19  compare to that?

20  A    Well, there's -- one is .005.  Let me get to those

21  numbers.

22  Q    They're in your report.  Let me just direct you

23  where to look in your report.

24  A    Page 10, G.  He took five samples, but he did not

25  -- he only reported the low and high, which was .003 and

                    FRANK PARKER - REDIRECT

1    .005.  So that's --

2            THE COURT:  When you say he, you understand

3    that to be someone working at the Weyerhaeuser plant?

4            THE WITNESS:  That's correct.  Mr. Wendlick.

5    So that's at least two orders magnitude higher than what

6    we've got -- three orders actually.  And if you look at

7    the ten to the minus 8, it's five orders of magnitude.

8    BY MR. FINCH:

9    Q    From the perspective of an industrial hygienist, is

10   that a significant and substantial asbestos exposure

11   that you would be worried about?

12   A    Yes.

13   Q    OSHA, the Occupational Safety and Health

14   Administration, has what's called *permissible exposure*

15   *limits*.

16   A    Right.

17   Q    Do those -- are those intended to protect against

18   mesothelioma?

19   A    No.

20   Q    Does the OSHA regulations say that at that level of

21   exposure there is no risk?

22   A    It does not.  And the important thing to remember

23   is OSHA is only talking about healthy males primarily

24   who are in the work force.  They are not talking about

25   and it's inappropriate to apply that to ambient, to

                  FRANK PARKER - REDIRECT

186

1  householders, to young, the old, the infirm.

2      The other important thing to remember about it, it

3  implies that you only have an eight-hour exposure, you

4  have 16 hours to recover, and you have a weekend to

5  recover.  In the ambient, especially in environmental

6  ones, you do not have any time to recover.  You're

7  exposed for that 16 hours both outside and in the house,

8  weekends, holidays, whatever it might be.  So that is a

9  grossly inappropriate application of PEL to anything

10  outside of the workplace.

11  Q    Okay.  We'll get to in the house, household

12  exposures in a few minutes.  But sticking with community

13  or neighborhood exposures, did you also cite to some

14  literature of published studies that talk about

15  exposures that you thought were similar to Weyerhaeuser

16  here involving exposure from a plant polluting a

17  neighborhood?

18  A    Yes.  The one we talked about a little earlier was

19  this Awad study.

20  Q    And on this slide here, do we have some of the

21  other ones that you have in your report --

22  A    Yes.

23  Q    -- listed?

24  A    Yes.

25  Q    Could you just run us through those quickly and

FRANK PARKER - REDIRECT

1  describe what those situations were and why you thought

2  they were useful to --

3  A    Let me find the right page.

4  Q    -- preparing your report.  Page 24 perhaps?

5  A    24.  There you go.  You're ahead of me.  Thanks.

6  Well, probably the landmark on that paper everybody

7  refers to is the 1960 Wagner study.  It was a town

8  around an asbestos mine in Africa.  He was the first to

9  really demonstrate the people not only in the mine but

10 the household and people just in the environment

11 developed mesothelioma.

12     The other one I pointed to was the Libby Montana

13 experience we've had where most people read about that

14 in the newspaper.

15 Q    And just to be clear, Libby was a vermiculite mine

16 owned by the WR Grace Company?

17 A    Yes.

18 Q    And the contaminant of the vermiculite was

19 tremolite, which is another amphibole fiber?

20 A    Correct.

21 Q    Okay.  And then what happened in that town to the

22 people around the town?  What was observed?

23 A    Well, even though it's a relative to -- we're

24 talking about 15 percent asbestos in this fire door.

25 You're talking about less than 1 percent typically in

FRANK PARKER - REDIRECT

1    the tremolite Libby.  But they still found disease.

2    They found a contaminated ape.  They even found it in

3    the tree bark.  They found it in pets.  I mean it just

4    demonstrates how this material can be just distributed

5    throughout the company.

6    Q    And were there papers published -- I think you have

7    the collection to the overview, but were there papers

8    published in the peer-reviewed literature that

9    documented the mesotheliomas around --

10   A    Yes.

11   Q    -- from these community exposures?

12   A    Yes.  They also had -- I want to make sure.  They

13   also had a lot of what we call *plant exposures*.  It was

14   very similar to what we have here.

15   Q    You had people that were exposed working in the

16   plant.  You had people exposed in the community.  And

17   then people exposed take home, when they come home from

18   the plant.

19   A    That is correct.

20   Q    The Tarres, what's that about?  What was the type

21   of asbestos and what was the plant?

22   A    Well again, it was an asbestos cement plant where

23   they had both amphiboles and serpentines.  They did

24   it -- I mean I don't know if Dr. Anderson talked about

25   it, but they found a correlation between mesothelioma,

                    FRANK PARKER - REDIRECT

1  the distance from the plant and the local wind

2  conditions in people who did not work in the plant.

3  Again, it's just a demonstration of these fibers getting

4  into the community.

5  Q    Getting in the community and creating significant

6  exposures to anyone who comes into that community, into

7  that radius?

8  A    That's correct.

9  Q    And then finally I think Kumagai, there was a lot

10  of discussion with Dr. Anderson about Kumagai.  You were

11  sitting in the courtroom.  Is there anything you want to

12  add to Dr. Anderson's testimony about Kumagai?

13  A    No, not really.  He knows that stuff better than I

14  do.

15         MR. FINCH:  Does Your Honor have any more

16  questions about the Japanese study?

17         THE COURT:  Why don't you ask your questions,

18  Counsel.

19         MR. FINCH:  Thank you.

20         THE COURT:  If I do, as you know I won't

21  hesitate to ask.

22  BY MR. FINCH:

23  Q    Within the 1.25 mile radius around the Weyerhaeuser

24  plant, did you have evidence of visible dust emissions?

25  A    Sure.  I mean especially these descriptions of the

                    FRANK PARKER - REDIRECT

1   bag house like -- they called it a guiser shooting stuff

2   up into the air.  The testimony of not only the

3   plaintiffs, but the records in the plant about how they

4   were constantly getting complaints from the local

5   railroad and from the people in the parking lot getting

6   this material on their cars.  I mean there's all kinds

7   of factual testimony that this material is getting out

8   of the plant.

9   Q    Does the presence of visible dust provide evidence

10  of significant exposure without quantitative

11  measurements?

12  A    Yes.  I mean --

13  Q    Why so?

14  A    Well, if you just -- in general looking

15  historically, I mean if you have a product like we're

16  talking here, either the raw asbestos or when they

17  started handling that or cutting and sanding and all

18  that or the stuff going up the stack, you can almost be

19  assured that you're above any kind of standard.

20       More importantly for the environment is that the

21  EPA under the hazardous -- Hazardous Emergency Response

22  Act under the Clean Air Act declared -- they were

23  convinced, and they so state, that if you have any

24  visible emissions, it is an unacceptable risk to the

25  community, period.

                    FRANK PARKER - REDIRECT

1      MR. METCALF:  Your Honor, I'm just going to

2  object to the testimony about the visible emissions.

3  That's something that is part of NESHAPS and the Court

4  has ruled already on the admissibility of that.

5      THE COURT:  That's fine.  You can ask your next

6  question.

7  BY MR. FINCH:

8  Q   Is it also professional industrial hygiene

9  standard, leaving aside NESHAPS, that if you see visible

10  dust from something you suspect you have asbestos in it,

11  that's a dangerous exposure?

12  A   Yes.  Most practicing industrial hygienists

13  wouldn't even bother to take any air sample.  They'd

14  just say they've got to stop this right now.

15  Q   Okay.  You were asked some questions about some

16  work you did involving a plant in Algoma and there was

17  some testing of some of the houses nearby.  Do you

18  recall those questions?

19  A   Yes.

20  Q   Okay.  Can you explain to the Court what processes

21  that were used in the Algoma plant were as compared to

22  the plant here in Marshfield?

23  A   They were somewhat similar.  The thing we didn't

24  have there was a lot of this fact witness testimony

25  about visible emissions, dust in the community, that

FRANK PARKER – REDIRECT

1  type of thing.

2  Q    So you had -- in this case, the Marshfield case,

3  you had that testimony.  You didn't have it in Algoma?

4  A    That's my recollection.

5  Q    Why is it you decided that it wasn't necessary to

6  do a systematic testing of all of the houses in some

7  vicinity around the Marshfield plant as compared to

8  doing that kind of work in Algoma?

9  A    Well, when Mr. McCoy and I first started, I thought

10 basically the fact testimony and stuff we had out of the

11 plant really was more than enough.  I didn't think we

12 needed to go to the expense and all that of trying

13 designing a scientific study to make sure we had houses

14 that were there at the same time and that they hadn't

15 been -- you know, there's a lot of work that goes into

16 trying to design those kinds of studies and I just

17 didn't think it was necessary.

18 Q    What significance, if any, is there for the

19 negative soil samples that apparently someone in your

20 office did?

21 A    Well, first off I did not design the study.  I

22 didn't rely on the study.  I have no idea how it was --

23 the sites were picked.  The client called us and wanted

24 somebody to come up there and help them.  We sent

25 Mr. Debrese (ph).  They told him where to sample.  So

                    FRANK PARKER - REDIRECT

1  from my standpoint, I don't think they're very helpful.

2      But I would also point out I think they ultimately,

3  when I looked at those in deposition, they actually

4  found a fiber in one of the samples.

5  Q    There was discussion with Dr. Anderson about the

6  Helsinki criteria.  You recall that?

7  A    Yes.

8  Q    And am I correct that some of the experts that were

9  at the Helsinki conference in Finland were industrial

10  hygienists?

11  A    Yes.

12  Q    From the perspective of industrial hygiene, what is

13  a significant exposure, asbestos exposure that you would

14  consider to be significant or dangerous or could give

15  rise to disease?

16  A    Well, I think they define it fairly well.  They

17  just say a significant exposure that look at

18  occupational, household, domestic they call it, and

19  environmental.  It's basically anything above ambient.

20  Q    Is there anything in the Helsinki report criteria

21  that require you to have a quantitative measure or

22  estimate of a given exposure like an occupational

23  exposure or a household exposure or a domestic exposure

24  in order to make the determination that it's

25  significance?

                   FRANK PARKER - REDIRECT

1    A    No.

2    Q    Does the Helsinki criteria talk about the -- thank

3    you -- talk about the comparability of household

4    exposures and occupational-level exposures?

5    A    That's true.  Yes, it does.

6    Q    What does it say?

7    A    Well, and if you look at the data, the household

8    exposures were for laundering, especially if you do

9    things like vacuum cleaning, those kinds of things.

10   Those concentrations are substantially similar to what

11   you find in the workplace like the Marshfield plant.

12   Q    Okay.  In the language of the Helsinki criteria,

13   they say in some circumstances exposures such as those

14   occurring among household members may approach

15   occupational levels.

16   A    Yes.  I mean if you look at the data, they more

17   than just approach it, they probably -- they're pretty

18   congruent except for the very high numbers, the very

19   high limit, upper end of the distribution of exposures.

20   The highest I've seen in a household is probably 15

21   fibers per CC.  The highest you see in a plant may be a

22   couple hundreds fibers per CC.

23   Q    Okay.  And in your report, not your individual

24   plaintiff report but in your general report, do you have

25   the data of what the literature shows for the types of

                   FRANK PARKER - REDIRECT

1  asbestos exposures associated with doing things like

2  sweeping up asbestos fibers in a location, picking up

3  clothes, loading a washer/dryer; do you have that in

4  your report?

5  A     Yes.

6  Q     Okay.  Could you tell the Court what those ranges

7  are?  The first one I saw was on page 23 about sweeping.

8  A     Yeah.  Well, like I say, the highest numbers you

9  see are things like vacuum cleaners which I think show

10  you.  And the reason for that, that's why bag houses are

11  also -- I mean you think of a vacuum cleaner is a small

12  bag house.  The mechanical energy that a vacuum cleaner

13  puts into picking the dust up off the floor, these

14  fibers are not individual fibers.  They're not just a

15  single fiber.  They are what's called a fiber bundle and

16  each one has a fibril.  And so the mechanical energy

17  breaks those up.  So you end up with one fiber, you end

18  up with more than one.

19      You then blow it out through the sides of the bag.

20  Many of those then get re-entrained back into the air.

21  So that's the highest I think we found was about 15

22  fibers per CC from that.

23  Q     Okay.  What about for doing activities like shaking

24  out clothes, putting clothes in the laundry.  Do you

25  have a section in your report that talks about that?

FRANK PARKER - REDIRECT

1  A    Yes.  I mean again, they're pretty much all over

2  the place.  Wendlick himself did some sampling on

3  washing the clothing from their workers and he got 8.3

4  and 9.1 fibers per CC.  Literature goes -- some of it

5  goes much lower:  .4, .1.  So you have again this

6  distribution.

7  Q    Dr. Anderson talked about one of his own studies

8  which he wrote a paper about in 1976 where household

9  occupants were developing asbestosis and pleural

10 disease.  As an industrial hygienist, what does that

11 tell you about the kinds of exposures you can experience

12 from living in a house once asbestos dust gets into it?

13 A    It's very high.

14 Q    Is the exposure that occurs once asbestos dust gets

15 into the house, whether it's brought home on the clothes

16 of somebody or whether it comes in through the air

17 because you're living in a polluted community, what are

18 the activities that occur inside the house, the

19 household activities that give rise to additional and

20 continuous exposures to asbestos?  What are some of the

21 things that people do -- I think you've touched on them

22 so far, but let's just try to make a laundry list of

23 things that aren't work related but that once the dust

24 gets into the house, activities in the house that create

25 more exposure.
             FRANK PARKER - REDIRECT

1    A    Well, anything that takes these fibers that have

2    either settled out or are still in the air and disturbs

3    them:  Sweeping; family contact with a washing, if it's

4    contaminated clothes they pull them out of the hamper,

5    whatever it may be and get it on their own body, that

6    contaminates their clothes; not only does picking them

7    up release fibers, but in contaminating their own

8    clothes, hands, and then eventually some of those are

9    released afterwards or during that period of time, so

10   that adds to the exposure.

11           THE COURT:  Counsel, we strayed pretty far from

12   the areas of cross.  This is all laid out in his report.

13           MR. FINCH:  Okay.

14           THE COURT:  So if you have something more

15   specific, you should get to it.

16   BY MR. FINCH:

17   Q    From the perspective of an industrial hygienist,

18   you were asked a lot of questions about quantify this,

19   quantify that.  Do you need a contemporaneous

20   quantitative measurement or a quantitative estimate of

21   exposure in terms of fiber per CC in order for you as a

22   industrial hygienist to say this is a significant

23   dangerous exposure that could give rise to risks of

24   disease if not controlled?

25   A    No.
                     FRANK PARKER - REDIRECT

1          MR. FINCH:  That's all I have.

2          THE COURT:  Very good.  Any redirect?

3          MR. METCALF:  Just two areas.

4          THE COURT:  Recross.   (2:13 p.m.)

5          MR. METCALF:  Yes, Your Honor.

6                    RECROSS-EXAMINATION

7   BY MR. METCALF:

8   Q    Mr. Parker, we talked a little bit about the

9   background standards and you referenced one of -- I

10  guess page 10 of your report I believe it was where you

11  talked about the NRC --

12  A    Okay.

13  Q    -- study that looked at background?

14  A    Yes.

15  Q    That study was done looking at TEM; correct?

16  Transmission electron microscopy?

17  A    Yes.

18  Q    I believe that's correct.  Not PCM; right?

19  A    That's correct.

20  Q    And are you familiar with the NIOSH revised

21  recommended asbestos standard from 1976?

22  A    Yes.

23  Q    At the end, it looks at ambient levels and ends

24  with a discussion of background levels reviewed using

25  phase contrast microscopy.  Do you see that?
                    FRANK PARKER - RECROSS

1   A     That's what it says.

2   Q     And they report in this study or in this article

3   that studies indicate ambient levels to be generally

4   less than .01 fibers but some peak values as high as .03

5   fibers; correct?

6   A     That's what they say.

7   Q     And those are in the range of the numbers that

8   Mr. Wendlick reported; right?

9   A     That is correct.

10  Q     You mentioned Libby Montana.  In Libby Montana,

11  they used vermiculite and tailings from that mine on the

12  golf courses and the tracks and all around that

13  community; right?

14  A     That's correct.

15  Q     We don't have that situation in Marshfield, do we?

16  A     Not that I know of.

17  Q     Lastly, you mentioned that in Algoma, I believe

18  your testimony was there was -- you didn't have these

19  descriptions of dust in the community; right?

20  A     Not like we have -- not like we had here as I

21  remember.

22  Q     Let me show you your testimony from April 14, 2010,

23  and if we look at page 42, line five.  You're asked

24  about the sampling that you took and you say that if you

25  take the sampling essentially by itself is one thing,

FRANK PARKER – RECROSS

1    "But if you put it together with the descriptions of the

2    dusty emissions from the plants, you put it together

3    with the description of the dust coming out of trucks

4    going down the streets, the community complaining about

5    the dust, the fact that the dust contained large

6    quantities of asbestos, et cetera."  You're references

7    there community descriptions; correct?

8    A    Well, yes.  It was primarily about the -- as I

9    remember, about the plant itself and the trucks.  I

10   don't -- that's what -- it is what it is.

11           MR. METCALF:  That's everything I have, Your

12   Honor.

13           MR. FINCH:  Can I have one brief re--

14           THE COURT:  You may after this question which

15   is simply how do you account for the distinction between

16   the ambient air numbers that you quote and the NIOSH

17   numbers in '76?

18           THE WITNESS:  Simply because that was 1976 they

19   had very limited database.  It's about the time the

20   National Academy of Science went out and looked at all

21   kinds of data they could find, and actually since then,

22   as we just said, the EPA ASTDR (sic) has looked at even

23   additional data to come up with this ten to the minus 5,

24   ten to the minus 8.

25           THE COURT:  And when the EPA did that, what
                        FRANK PARKER - RECROSS

1    year was that?

2            THE WITNESS:  AT -- the high criteria was '76.

3    The -- hang on a second here.

4            MR. FINCH:  Were you asking about the National

5    Academy of Sciences document?

6            THE COURT:  Yes.

7            THE WITNESS:  What year was that?

8            THE COURT:  While you're doing that, were you

9    able to pull one of the specific reports for Mr. Parker?

10           MS. CLARK:  I have all eight if you like.

11           THE COURT:  One would be great.  I just need

12   one.  Thank you very much, Counsel.

13           MR. FINCH:  The National Academy of Sciences

14   report speciform fibers is 1984.  The ATSDR report was

15   2001.  And then I have one followup question based on

16   that.

17                    FURTHER REDIRECT EXAMINATION

18   BY MR. FINCH:

19   Q    They showed you a 1976 NIOSH document where they

20   were measuring fibers in the air using a PCM.  Do you

21   recall that?

22   A    Yes.

23   Q    But the 1984 NAS was using transmission electron

24   microscopes; right?

25   A    Correct.
                    FRANK PARKER - REDIRECT

1   Q    Can you distinguish asbestos fibers from something

2   else just using PCM or do you need to use TEM?

3   A    TEM is by far the better scientific method.  PCM is

4   very useful.  We use it a lot.  It depends on what the

5   source is and what you know about it.

6   Q    Okay.  And when using an electron microscope, you'd

7   be able to see more -- using TEM, would you be able to

8   see more asbestos fibers if they were, in fact, there in

9   the unpolluted ambient air?

10  A    Actually TEM looks at a very much smaller area than

11  PCM and so more or less isn't the issue.  The real issue

12  is TEM tells you and confirms that it's an asbestos

13  fiber where PCM is difficult to do that with.

14  Q    And it's your testimony as an industrial hygienist

15  then when you're talking about "unpolluted background

16  ambient air," the best source is the National Academy of

17  Science, its peer-reviewed studies?

18  A    That's my opinion, that and the ASTDR.

19          THE COURT:  Very good.  You may step down,

20  Mr. Parker.  Thank you for your time today.

21          THE WITNESS:  Thank you.

22      (Witness excused at 2:18 p.m.)

23          THE COURT:  Why don't we just talk briefly

24  about the other report at issue, Dr. Abraham.  And

25  perhaps since it's defendants' motion, I'll hear from
                    FRANK PARKER – REDIRECT

1  you as to whether you think there's anything more that

2  would be served by having him testify.

3       MS. ELLIS:  Your Honor, Dr. Abraham's opinions

4  are to some degree cumulative of Dr. Anderson.  He

5  confirms the diagnosis, which is a unique piece of his

6  opinion and for the purposes of this motion we're not

7  arguing over his diagnoses.  But he does take the second

8  step of making a specific causation opinion, which

9  overlaps with Dr. Anderson.

10       THE COURT:  And when you say that, does he use

11  the substantial language as well?

12       MS. ELLIS:  I believe so, Your Honor.  Let me

13  look specifically at his report.  We'll pull it out.

14       THE COURT:  I see him saying asbestos exposure

15  is well known to be the cause of nearly all malignant

16  mesothelioma.

17       MS. ELLIS:  Yeah.  And Dr. Anderson at his

18  deposition testified he was asked to assume that there

19  were exposures in the community and asked to --

20       THE COURT:  Dr. Anderson or Dr. Abraham?

21       MS. ELLIS:  I apologize.

22       THE COURT:  You have them both.

23       MS. ELLIS:  Dr. Abraham testified he was asked

24  to assume exposure in those two settings and he

25  testified that assuming there was exposure, he would

1    testify that they were causal.  Our objections with his

2    opinion are really captured in our argument over the --

3    every fiber theory that the parties briefed --

4         THE COURT:  Well, that's what I'm getting at

5    because the every fiber opinion I think probably is

6    supported by science; that this -- that these

7    nonoccupational exposures are a substantial cause I

8    think is where the science may break down.  To the

9    extent that he's only expressing the opinion that every

10   fiber is causal or can be causal, I'm not sure I

11   understand the basis to exclude it.  But we don't -- I

12   don't disagree that that's as far as he's testified.

13   There's really nothing more to explore as to his

14   opinions.

15        MS. ELLIS:  Right.

16        THE COURT:  Anything more for the plaintiff on

17   that subject?

18        MR. FINCH:  No.  I think given where the rubber

19   hits the road is whether the household and the

20   neighborhood exposures can be substantial contributing

21   factors.  I don't think Dr. Abraham's testimony adds

22   anything more to that beyond the two witnesses Your

23   Honor has already heard from.  I don't agree that he's

24   necessarily cumulative because I think we could call him

25   and talk about various things at trial, but for purposes

1    of this hearing today I don't think we need to hear from

2    the good Dr. Abraham, who is waiting patiently in

3    Syracuse.

4            THE COURT:  All right.  If you want to notify

5    him that we won't be adding him, I'm sure he'd

6    appreciate finding that out.  So feel free.

7        While that is occurring, let me try to focus the

8    parties' closing remarks today.  I do want to go back

9    and look at these studies and the other materials that

10   have been referenced today, but I agree that at the end

11   of the day, we are looking at a question as to the

12   relevance of evidence of significant exposure, which I

13   think is clearly relevant, and whether or not

14   Mr. Anderson has provided enough support for that

15   testimony.  And then evidence of substantial cause and

16   whether Dr. Anderson's testimony is sufficiently

17   supported to allow that to be accepted.

18       Let me address, because we just talked about it,

19   Mr. Anderson's testimony.

20           MR. FINCH:  Mr. Parker.

21           THE COURT:  Let me try that again.  Thank you.

22   Mr. Parker's testimony, not Dr. Anderson's.  Mr. Park's

23   testimony.  Thank you.  Assuming that the only

24   epidemiological studies that we have work from a zone no

25   larger than 1.25 miles, it seems to me that he's given

1   enough basis to believe that when this plant was in full

2   operation that there were or he at least can opine that

3   there were significant exposures within that zone.

4        I don't see any science behind testimony that there

5   was for causation purposes significant exposure beyond

6   that level, beyond that zone that is measurable and

7   causal in terms of epidemiological studies.  That's

8   different than to say there could not be other areas

9   where one is exposed, for example, with at least with

10  respect to some of the, I'm going to call them

11  plaintiffs because it's simpler, but I understand

12  technically they may not be represented by estates; that

13  there were plaintiffs who may have had, and he and

14  Dr. Anderson would so opine, significant exposures as a

15  result of having their parents coming home from the

16  plant with asbestos on clothing or otherwise.  And

17  perhaps that might get you there.  Although as I look at

18  his reports, I'm not sure how any of those would apply.

19       In any event, it's one thing for him to testify

20  that they were significant exposures because of those

21  other kinds of nonoccupation exposure besides activities

22  within the 1.25 miles of the plant.  But unless -- there

23  are some studies that I've yet to see that draw those

24  links.  I don't know how you could say that they were a

25  substantial cause.  I know that -- in other words, I

1  don't think there's science behind it.  There's

2  certainly reason to believe it's a cause, but not a

3  substantial cause.  And that's one area of concern I

4  have.  And I realize that's both an issue that neither

5  side will agree on in terms of how I'm thinking about it

6  and I'm happy to hear the parties' views.

7       As to the Dr. Anderson -- well, let me take up

8  Abraham first.  With respect to Abraham, I think he can

9  testify to the things in his report.  The only question

10  is really a summary judgment question is whether or not

11  you get to a jury if all you are able to prove is that

12  any exposure is a cause of injury because I really think

13  that's all Dr. Abraham is opining about.

14       And I suppose one could argue that even as to

15  Mr. Parker, his statements as to significant pockets of

16  exposure are something that I wouldn't necessarily

17  exclude as evidence.  The only question is is it

18  sufficient evidence to support a finding by a reasonable

19  jury of those exposures being a substantial cause absent

20  some solid studies indicating it is.

21       And that brings me then to Dr. Anderson, who does

22  want to provide the ultimate conclusion in this case,

23  ultimate legal conclusion in this case with respect -- I

24  should say he claims to provide the ultimate legal

25  conclusion in at least the way he's phrased his opinions

1    in this case, and that is that the nonoccupational

2    exposures were a substantial cause of the mesotheliomas.

3    I'm going to get there yet.

4        As to that opinion, I'm troubled whether it is an

5    appropriate one, at least in its current form, to go to

6    the jury because it subsumes the ultimate legal

7    question.  I'm more concerned with what it means.  And

8    now I'm talking about both legally and as specific to

9    Dr. Anderson.  I'm not sure I got a satisfactory answer

10   as to what he means by a significant cause other than

11   that somewhere there's a range of exposure -- I should

12   say substantial cause -- other than there's a range of

13   exposure that constitutes a substantial causative factor

14   and that for various reasons he assumes that here -- let

15   me see if I can turn that off.  Says we're not

16   connected, but I imagine that's an automatic feature.

17       So I say that by way of general comments and I'm

18   happy to hear from both sides before we close the record

19   in this hearing.  Because it's your motion, I'll hear

20   from Weyerhaeuser first.

21       MS. ELLIS:  Thank you, Your Honor.  Much of

22   what the Court is discussing about the trouble with sort

23   of the medical aspect of substantial factor as opposed

24   to the legal aspect of it is something that has been

25   ongoing, I think, and is being played out in the case

1    law as we speak.  There is a long line of cases now that

2    are rejecting this cumulative exposure theory for this

3    exact reason that --

4            THE COURT:  And on at least a number of cases

5    that are accepting even the notion of marginal causation

6    being sufficient.

7            MS. ELLIS:  Yes, Your Honor, that is right.

8            THE COURT:  That doesn't really get me anywhere

9    either.

10           MS. ELLIS:  We've got things on both sides of

11   the fence.  I think the *Krik* opinion that has recently

12   come out of the Northern District of Illinois is a very

13   good discussion and decision on the issue because the

14   court started with allowing the expert to testify but

15   striking the portions of his opinion on the *any exposure*

16   *can contribute*.  And right before trial, the court

17   entertained argument from the expert in a Daubert

18   hearing outside the presence of the jury and the

19   court -- and the expert offered up this cumulative

20   exposure theory identical to what we're hearing here;

21   that cumulative exposure causes disease and you can't

22   rule out any exposure from the cumulative so therefore

23   it's a substantial contributing factor.  It's a

24   substantial cause.  And the *Krik* court said that's the

25   exact same thing as every fiber and it's been redressed

1   as cumulative exposure.

2           THE COURT:  If that's what Dr. Anderson was

3   saying, every fiber -- I'm not precluding the

4   possibility that's what he's saying, but that's not how

5   I understood his testimony -- then I would lean towards

6   excluding it.  But he seems to be saying that there's

7   sufficient exposure here, that it's a significant factor

8   and to be relying on the epidemiological studies from

9   other countries that have singled out causations other

10  than occupational exposures.  And to the extent that I

11  accept those and I accept -- and this is a big caveat as

12  well -- I accept that the individual plaintiffs were

13  significantly exposed, which is what I understand the

14  studies to require by nonoccupational asbestos, there is

15  some science to support it.

16          MS. ELLIS:  The studies that Dr. Anderson

17  relies on do stand for and support the proposition that

18  environmental exposures can cause mesothelioma.

19  Household exposures can cause mesothelioma.  In those

20  settings where they found large numbers of that exact

21  condition in place, the dose, the exposure that occurred

22  there resulted in those diseases.  And the Bourdés study

23  that Dr. Anderson --

24          THE COURT:  Let's use an example here.  You

25  have at least a few individual plaintiffs who lived for

1   substantial periods of time within the 1.25 mile zone --

2           MS. ELLIS:  Yes, Your Honor.

3           THE COURT:  -- of concentration, so presumably

4   they got some significant doses and under these studies

5   that could well cause mesothelioma.  So then the

6   question is -- and this gets into the chicken and egg.

7   If you have -- if we look at overall odds, I think you

8   have the better of the case; that is to say, if you

9   picked any one person out with mesothelioma, even with

10  those exposures the chances that that person has

11  exhibited the symptoms when and how they did are

12  substantially higher for work exposure.  But I'm not

13  sure that's enough.  I'm not sure under the law.

14      If they can show that there is a significant

15  contributor or significant exposure in nonoccupational

16  settings raises your odds, I don't know what that is.

17  But if the data was, as described at one point using

18  overall data, that it's a very small likelihood, one in

19  a million, four million or liberally ten -- let's try it

20  again.  .0001 percent, .0004 percent or 1 to 10 percent,

21  then the relative risk or the relative likelihood is

22  very, very small.  But that's, accurately stated, the

23  chances in the population as a whole whereas if someone

24  has it, I'm not sure that those are the appropriate

25  statistics.  Once someone has it -- I'm trying to think

1  of the name of the statistical anomaly, it's come up a

2  lot in false positives in the risk of doing certain

3  kinds of tests because there are so many more false

4  positives in a population as a whole as opposed to

5  people that actually have the disease come a lot in

6  approving cancer testing.  In any event, once we're down

7  to the individual who has it, if we know that the

8  combination of work and nonwork, at least for those

9  nonworkers who have significant exposure is a marginal

10  increase, not just a very small increase, and I don't

11  think that epidemiological studies would support that

12  kind of view as you would looking at a population as a

13  whole, then at least where that's been proven, and I'll

14  come back to that in a second, the significant exposure,

15  nonoccupational, I'm not sure that a jury isn't entitled

16  to at least decide if it was a substantial factor for

17  that plaintiff.

18       MS. ELLIS:  I think our issue -- and I

19  basically agree with everything that Your Honor just

20  said with the gaping hole here for us is the level or

21  amount of exposure that actually occurred.

22       THE COURT:  All right.  So let's talk about

23  that.  Let's -- the most extreme position is the

24  individual that I described who was in a household

25  within, let's say, somewhere within three or four blocks

1  of the plant for a substantial period of time as they

2  grew up or -- and/or as they worked at the plant.  So

3  are you in agreement that we can go to trial with

4  respect to those or at least that Dr. Anderson ought to

5  be able to testify, whether or not it's at summary

6  judgment they lose for other reasons; in other words, if

7  that's evidence of significant nonoccupational exposure.

8         MS. ELLIS:  Well, I think it goes back to what

9  we're just saying.  There's no evidence here that

10 there's a significant exposure happening in 1.25 miles

11 of this plant.  We have emissions --

12         THE COURT:  I'm sorry.  Go ahead.

13         MS. ELLIS:  Even let's assume there are

14 emissions from the plant, asbestos-containing emissions

15 from the plant.  And let's assume there are people --

16         THE COURT:  Well, I don't know if we need to

17 assume.  I think we know there were asbestos emissions.

18 I mean the level of them I grant you remains in dispute.

19         MS. ELLIS:  Right.

20         THE COURT:  But we know there were emissions.

21         MS. ELLIS:  Okay.  Yes, there are.

22         THE COURT:  And we also know that -- and the

23 only evidence we have -- to the extent your client was

24 spewing, in the pejorative word, to the extent releasing

25 asbestos fibers, that already establishes negligent

conduct.  So then the question is how much evidence of
causation is enough and the only evidence we have,
contemporaneous evidence is the plant's own measured
exposures.  And I guess your argument is that those
exposures are not sufficiently high even within this
zone to be substantially causal.  And I'm not quite sure
where we get there.  We have two disputes as to what
substantially high is.  I think the notion that it's
ambient, I think that's silly because anything above
ambient would mean we'd be going back to exactly what
you just talked about.  Anything above ambient means any
kind of exposure other than naturally caused in the
environment.

     But some of the epidemiological studies talk about
similar ranges of exposure within that zone to those
that were tested.  And then you've got conflicting
measures, depending upon which one you rely upon, and
that's exactly why we end up with experts getting on the
stand saying this is important or this isn't important
and the jury has to make that determination.

          MS. ELLIS:  I think what we have -- the dots
haven't been connected between emissions from the plant,
let's call it asbestos emissions coming from the plant,
to asbestos in the community air to exposure.  And just
because we have emissions from the plant, it doesn't

1    then end result go to exposure.  You still have to put

2    the pieces together.  In looking at epidemiological

3    studies that relate to places much different than what

4    we have here, and in particular when the experts haven't

5    told us how we can reasonably look at, you know, an

6    Italian asbestos plant that operated for 90 years using

7    15 times the amount of asbestos that was alleged here,

8    operating for four times longer and the list goes on and

9    on where they found 80 people living in the community

10   with meso with no other exposure, how can you take any

11   information from that study and put it on Marshfield

12   other than the general fact that occupational -- excuse

13   me, environmental exposure can cause mesothelioma in

14   certain settings.  It says nothing about what we have

15   here.

16           THE COURT:  Well, is it appropriate or why

17   wouldn't it be appropriate to allow the jury to consider

18   evidence of release into the community for those

19   individuals who spend substantial time within the

20   so-called zone of exposure at levels suggested by the

21   measurements by the plant?  And I take -- I heard what

22   you just said which is that --

23           MS. ELLIS:  Right.

24           THE COURT:  -- the evidence of cause there is

25   not comparable because the exposures are so much greater

1  in epidemiological studies that we have from other

2  countries.  Is there any other reasons besides that?

3        MS. ELLIS:  I mean it's the exposure and the

4  duration of exposure and the incidence of disease that

5  shows up in those communities.  And it's just -- to me

6  it's a wholesale difference.  And it's, too, the

7  Daubert --

8        THE COURT:  When you say disease that shows up,

9  you mean other than the mesothelioma?

10       MS. ELLIS:  I mean the fact that there are --

11 not only are there mesos showing up in those

12 communities, there's 80 mesotheliomas showing up there.

13 I mean it is -- when you see something like that, you

14 can then can infer well then yes, there is an exposure.

15       THE COURT:  Well, but, you know, that goes back

16 to the notion that you're dealing with much larger

17 population sizes than you're dealing with here.  It

18 doesn't mean that there isn't an impact, if you get

19 someone who does have it, that there wasn't an impact.

20 And the way you measure it is by looking at similar

21 circumstances.  And I guess at the end of the day the

22 argument is whether the circumstances are similar and

23 not that someone with a medical background and

24 epidemiological background could draw -- is drawing a

25 reasonable scientific link or at least one that he can

1   describe to the jury.

2          MS. ELLIS:  And I know Your Honor doesn't need

3   us to tell you about the case law, but there is this

4   *Textron* case from the Seventh Circuit that addresses the

5   joiner problem when experts take studies that are

6   dissimilar from the facts and don't appropriately

7   connect the dots and don't appropriate walk through the

8   analysis.

9          THE COURT:  I do find somewhat persuasive, and

10  I've got to go look at the study, but studies of studies

11  have proven increasingly more reliable than anything

12  else.  To the extent that Dr. Anderson is accurately

13  describing that study, that might be enough to get him

14  there.

15         MS. ELLIS:  So the Bourdés meta analysis, it

16  did -- it looked at six environmental studies that

17  ranged from -- I think there's three on asbestos mines

18  studies that are in there and then there are three

19  factory studies.  One of the factory studies relates to

20  the Italian asbestos cement plant that we've spent a

21  great deal of time talking about.  One of the mines is

22  the South African crocidolite mine.  And in all of those

23  cases, all of those studies there were what I'll call

24  like a purely community mesothelioma identified, not

25  just one, but numerous.  And Bourdés is the paper that

1    we put up that said you can't use these relative risks

2    and these numbers and put them on another population

3    unless you know that the exposure levels are comparable.

4    Otherwise it doesn't apply.  And that gets to the very

5    heart of the issue.

6              THE COURT:  Understood.

7              MS. ELLIS:  Two quick points.  The Casale,

8    Italy, which is where this Italian cement plant is

9    located, the population there is 40,000 people.  And I

10   note that because this notion about, you know, the

11   population size and how, you know, that it would be

12   impossible in Marshfield for us to look for disease in

13   the community because it would never show up, I mean

14   that has not been sufficiently stated here.

15             THE COURT:  On the other hand, isn't that part

16   of the problem with American studies is that unlike many

17   European countries, we didn't track most of this data.

18   We have a company -- in other words, if people weren't

19   self-reporting, and I don't know that they were even

20   identifying mesothelioma regularly or would look for it

21   in nonoccupational settings until more recently.  If you

22   have contrary studies that indicate that's happened, I

23   didn't see those.  It would be relevant to me if you

24   want to refer those --

25             MS. ELLIS:  I will.

1        THE COURT:  -- to me before we're done today or

2   you can mark them and provide them as part of the -- I

3   assume they're attached to the expert reports that

4   you've named and those studies would be relevant.

5        MS. ELLIS:  Last point on that, Your Honor, is

6   that Wisconsin has actually been tracking mesothelioma

7   diagnoses from, I believe, 1990, maybe even before that.

8   So every -- it's statutory.  Every diagnoses of

9   mesothelioma must be logged into this database.

10        THE COURT:  Which makes my point though.  1990

11   is not a period we're dealing with.

12        MS. ELLIS:  Well, with the latency period that

13   is associated with mesothelioma and the allegation here

14   is that the last year we're talking about exposure is

15   1978, it actually puts you -- it makes this information

16   that they do have very relevant.  The plaintiffs we're

17   here talking about today were diagnosed in 2013/'14.

18   Modern day.  So it's -- there are --

19        THE COURT:  And those studies are showing what

20   in Wisconsin?

21        MS. ELLIS:  Well, I hope I didn't misspeak.

22   There's not a study, it's just that --

23        THE COURT:  Well, they have the data.

24        MS. ELLIS:  Right.

25        THE COURT:  But your clients haven't done that

1  study any more than the plaintiffs.

2         MS. ELLIS:  No, Your Honor, we have not.

3         THE COURT:  Which I guess is one of the problem

4  with you didn't do this if you've already -- if there's

5  already been liability established.  Although granted

6  here as to occupational, it's not anything that's

7  compensable beyond workman's compensation.

8      Let me just mention a couple of things and then if

9  there's something more you have.  Can you help me with

10  respect to the specific individuals who did not live or

11  spend significant time within the so-called zone of

12  exposure among what I'm calling the plaintiffs?

13         MS. ELLIS:  Right.  So the plaintiffs who did

14  not live at any point in time within the 1.25 miles are

15  Mr. Masephol; Mrs. Treutel, which is the Jacobs case;

16  and there is Mr. Seehafer, who he lived I think two

17  months -- two or three months was the allegation.  And

18  then Mr. Boyer lived in 1.25 miles, I believe, three

19  years.

20         THE COURT:  Okay.  And as to Boyer and perhaps

21  others, there is an assertion that they went to school

22  within that distance, which would be a fair amount of

23  exposure over the course of 12 years, something like

24  that.

25         MS. ELLIS:  Well, if exposure is time, then it

1  is a period of time that he would have been spending

2  hours a day there.  But time doesn't account for, as the

3  Court pointed out earlier, the frequency and intensity

4  of exposures, which is --

5       THE COURT:  And I suppose the other problem is

6  that epidemiological studies suggest far lower risks for

7  nonhousehold exposure.

8       MS. ELLIS:  Right.

9       THE COURT:  All right.  The other question is

10 just one of how to make sense of these two lung cancer

11 cases given the evidence of pleural plaques, whether

12 that at least gets them to the same situation -- the

13 evidence of pleural plaques gets them to the same

14 situation as those diagnosed for mesothelioma.

15      MS. ELLIS:  I sometimes just call it meso.  You

16 can just say meso.

17      THE COURT:  No, I can't.

18      MS. ELLIS:  Shorthand.

19      THE COURT:  Mesothelioma.  Anyway, go ahead.

20      MS. ELLIS:  So the pleural plaques in the lung

21 cancers, the pleural plaques are considered, I think, as

22 a marker of exposure.  So if the pleural plaques show

23 up, then it might be an indication there has been

24 asbestos exposure.  It certainly would say nothing about

25 where the exposure came from.

1          THE COURT:  Agreed.  But I just want to -- in

2    thinking about it, it says to me -- one way to think

3    about it is that the presence of the pleural plaques

4    puts them in the same category as the other plaintiffs

5    before we talk about causation.

6          MS. ELLIS:  So I think Helsinki in the most

7    recent draft, I don't have a copy of it in front of me,

8    but Helsinki talks about what's required to link a lung

9    cancer to asbestos exposure and I think it expressly

10   states that pleural plaques are not enough by themselves

11   to make that association.  And there has to be that very

12   significant exposure there and it is significant,

13   meaning more than what you look for in a mesothelioma

14   case.  It has to be there.

15         THE COURT:  All right.  Anything more that you

16   wish to add before I hear from plaintiff?

17         MS. ELLIS:  I would just say pleural plaques

18   are consistent with an occupational exposure.

19     Last thing I would like to say, Your Honor, is that

20   the Maule study, which is the 2007 Italian study where

21   the 27.5 came from and the 10.5 that we've all looked

22   at, the 10.5 relative risk for environmental exposures

23   is for people living at zero kilometers from the plant.

24   And I can't exactly tell you if that means that the

25   folks were living on the plant site, but they were

1   living very, very close to the plant.  So the 10.5 is

2   not a -- it's not the 1.25.  When they expand out from

3   zero to three kilometers, kilometers, the risk goes down

4   to 6.8.  And it is very much -- the studies discuss this

5   decreasing risk with distance from the plant.  So it's a

6   point that I wanted to make.

7        And I think --

8              THE COURT:  I get it.  I'm not sure it changes

9   the overall analysis but that puts you, if you were to

10  pursue it with some kind of gradation, still say within

11  one kilometer and substantial -- I don't want to use

12  substantial.  There may be a significant exposure.

13             MS. ELLIS:  Right.

14             THE COURT:  Understood.  Thank you.  Mr. Finch.

15             MR. FINCH:  Start with the epidemiology.  You

16  had probably the most well-credentialed epidemiologist

17  in the state looking at epidemiology studies relating to

18  community or neighborhood exposure.  And he --

19             THE COURT:  I think that might be Pat

20  Remington.  But he's probably really good too.

21             MR. FINCH:  Dr. Anderson was -- is the head of

22  the Department --

23             THE COURT:  I'm teasing.  I apologize.  Go

24  ahead.

25             MR. FINCH:  All right.  The point is none of

1   the -- remember how they showed those studies on the --

2   the six studies he looked at?  They used the amount of

3   asbestos tons by tonnage used in the plant and the

4   number of years.  They didn't have any fiber level

5   measurements in the air because there aren't any.  They

6   didn't have evidence in those studies about dust,

7   visible dust emissions like they have here.

8        What you have is you have studies of people who

9   live in a vicinity of asbestos point source emission to

10  have excess disease.  An epidemiologist looks at that

11  and says this is comparable and this is not.  All their

12  criticisms that they have, well, if it wasn't perfectly

13  lined up, you should have used this, you should have

14  used that, that's perfect fodder for cross-examination

15  but it doesn't mean he doesn't have a sound scientific

16  basis for his opinion that the neighborhood exposure,

17  environmental exposure can be a risk, can cause

18  mesothelioma by itself.  And that is supported not only

19  by the studies, he said it's supported by the Helsinki

20  criteria itself which talks about a significant

21  environmental exposure can cause mesothelioma.

22  Environmental exposures have lower risk than

23  occupational exposure, but it can still by itself cause

24  mesothelioma.  So --

25            THE COURT:  Cause is not the question.

1  Substantial cause is the question.

2           MR. FINCH:  I -- here is --

3           THE COURT:  You anticipated that.

4           MR. FINCH:  Here is the way -- doctors don't

5  walk around saying something is a substantial cause.

6           THE COURT:  Your doctor just did.

7           MR. FINCH:  Because he's in a courtroom and

8  he's asked --

9           THE COURT:  Well then he shouldn't -- he can't

10 opine as a medical expert and use legal terminology.

11 You're kind of making the point I tried to emphasize.  I

12 don't know how I let him say that if it's not something

13 doctors talk about.

14          MR. FINCH:  Well, it happens all the time in

15 almost any kind of tort litigation that I've ever done,

16 whether it's med mal or doctors don't necessarily go

17 around talking about the appropriate standard of care

18 outside of a courtroom.  They don't talk about to a

19 reasonable degree of medical probability outside of the

20 courtroom.  Those are words that they say because judges

21 require them to say it.

22     But the way -- it is a medical fact that as you

23 have increasing dose of asbestos, you have increasing

24 likelihood of disease.  Once you have the disease, the

25 cumulative exposure causes these.  Is every exposure a

1   substantial cause?  No, it's not.  And I don't think he

2   was saying that.  I think what he was saying --

3            THE COURT:  No, I agree.  He wasn't saying

4   that.  The question is --

5            MR. FINCH:  He was not saying that.

6            THE COURT:  -- what does he mean by a

7   substantial exposure --

8            MR. FINCH:  What he means by a substantial --

9            THE COURT:  Just let me finish.

10           MR. FINCH:  Sure.

11           THE COURT:  He means substantial exposure in

12  whatever way Dr. Anderson was suggesting it.  But it's

13  not at all clear since I don't know, since I don't think

14  any of us in the courtroom could tell you definitely

15  what substantial is when it comes to cause in these

16  cases, it's meaningless.

17       Now having said that, I agree.  Your point is a

18  good one that reasonable care is also sort of an

19  uncertain term that we allow experts to give meaning to.

20  So --

21           MR. FINCH:  And --

22           THE COURT:  -- perhaps that's where we are.

23  But there is some gatekeeper role for the Court where --

24  and maybe all I'm saying is this comes back to what is

25  significant exposure and if the epidemiological studies

1   tell us that it's within this one mile roughly,

2   approximately one mile zone, then have you come forward

3   with enough evidence.

4         MR. FINCH:  I believe we have given Dr. -- both

5   Dr. Anderson's testimony and Mr. Parker's testimony.

6   But --

7         THE COURT:  Well, I mean you could point it to

8   me because we're down to a specific number of

9   individuals.  Mesothelioma exposure within 1.25 miles is

10  what?

11        MR. FINCH:  But in addition to the -- in

12  addition to -- there's another piece of this.  It's not

13  just living in the -- within the 1.25 miles, it's also

14  the household exposure, the exposures that occur in the

15  household as a result of dust being brought in the

16  household from --

17        THE COURT:  I understand.  But the reality is

18  that the greatest concentration is in that area and you

19  have to get an individual placed there or convince me

20  that there's been substantial additional exposure.  For

21  example, if both parents were working and bringing that

22  home.

23        MR. FINCH:  Well, I think what the household

24  literature is, which is the 1976 study, the Anderson

25  study, it didn't matter how far you lived from the plant

1   if you come home every day with asbestos dust on your

2   clothes and then that dust --

3          THE COURT:  Well, but the coming home every day

4   with asbestos clothes isn't enough because we know that

5   we exclude it for that worker.  So it would have to be a

6   spouse or perhaps parents.

7          MR. FINCH:  Right.  And for Mr. Masephol, for

8   example, his father was work occupationally exposed,

9   brought the dust home on his clothes.  That's not the

10  problem.

11         THE COURT:  For how long?

12         MR. FINCH:  From 1948 to 1982.

13         MS. ELLIS:  Sorry, that's actually not right.

14         MR. FINCH:  Okay.  From Weyerhaeuser --

15         THE COURT:  I'm sorry, instead of everyone

16  jumping in.

17         MS. ELLIS:  I apologize.

18         THE COURT:  Your answer with respect to

19  Weyerhaeuser exposure or the Weyerhaeuser plant we're

20  calling it --

21         MR. FINCH:  Right.

22         THE COURT:  -- is from what period?

23         MR. FINCH:  '55 to his father stopped living

24  there in 1982.

25         THE COURT:  So '55 to '82.  27 years.

1                MR. FINCH:  Yes.  That's not --

2                THE COURT:  And he would have been bringing it

3       home.

4                MR. FINCH:  That the dad would have been

5       bringing it home.

6                THE COURT:  On his clothes.  Understood.

7                MR. FINCH:  And for some period of time,

8       Richard Masephol, who got mesothelioma, was working in

9       the plant.  So that exposure is barred by worker's comp.

10      But he has household exposure and he didn't live in the

11      environment but the household exposure by itself can

12      cause mesothelioma.

13               THE COURT:  But the household exposure being

14      the father being --

15               MR. FINCH:  Correct.  Being the father

16      bringing --

17               THE COURT:  I understand.

18               MR. FINCH:  Being the father --

19               THE COURT:  That's what we just talked about.

20               MR. FINCH:  Right.  And that's the second piece

21      of Anderson's -- Anderson says there are three types of

22      exposure that have been shown in the literature that can

23      be causative.  And if it's enough to cause it by itself,

24      it can be substantial if you've got a person that has

25      that kind of exposure in their life.  That's what it

230

1    boils down to.

2            THE COURT:  Well, you say that, but I'm not

3    sure that's true in the studies.  So I'm not sure it's

4    true that particularly in the study of studies that

5    that's what was meant by household exposure.

6            MR. FINCH:  No.  The studies -- the study of

7    studies was environmental exposure.  The study I'm

8    talking about is the household exposure, Anderson's

9    paper from 1976 which showed a substantially significant

10   percentage of people that are household contacts of

11   asbestos workers having pleural plaques, asbestosis, and

12   some of those people got mesothelioma, some of those

13   people got lung cancer.  That is --

14           THE COURT:  I'm with you now.

15           MR. FINCH:  And then there are some earlier

16   studies that he talks about in that '76 paper that he

17   didn't do, but they're in the literature which I think

18   we attached to our brief.  There's the Newhouse/Thompson

19   study from '65 and even Wagner had a few household

20   contacts.  So that's the other piece of it.  And so --

21           THE COURT:  And with respect to Treutel?

22           MR. FINCH:  With respect to Ms. Treutel,

23   husband, daughter and son were working in the

24   Weyerhaeuser plant in the 60's and up through 70.

25           THE COURT:  The husband for what period of

1  time?

2          MR. FINCH:  The husband -- well, as to

3  Weyerhaeuser, it will be from whenever Weyerhaeuser took

4  it over, from 1960 to 19 -- excuse me, 1955 to 1984.

5  The daughter worked there for two summers, and then the

6  son worked there for one summer.

7          THE COURT:  So we're really talking about an

8  exposure period of 19 years in the home.

9          MR. FINCH:  Correct.

10          THE COURT:  No.  Actually you said '84?

11          MR. FINCH:  '55 to '84.

12          THE COURT:  Actually 29 years.  Okay.

13          MR. FINCH:  So if you back out, if you say '55

14  to '79, that is 24 years.

15          THE COURT:  Okay.

16          MR. FINCH:  And if you add the months for the

17  kids that did that, give or take 24 years.

18          THE COURT:  Understood.  Thank you.  Seehafer.

19          MR. FINCH:  The last one?  Seehafer?  I don't

20  think there was any household exposure for Mr. Seehafer.

21          THE COURT:  And it doesn't appear there was any

22  for Boyer either; is that correct?

23          MR. FINCH:  Mr. Boyer -- his father, yeah, his

24  father -- no, I'm sorry.  Yeah, his father worked there

25  and mother.  From '55 to '78 would be the father, and

1  the mother worked there 1963.  And he also -- Mr. Boyer

2  is the guy who attended the high school less than a mile

3  from the plant and lived there too within the 1.25.  So

4  I think the one that --

5          THE COURT:  I'm sorry, for how long?

6          MS. ELLIS:  Three years.

7          MR. FINCH:  Four years.  '79 to '83.

8          THE COURT:  So the father was working --

9          MR. FINCH:  Excuse me.  I'm sorry.  He lived

10  two or three blocks from the plant from '78 to '79 and

11  he lived a mile from the plant from '79 to '83.  Then

12  the father was working from '55 until whenever they

13  stopped using asbestos in '78.

14          THE COURT:  You said '78.  Okay.  So 23 years.

15          MR. FINCH:  Yeah.

16          THE COURT:  All right.

17          MS. ELLIS:  Your Honor --

18          MR. FINCH:  So he's got all three.

19          MS. ELLIS:  Can I just interject one thing?

20          THE COURT:  You can in a moment.

21          MS. ELLIS:  Okay.

22          THE COURT:  Are you done with your comments

23  then?

24          MR. FINCH:  Yes.

25          THE COURT:  Okay.  Then that's an appropriate

1  time if you wanted to add something more.

2        MS. ELLIS:  Thank you.  I didn't mean to

3  interrupt.  It's just these years are not in line with

4  the facts because the experts have testified that the

5  time period they're looking at is 1956 to 1978 is the

6  relevant time period.

7        THE COURT:  Well, we're not off by very much

8  then.  Instead of '55, it should be '56?

9        MS. ELLIS:  Yes.  And then with the second

10  caveat that Weyerhaeuser picks up in 1960.  So the

11  relevant period for Weyerhaeuser would be 1960 to 1978.

12        THE COURT:  All right.  Are we -- is there any

13  disagreement with that?

14        MR. MCCOY:  There is, Judge, with the period

15  before where it was Roddis, that's a continuation

16  because there was just a merger-type situation.  There's

17  still liability.

18        THE COURT:  So they accepted the liability?

19        MS. ELLIS:  No, Your Honor.  That has not

20  been --

21        THE COURT:  Was it an asset purchase or was it

22  a corporate merger?

23        MS. ELLIS:  It was an asset purchase.

24        THE COURT:  Why do you say it was not an asset

25  purchase?

1          MR. MCCOY:  I don't have that right in front of

2    me, but I would have to provide that.

3          THE COURT:  If you have evidence that it was

4    not an asset purchase and that liabilities were

5    accepted, would you share that with plaintiffs' counsel

6    -- I'm sorry, defendants' counsel.  If you can't agree,

7    then you can each file something by -- where are we --

8    by Friday explaining -- actually why don't we say by

9    Monday explaining your position.

10          MR. MCCOY:  Yes, sir.

11          THE COURT:  It shouldn't be very hard to do

12    with the corporate documents.

13          MR. FINCH:  You're just talking about the years

14    '55 -- '56 to '60?

15          THE COURT:  That's exactly right.  That's what

16    we're talking about.  Okay.  Actually would it be '56 to

17    '60?

18          MR. FINCH:  '56 to '60 with Roggis.  '60

19    Weyerhaeuser took it over, either by assuming the

20    liabilities or not.  I don't think from Dr. Anderson's

21    testimony -- I'm sorry, Your Honor, I should stand.  I

22    didn't think from Dr. --

23          THE COURT:  You don't need to stand.  Doesn't

24    matter to me.  But in any event, I got it.  So you can

25    advise me by Monday whether you think there's some issue

1  with respect to the appropriate periods of time.  And I

2  take your point that four years one way or the other

3  probably doesn't change my ruling as to the testimony of

4  the experts.

5      I do appreciate the quality of the comments today

6  and of your efforts to be streamlined in your

7  presentation with the witnesses.  I do find this one of

8  those fascinating questions which I used to tell me

9  clients is never good news for the client, but I will

10  try to do my best with it.

11      Was there something -- you're both standing at this

12  point, so was there something more the plaintiff wanted

13  to add?

14          MR. FINCH:  No, Your Honor.  It has been a

15  privilege.  Thank you.

16          THE COURT:  Something more for the defense?

17          MS. ELLIS:  Last point.  I don't want to

18  belabor things.  In the take-home context, I think it's

19  worth noting that the jobs that the spouses had or

20  family members had, none of them involved working with

21  asbestos products at the plant.  And so to the extent

22  that we're talking about a worker working at the plant

23  and then coming home, there's been this assumption that

24  the workers were bringing asbestos home and again, it is

25  a problem.  It goes back to -- everything we're talking

1    about here today is sort of connecting how it is that

2    the worker accumulated enough asbestos on his or her

3    clothes and then transported it into the house and

4    created some dosage there.

5            THE COURT:  And so we're clear, when you say

6    working with asbestos, what do you mean?  In other

7    words, what would be occupations within the plant in

8    which they worked with asbestos?

9            MS. ELLIS:  Let me give you an example in one

10   of the cases, which would be the Prust case.  Mr. Prust

11   is our plaintiff.  Deceased.  He has lung cancer.  His

12   wife, Mrs. Prust, also worked at the plant.  Mrs. Prust

13   worked on the second floor in a building that's been

14   referred to -- it's called the core mill.  The second

15   floor of the core mill was where they worked exclusively

16   on venire, which is nothing but wood.

17           THE COURT:  I'm with you.

18           MS. ELLIS:  They are installing, sanding, et

19   cetera.  So the first floor of that building which was,

20   I forget the size, it's a gigantic floor like 400 feet

21   by 200 feet.  I can't remember.  So very, very large

22   floor.  But on the north end of that floor is where the

23   sanding and sawing of mineral core occurred.

24           THE COURT:  All right.  Let me ask you another

25   question.  Is there agreement -- and I'll begin with

1    you, Ms. Ellis.  Is there agreement that each of the

2    plaintiffs here, and by that I mean those for whom there

3    is a claim being sought, all worked in this first floor

4    sanding area?

5            MS. ELLIS:  It may not be that first floor

6    sanding area.  There are other places in the mill where

7    they're working with the asbestos product.

8            THE COURT:  The asbestos cores.

9            MS. ELLIS:  The asbestos core, that's correct.

10           THE COURT:  And is there agreement that all of

11   the plaintiffs worked with asbestos cores?

12           MS. ELLIS:  Can I confer really quickly about

13   that?

14           THE COURT:  You certainly may.  And why don't I

15   hear from plaintiff on that subject.  Do you know,

16   Mr. Finch?

17           MR. FINCH:  Mr. McCoy will answer that.

18           MR. MCCOY:  Judge, I will say that the experts

19   were provided in their reports and it lays out exactly

20   what information they had about what another family

21   member was doing in terms of occupational exposure to

22   asbestos.

23           THE COURT:  Which isn't my question.  My

24   question is with respect to the plaintiffs, those people

25   who actually are claiming cause of injury --

1          MR. MCCOY:  I understand.

2          THE COURT:  -- were they working with asbestos

3     cores during their work life.

4          MR. MCCOY:  Not all were on that first floor

5     where there was the cutting and sawing operations.

6          THE COURT:  What about with respect to the

7     other areas where there was work with asbestos cores?

8          MR. MCCOY:  They all -- I'm trying to think.

9          MS. ELLIS:  I believe --

10          THE COURT:  Counsel, that's the second time

11     you've done that.  I don't understand.

12          MS. ELLIS:  I'm sorry, Your Honor.

13          MR. MCCOY:  Judge, they all had some

14     occupational exposure to asbestos and it's laid out.

15     They're so diverse, it's hard to even describe it.

16     They're laid out to the experts.  We gave them that.

17          THE COURT:  Ms. Ellis, it sounds like the

18     parties are in agreement on that point.

19          MS. ELLIS:  Yes, Your Honor.  I apologize.

20          THE COURT:  That's fine.  Was there anything

21     more then for the plaintiff today?

22          MR. FINCH:  No.

23          THE COURT:  Anything more for the defense?

24          MR. MCCOY:  Judge, I just want to correct one

25     more point on this history of exposure.  For

1   Mr. Masephol, we later got some records about his

2   father's work that may not have been in the expert

3   report.  And I know Mr. Finch here made a mention of a

4   time period.  The later records showed that it was about

5   half of that actual time period where his father was in

6   occupational exposure to asbestos.  So although the

7   period was like 24 years where he was with his father,

8   the actual occupation, the actual take-home exposure

9   time was about half that.

10          THE COURT:  And you're saying that because

11  during the other portion --

12          MR. MCCOY:  He was farming or something like

13  that.

14          THE COURT:  I'm sorry?

15          MR. MCCOY:  He was farming or doing

16  nonexposure, but his father was not getting exposed to

17  asbestos.

18          THE COURT:  So 13 to 14 years would have been

19  the period even if we go all the way back to '56.

20          MR. MCCOY:  There's much closer, yes.

21          THE COURT:  Thank you.  And again, thank you,

22  Counsel, for your efforts.  I did find both sides'

23  presentations extremely helpful and they do help focus

24  me.  I'm not sure how much is determinative of the

25  motion before me, but it is certainly important to my

1  overall understanding of this case and so I'm glad we

2  spent the time.  Whether the parties feel it was

3  worthwhile or not, it was helpful.

4          MR. FINCH:  Your Honor, may we have until close

5  of business tomorrow to get the exhibits to Your Honor?

6          THE COURT:  Absolutely.  That's fine.  As long

7  as you get it on file the end of the day tomorrow is

8  perfectly fine.  When I said file, you're welcome to do

9  it electronically if that's --

10          MR. FINCH:  Because people are traveling to

11 various places.

12          THE COURT:  Understood.  Let's make it simple.

13 Any submission is due by the end of the day on Monday

14 and we'll just leave it at that.

15          MR. FINCH:  That would be better.

16          THE COURT:  Thank you very much.  We're

17 adjourned.  You're free to move about as you wish.

18      (Proceedings concluded at 3:14 p.m.)

19

20                    *  *  *  *  *

21

22

23

24

25

1          I, LYNETTE SWENSON, Certified Realtime and

2     Merit Reporter in and for the State of Wisconsin,

3     certify that the foregoing is a true and accurate record

4     of the proceedings held on the 3rd day of December 2015

5     before the Honorable William M. Conley, Chief Judge for

6     the Western District of Wisconsin, in my presence and

7     reduced to writing in accordance with my stenographic

8     notes made at said time and place.

9     Dated this 8th day of December 2015.

10

11                          /s/_____

12                          Lynette Swenson, RMR, CRR
                            Federal Court Reporter

13

14    The foregoing certification of this transcript does not
      apply to any reproduction of the same by any means
15    unless under the direct control and/or direction of the
      certifying court reporter.

16

17

18

19

20

21

22

23

24

25